# STATE OF CONNECTICUT *v.*
# CHRISTOPHER JENKINS
## (SC 18077)

Norcott, Katz, Palmer, Vertefeuille and Zarella, Js.*

---

* The listing of the justices reflects their seniority status on this court as of the date of oral argument.

Argued October 28, 2009—officially released September 7, 2010

*James M. Ralls*, senior assistant state's attorney, with whom, on the brief, were *Scott Murphy*, state's attorney, and *Paul Rotiroti*, senior assistant state's attorney, for the appellant (state).

*Timothy H. Everett*, special public defender, with whom, on the brief, was *Christopher Houck*, certified legal intern, for the appellee (defendant).

*Jon L. Schoenhorn* filed a brief for the Connecticut Criminal Defense Lawyers Association as amicus curiae.

*Opinion*

NORCOTT, J. In this certified appeal, we consider the limitations, under the fourth amendment to the United States constitution[1] and article first, § 7, of the Connecti-

---

[1] "The fourth amendment to the United States constitution provides: 'The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.' The fourth amendment has been made applicable to the states via the fourteenth amendment." *State* v. *Gonzalez*, 278 Conn. 341, 344 n.4, 898 A.2d 149 (2006).

cut constitution,[2] on police questioning and requests for consent to search automobiles conducted during the course of routine traffic stops. The state appeals, following our grant of its petition for certification,[3] from the judgment of the Appellate Court reversing the trial court's judgment of guilty of possession of narcotics with intent to sell by a person who is not drug-dependent pursuant to General Statutes § 21a-278 (b),[4] rendered after a conditional nolo contendere plea following the trial court's denial of the motion to suppress evidence found in the automobile of the defendant, Christopher Jenkins. *State v. Jenkins*, 104 Conn. App. 417, 934 A.2d 281 (2007). Guided by case law following the United States Supreme Court's recent decisions in *Ari-*

[2] The constitution of Connecticut, article first, § 7, provides: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation."

[3] We granted the state's petition for certification limited to the following issue: "Did the Appellate Court correctly determine that the trial court improperly denied the defendant's motion to suppress?" *State v. Jenkins*, 285 Conn. 909, 940 A.2d 809 (2008).

[4] General Statutes § 21a-278 (b) provides: "Any person who manufactures, distributes, sells, prescribes, dispenses, compounds, transports with the intent to sell or dispense, possesses with the intent to sell or dispense, offers, gives or administers to another person any narcotic substance, hallucinogenic substance other than marijuana, amphetamine-type substance, or one kilogram or more of a cannabis-type substance, except as authorized in this chapter, and who is not, at the time of such action, a drug-dependent person, for a first offense shall be imprisoned not less than five years or more than twenty years; and for each subsequent offense shall be imprisoned not less than ten years or more than twenty-five years. The execution of the mandatory minimum sentence imposed by the provisions of this subsection shall not be suspended, except the court may suspend the execution of such mandatory minimum sentence if at the time of the commission of the offense (1) such person was under the age of eighteen years, or (2) such person's mental capacity was significantly impaired, but not so impaired as to constitute a defense to prosecution."

Although § 21a-278 (b) was the subject of technical amendments in 2007; see Public Acts 2007, No. 07-217, § 97; those amendments have no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current revision.

*zona* v. *Johnson*, 555 U.S. 323, 129 S. Ct. 781, 172 L. Ed. 2d 694 (2009), *Muehler* v. *Mena*, 544 U.S. 93, 125 S. Ct. 1465, 161 L. Ed. 2d 299 (2005), and *Ohio* v. *Robinette*, 519 U.S. 33, 117 S. Ct. 417, 136 L. Ed. 2d 347 (1996), we agree with the state that, under the federal constitution, the detective validly searched the defendant's automobile because the traffic stop was not measurably prolonged and the defendant voluntarily had consented to the search. We further conclude that the state constitution does not provide the defendant with any increased protection with respect to nontraffic related questioning and requests for consent to search during routine traffic stops. Accordingly, we reverse the judgment of the Appellate Court.

The record reveals the following facts and procedural history. On the night of May 7, 2004, Michael Morgan, a detective with the Newington police department, was patrolling the Berlin Turnpike (turnpike) in Newington in connection with a special traffic safety detail known as turnpike traffic enforcement. Morgan drove an unmarked police cruiser, but wore a full police uniform, complete with a badge, a sidearm, and a utility belt with handcuffs, pepper spray and a Stinger flashlight. At approximately 11:15 p.m., Morgan observed a Nissan Altima (Altima), operated by the defendant and proceeding northbound on the turnpike, make two abrupt lane changes without signaling. Morgan then activated his cruiser's emergency lights and initiated a traffic stop for making lane changes without signaling in violation of General Statutes § 14-242.

After Morgan stopped the Altima on the shoulder of the turnpike near its intersection with Griswoldville Avenue, a short distance south of the former Krispy Kreme doughnut shop, he radioed the Altima's Pennsylvania license plate number to his dispatcher, who checked it and did not report any matters of concern. Morgan then approached the defendant on the driver's

side of the Altima, informed him of the reason for the stop and requested his driver's license, registration and insurance papers. Morgan also questioned the defendant regarding his travel itinerary; the defendant told Morgan that he was returning from visiting his daughter in New York. The defendant then gave Morgan a New Jersey driver's license and a valid Pennsylvania rental agreement for the Altima. Morgan testified that, during this exchange and the remainder of the traffic stop, the defendant appeared "unusually nervous," gave "quick answers" to his questions and did not make eye contact with him.

Morgan then took the defendant's papers back to his cruiser, where he checked the defendant's personal and vehicular information with his dispatcher, and learned that there were no outstanding warrants, wants or cautions pertaining to the defendant. Morgan also requested a backup officer to respond to the scene of the traffic stop, because he had decided that he was going to ask the defendant for consent to search his vehicle. Morgan then began to write an infraction ticket for the illegal lane changes.

By the time Morgan had finished writing the ticket, the backup officer and shift supervisor, Sergeant Derrick Sutton, had arrived, also wearing a full police uniform. Morgan then approached the defendant and asked him to exit his car in order better to explain the ticket.[5] Morgan then explained the ticket to the defendant, but did not give it to him at that time. On the basis of the

---

[5] Morgan testified that, when working traffic enforcement on the turnpike, his regular practice is to ask the driver to exit his or her car for an explanation of the ticket, because that enables Morgan to show the driver the amount of traffic on the turnpike, as well as to have the driver's full attention away from distractions such as radios or cellular telephones. Morgan also testified that he created a lane of safety for himself and the defendant to move around in by parking his cruiser half in the right travel lane, and half on the shoulder, and offsetting it from the Altima, which was parked entirely on the shoulder.

defendant's continued nervous demeanor and account of his travels,[6] Morgan asked him whether he had anything "illegal" on his person. The defendant replied that he did not have anything illegal on him, and Morgan then patted down the defendant, which did not reveal any contraband.[7] Morgan then asked whether the defendant had anything "illegal" in the Altima. The defendant replied that all he had in the car was some beer on the floor by the passenger seat, and told Morgan that he could "go ahead and check. You can check if you want."[8] At this point, Morgan did not inquire further of the defendant, or advise him that he could refuse to allow Morgan to search the car. Morgan then instructed the defendant to stand with Sutton, and Morgan began to search the interior of the Altima. Morgan testified that, during the stop, neither he nor Sutton had drawn their weapons, nor had handcuffed, threatened or otherwise coerced the defendant.

Morgan began his search of the Altima on the driver's side of the vehicle and immediately proceeded to open a closed compartment in its center console, where he found a package wrapped in white tissue paper. The tissue paper concealed a plastic bag that contained a white powder substance that Morgan identified as cocaine. At that point, Morgan stopped the search, handcuffed the defendant and placed him under arrest. Following the defendant's arrest, a search of the rest of the Altima, including the backseat and trunk area, revealed additional cocaine and a large quantity of heroin.[9] From the time that Morgan initiated the stop, until

[6] Morgan did not, however, consider it unusual that the rental vehicle was registered in a different state than its driver was licensed.

[7] Morgan testified that he did not believe that the defendant was armed at the time of the stop.

[8] For additional discussion with respect to the phrasing of the defendant's consent, see footnote 38 of this opinion and the accompanying text.

[9] We note that the defendant does not contest the propriety of this subsequent search of the Altima.

he obtained consent to search, only ten to fifteen minutes had elapsed, a period of time that he testified was consistent with an average traffic stop. The entire stop lasted at most twenty minutes, from its inception until the defendant's arrest.

Thereafter, the state charged the defendant with two counts of possession of narcotics by a person who is not drug-dependent in violation of § 21a-278 (a) and (b),[10] and one count each of possession of narcotics in violation of General Statutes § 21a-279 (a), possession of drug paraphernalia in violation of General Statutes § 21a-267 (a), and making an improper turn without a signal in violation of § 14-242. The defendant then moved to suppress all evidence seized from him and his vehicle, claiming that the traffic stop was impermissibly extended without probable cause or reasonable and articulable suspicion, and also that he had not voluntarily consented to the search of his vehicle.

The trial court, *Alexander, J.*, following an evidentiary hearing at which Morgan was the only witness, denied the defendant's motion to suppress. The trial court found that the state had proven by a preponderance of the evidence that the defendant had "freely and voluntarily given consent . . . in the search of his motor vehicle" because "the initial motor vehicle stop was a result of observed traffic violations; the length

[10] We note that § 21a-278 (b) proscribes, inter alia, both the possession and sale of narcotics. The substitute information in the present case charged the defendant with violations of § 21a-278 (a) and (b) on the basis of the defendant's alleged "[s]ale of certain illegal drugs." This statement appears to be a scrivener's error. At no point in the proceedings before the trial court did the state claim that the defendant had participated in the actual sale of drugs. Additionally, we note that the judgment file in the present case notes that the § 21a-278 (b) violation to which the defendant pleaded nolo contendere was "[p]ossession of [n]arcotics with [i]ntent to [s]ell." Accordingly, we refer to the crimes with which the defendant was charged under § 21a-278 (a) and (b) as possession of narcotics with intent to sell by a person who is not drug-dependent.

of the stop was brief (no more than fifteen minutes); the conduct of the officer was professional and not overbearing; the defendant told the officer to check his vehicle for illegal items; [and] the defendant did not withdraw his consent at any time." Noting that it was appropriate for Morgan to ask the defendant to exit his car during the stop; see generally *Pennsylvania* v. *Mimms*, 434 U.S. 106, 98 S. Ct. 330, 54 L. Ed. 2d 331 (1977); *State* v. *Dukes*, 209 Conn. 98, 547 A.2d 10 (1988); the trial court then specifically declined to credit the defendant's claim that "his statement to the police that evening was meant only to have the officer look at the beer in his car," considering the defendant's spontaneous response to Morgan's inquiry about the presence of illegal items to be "unambiguous: go ahead and check." Following the denial of his motion to suppress, the defendant pleaded nolo contendere, conditioned on his right to appeal, pursuant to General Statutes § 54-94a,[11] to one count of possession of narcotics with intent to sell by a person who is not drug-dependent in violation of § 21a-278 (b). The trial court, *Handy, J.*, then sentenced the defendant to twenty years imprisonment, execution suspended after eight years, and five years probation.

The defendant appealed from the judgment of conviction to the Appellate Court, which concluded that the trial court should have suppressed the evidence taken from the defendant's car because he "was unlawfully detained . . . his consent to search the vehicle was

---

[11] General Statutes § 54-94a provides in relevant part: "When a defendant, prior to the commencement of trial, enters a plea of nolo contendere conditional on the right to take an appeal from the court's denial of the defendant's motion to suppress or motion to dismiss, the defendant after the imposition of sentence may file an appeal within the time prescribed by law provided a trial court has determined that a ruling on such motion to suppress or motion to dismiss would be dispositive of the case. The issue to be considered in such an appeal shall be limited to whether it was proper for the court to have denied the motion to suppress or the motion to dismiss. . . ."

tainted by that illegal detention and . . . the state failed to purge the taint of the illegal detention." *State* v. *Jenkins,* supra, 104 Conn. App. 424. The Appellate Court stated that, under *Terry* v. *Ohio,* 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), "[i]n determining if a seizure has exceeded the scope of a permissible motor vehicle stop, the court must determine whether the officer's action was justified at its inception and whether it was reasonably related in scope to the circumstances that justified the interference in the first place." *State* v. *Jenkins,* supra, 427. Emphasizing that the validity of the initial stop was uncontested; id.; the Appellate Court then observed that "Morgan did not embark on his inquiry into whether the defendant was engaged in other illegal activity until *after* Morgan had (1) completed a check of the defendant's license and determined that it was valid and that there were no outstanding warrants for him, (2) examined the car rental agreement and determined that it appeared in order and that the time frame for the rental was valid and (3) returned to the defendant's vehicle, had him exit the vehicle and explained the traffic ticket to the defendant. Accordingly, [the Appellate Court concluded that] the record clearly reveal[ed] that Morgan's inquiry into other suspected illegal activity came after Morgan's purpose for effectuating the stop had been achieved."[12] (Emphasis in original.) Id., 428–29.

Having concluded that the stop had been extended beyond the time necessary to effectuate its initial purpose, the Appellate Court then concluded that the

[12] The Appellate Court also rejected the state's claim that the record was inadequate for appellate review with respect to whether Morgan had returned the defendant's ticket and paperwork to him. The court noted that the record indicated that Morgan had not given the defendant the ticket, and that any inadequacy on this point should be charged to the state because it bore the burden of proof to establish the voluntariness of the defendant's consent at the suppression hearing. *State* v. *Jenkins,* supra, 104 Conn. App. 430.

state's evidence "did not establish that Morgan had reasonable suspicion to expand the scope of the stop into an inquiry of whether the defendant was engaged in illegal activity unrelated to the underlying stop or that Morgan was proceeding on anything more than a mere hunch. Therefore, once Morgan began to question the defendant about unrelated illegal activity, the formerly valid motor vehicle stop morphed into an illegally prolonged seizure of the defendant." Id., 434. Applying the three factor test articulated in *Brown* v. *Illinois*, 422 U.S. 590, 603–604, 95 S. Ct. 2254, 45 L. Ed. 2d 416 (1975), to determine whether the taint of police misconduct has been attenuated,[13] the Appellate Court further determined that the defendant's consent was tainted by the improper detention and that the state had not purged that taint because the consent was given while the defendant was illegally detained, that there were no intervening circumstances such as an admonition that the defendant had the right to refuse the search, and that Morgan's official misconduct was particularly flagrant on the basis of his testimony that he had patted the defendant down without any justifiable basis. *State* v. *Jenkins*, supra, 104 Conn. App. 434–36. Accordingly, the Appellate Court reversed the defendant's conviction and remanded the case to the trial court with direction to grant the defendant's motion to suppress.[14] Id., 437.

[13] In *Brown* v. *Illinois*, supra, 422 U.S. 603, in considering whether a confession was the fruit of the poisonous tree, or the "exploitation of an illegal arrest," the Supreme Court concluded that the "voluntariness of the statement is a threshold requirement." Id., 604. The Supreme Court then concluded that, once the confession was determined to be voluntary, the reviewing court then must consider other "relevant" factors to determine whether taint of the police misconduct has been attenuated, including specifically: (1) "[t]he temporal proximity of the arrest and the confession"; (2) "the presence of intervening circumstances"; and (3) "the purpose and flagrancy of the official misconduct . . . ." Id., 603–604. The *Brown* analysis is applicable to consents as well as statements. See *State* v. *Cates*, 202 Conn. 615, 621, 522 A.2d 788 (1987).

[14] In his dissent, Judge Schaller concluded that the defendant had failed to provide an adequate record for review of his claim that he had been detained unlawfully because the purpose of the traffic stop already had

This certified appeal followed. See footnote 3 of this opinion.

On appeal to this court, the state argues that the Appellate Court improperly: (1) relied on an inadequate record and reached out to decide claims not properly raised before the trial court, specifically whether Morgan improperly had patted down the defendant prior to obtaining his consent to search the Altima; and (2) concluded that, under the federal constitution, the scope or length of a traffic stop must be limited to its initial purpose, particularly given that there was probable cause that the defendant had committed two traffic violations in Morgan's presence. In response, the defendant strongly disagrees, and also argues as alternative grounds for affirming the judgment of the Appellate Court that: (1) his consent to search was involuntary; (2) Morgan's search exceeded the scope of the defendant's consent; and (3) Morgan obtained the defendant's consent to search in violation of article first, § 7, of the

___

been effectuated. *State* v. *Jenkins*, supra, 104 Conn. App. 437. Specifically, Judge Schaller noted that "[t]he record in the present case is similarly devoid of certain important factors" with respect to "critical matters that courts use to determine whether the purpose of a traffic stop has been completed," namely, whether Morgan had returned the defendant's license and registration, and had issued and explained the traffic citation to him. Id., 441. Noting that the issue of when the purpose of a traffic stop has been achieved and the stop completed is an unsettled question of law in Connecticut, and that other jurisdictions have taken varying approaches to the legality of police officers questioning motorists about issues unrelated to the initial stop, Judge Schaller also determined that the defendant had inadequately briefed the issue of whether Morgan unconstitutionally had extended the traffic stop by not explaining in detail whether the purpose of the traffic stop had been effectuated. Id., 441–49. Judge Schaller then rejected the defendant's other claims on appeal, namely, that: "(1) [E]ven if his consent had been voluntary, it was tainted by a prior unconstitutional search of his person, (2) the state failed to establish that he actually consented to the search of the vehicle, (3) any consent to search was not given voluntarily and (4) any consent to search was obtained by a violation of the Connecticut constitution by the police improperly converting a traffic stop into a criminal investigation." Id., 450.

Connecticut constitution, which he posits provides greater specific protections for motorists than does the federal constitution.

"Our standard of review of a trial court's findings and conclusions in connection with a motion to suppress is well defined. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . . We undertake a more probing factual review when a constitutional question hangs in the balance." (Citation omitted; internal quotation marks omitted.) *State* v. *Burroughs*, 288 Conn. 836, 843, 955 A.2d 43 (2008). The issues presented in this appeal concern the articulation and application of the relevant federal and state constitutional rules governing the conduct of routine traffic stops. Unless specifically noted; see part II B of this opinion; we agree with the defendant that they present questions of law over which our review is plenary.

I

ADEQUACY OF THE RECORD FOR REVIEW OF
CLAIMS PERTAINING TO THE
PATDOWN SEARCH OF
THE DEFENDANT

Given the fact sensitive nature of constitutional suppression inquiries, we begin with the state's claim that the Appellate Court improperly considered the fact of an illegal patdown search in agreeing with the defendant's contention that his consent to search the Altima was tainted by the previously performed illegal search. The state notes that the issue was not raised in the defendant's motion to suppress or litigated during the suppression hearing, and relies on *State* v. *Brunetti*,

279 Conn. 39, 901 A.2d 1 (2006), cert. denied, 549 U.S. 1212, 127 S. Ct. 1328, 167 L. Ed. 2d 85 (2007), and *State* v. *Medina*, 228 Conn. 281, 636 A.2d 351 (1994), to contend that the record is, therefore, inadequate for review of this unpreserved claim pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). In response, the defendant contends that the Appellate Court properly considered evidence in the record of the suppression hearing because the trial court failed to make detailed findings of fact, and emphasizes that he complied with his obligation to ensure a record adequate for appellate review by filing a motion for articulation, the trial court's denial of which was upheld by the Appellate Court. We conclude that the defendant's failure to litigate the validity of the patdown during the suppression hearing rendered the record inadequate for *Golding* review of this issue, and that the Appellate Court improperly considered any impropriety with respect to the patdown in its analysis of the defendant's claims.

The record reveals the following additional relevant facts and procedural history. When the defendant moved the trial court to suppress the narcotics found in the Altima, he claimed that the evidence was the fruit of an illegal search and seizure, namely, his detention "for an extended period without probable cause or a reasonable and articulable suspicion that the defendant was engaged in illegal activity . . . ." In his motion, the defendant contended that, "[a]t no time did [he] voluntarily consent to the search of his vehicle," any consent obtained "was tainted by the illegal action of [the] officers," and that he "did not feel free to leave or decline to answer any questions posed by the officer due to the circumstances of the time of day, the number of officers called to the scene, and the fact that [he] was alone." The defendant did not mention or question the legality of the patdown in his motion to suppress.

Following the suppression hearing, at which Morgan testified briefly about the patdown,[15] the parties briefed and then argued the case orally before the trial court. In his memorandum of law, the defendant mentioned the patdown search in the statement of the facts, and then noted only that "the extended detention of the defendant and the warrantless search of his vehicle were not conducted to promote officer safety or to preserve evidence. . . . Morgan failed to articulate what crime he had reason to suspect the defendant was committing and stated that at the time of the patdown search, he did not suspect that the defendant was carrying a weapon. These factors, which must be considered when determining whether the seizure of the defendant was reasonable under the circumstances, do not balance in favor of governmental intrusion into the defendant's liberty." The defendant did not mention the patdown in examining the totality of the circumstances and arguing that his consent was not voluntarily given.[16] The state did not mention the patdown in its memorandum in opposition, nor did the trial court discuss the patdown in its memorandum of decision.

---

[15] As noted previously, Morgan was the only witness to testify at the suppression hearing. On cross-examination, while exploring the circumstances of the defendant's consent to search the Altima, the defendant asked Morgan whether he had searched the defendant. Morgan replied in the affirmative, and further testified that he did not find anything illegal on the defendant's person. After further testimony about the search of the Altima, Morgan testified during recross-examination, in response to a question from the defendant asking why Morgan had searched his person: "I asked him if he had anything illegal on him and he said no, and I checked." Morgan then testified that he had not believed that the defendant was armed at the time. This was the only testimony about the patdown adduced during the suppression hearing.

[16] At oral argument before the trial court, the defendant mentioned the patdown in an effort to distinguish this case from *State* v. *Story*, 53 Conn. App. 733, 741, 732 A.2d 785, cert. denied, 251 Conn. 901, 738 A.2d 1093 (1999), by noting, for purposes of whether the defendant was free to leave at the conclusion of the stop, that the present case had a patdown, whereas *Story* did not.

After the defendant appealed to the Appellate Court, he contended specifically that, "(1) even if his consent to search the vehicle had been voluntary, it was tainted by a *prior, unconstitutional search of his person*, (2) the state failed to establish that he actually consented to the search of the vehicle, (3) any consent to search was not given voluntarily and (4) any consent to search was obtained by a violation of the Connecticut constitution by the police improperly converting a traffic stop into a criminal investigation."[17] (Emphasis added.) *State v. Jenkins*, supra, 104 Conn. App. 423–24; see also id., 427–28 ("the defendant's relevant claim on appeal relates to whether Morgan improperly expanded the scope of the stop by questioning the defendant about whether he was engaged in unrelated illegal activity and then performing a search of the defendant's person and his car, after the initial purpose for effectuating the stop had been achieved"). In connection with seeking *Golding* review of this claim, the defendant moved for an articulation seeking to have the trial court answer, inter alia: "After the defendant was ordered from his car, did . . . Morgan search the defendant's person and, if so, for what purpose? . . . Did the court find that the search of the defendant was reasonable? Did the court consider the search of defendant's person in determining whether the subsequent search of the defendant's car was constitutional?" The state did not take a position on the defendant's motion, but the trial court denied it. Thereafter, the Appellate Court granted the defendant's motion for review of that denial, but denied the relief requested.[18]

---

[17] Having reviewed the defendant's briefs to the Appellate Court, we deem the Appellate Court's description of his arguments an accurate representation of the claims that he made therein.

[18] For its part, upon receipt of the defendant's brief, the state moved for permission to file a late motion for rectification, seeking to include in the record Morgan's police report, which was mentioned, but not admitted as an exhibit at the suppression hearing. The state claimed that the report indicated that the patdown was proper because it had been invited by the defendant himself. The Appellate Court denied the state's motion for

Subsequently, the Appellate Court agreed with the state's argument that "the issue of whether the defendant's person was illegally searched was not raised in the trial court and that the record is inadequate to establish whether the defendant consented to the search of his person," and noted that, "even if we assume arguendo that an illegal search of the defendant's person occurred, this, in and of itself, does not necessarily invalidate the search of the defendant's car." *State* v. *Jenkins*, supra, 104 Conn. App. 428 n.11. Nevertheless, after determining that the defendant's consent followed an unlawfully prolonged detention, the Appellate Court, in applying the three factor attenuation test articulated in *Brown* v. *Illinois*, supra, 422 U.S. 603–604; see footnote 13 of this opinion; the third factor of which considers the "purpose and flagrancy of the police misconduct"; *Brown* v. *Illinois*, supra, 604; stated that: "Morgan testified that he conducted a patdown search of the defendant although he did not believe that the defendant was armed. *While the record is inadequate to determine whether the defendant's person was illegally searched, it is disconcerting that the officer testified that he conducted such a patdown without any justifiable basis.*" (Emphasis added.) *State* v. *Jenkins*, supra, 436; see also id., 428 n.11 ("as discussed herein, the fact that the defendant was patted down prior to the search of his car is relevant to whether his consent was tainted").

Before this court, the defendant renews his argument, accepted by the Appellate Court, that, under *Brown* v. *Illinois*, supra, 422 U.S. 603–604, the illegal patdown demonstrates that Morgan had engaged in "flagrant" misconduct by extending the stop. The defendant also relies on the patdown in support of his alternative ground for affirming the judgment of the Appellate

permission to file a late motion for rectification, and subsequently denied the state's motion for reconsideration en banc of that denial.

Court, namely, that his consent was involuntary because the "search of [the defendant's] person signified that he was already being treated as if he were under arrest," and the patdown violated "a fundamental principle of constitutional law that [the] police may not touch a citizen without justification."

The defendant's various claims in this certified appeal are an amalgam of issues both preserved and unpreserved in the trial court. With respect to those issues that are unpreserved, he seeks review pursuant to *State* v. *Golding*, supra, 213 Conn. 239–40, under which "a defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." To the extent that the defendant relies on the patdown in support of his constitutional claims, the legality of the frisk itself implicates the *Golding* rule because the defendant did not raise that issue before the trial court.

Our recent case law addressing whether a record is adequate for review under the first prong of *Golding* makes clear that this preservation exception operates in a very restrictive manner, particularly in the fact sensitive context of illegal search and seizure claims. The leading recent decision on this topic is *State* v. *Brunetti*, supra, 279 Conn. 42, wherein we declined to review the defendant's claim, made for the first time on appeal, "that he was entitled to a new trial because, even though his father had consented to the search [of

the defendant's home], the search was constitutionally infirm because the defendant's mother, who was present when the police obtained the father's consent, declined to consent to the search." Specifically, before the trial court, the defendant's motion to suppress bloody clothing found in the home where he had lived with his parents, and the confession that followed his arrest, focused solely on the validity of his father's consent to the search, on the ground that his father had been improperly induced to agree to the search. Id., 48–49. The suppression hearing transcript subsequently revealed that the defendant's mother had refused to sign the written consent form proffered by the police, but neither the state nor defense counsel inquired further about the mother's refusal to sign the consent form, despite the fact that she had testified at the hearing. Id., 49–50. The trial court's ruling on the defendant's motion to suppress concluded that "the defendant's father's consent to search was knowing and voluntary, and, therefore, constitutionally valid." Id., 50. After the defendant was convicted of murder and filed an appeal, he moved for articulation of numerous questions, including whether his mother " 'decline[d] to give her consent for a search of the house?' " Id., 52. The trial court denied the motion for an articulation, and we subsequently declined to order it to issue the requested articulation. Id., 53–54.

We thereafter concluded that the record was inadequate for review of the defendant's joint consent claim under the first prong of *Golding.* Id., 56–64. We rejected his argument that the trial court's statement, in ruling on his suppression motion, that "[i]t is clear that at least one of the parties, one of the parents, declined to consent to [the] search," "perfected the record for review because it [constituted] a finding, supported by [the] evidence, that the defendant's mother had declined to consent to the search." (Internal quotation

marks omitted.) Id., 56. We disagreed with the defendant's reliance on testimony that his mother had declined to *sign* the consent form, and emphasized that, "the act of declining to sign a *consent* to search form is not tantamount to a refusal to consent to the search; rather, it is simply one of several relevant factors that a court considers in determining the validity of a consent to search. . . . Because the refusal to sign a consent to search form is one of several factors to be considered in determining the validity of consent, such refusal does not vitiate consent otherwise found to be valid in light of all of the circumstances." (Citation omitted; emphasis in original.) Id.

Most importantly, we emphasized that, "because the defendant's motions to suppress did not implicate the mother's consent or lack thereof, the state was not on notice that it was required to establish, on the basis of the totality of the circumstances, that the defendant's mother had consented to or acquiesced in the search. In such circumstances, the state bears no responsibility for the evidentiary lacunae, and, therefore, it would be manifestly unfair to the state for this court to reach the merits of the defendant's claim upon a mere *assumption* that the defendant's mother had declined to consent to the search."[19] (Emphasis in original.) Id., 59; see also id., 62 ("because the state had no obligation or incentive to adduce any evidence regarding the moth-

---

[19] We noted that, other than the testimony that the defendant's mother had refused to sign the consent form, the defendant had "presented no other evidence on the issue. *Because the mother's actions relating to the consent to search were not at issue at the suppression hearing*—the defendant had claimed only that his father had not given valid consent to search and, in fact, expressly had indicated that the mother's consent was *not* necessary—the state had no reason to present any evidence regarding the mother's consent or lack thereof, and, consequently, it did not do so. As a result, we simply do not know any of the other circumstances surrounding the mother's refusal to sign the consent to search form." (Emphasis altered.) *State* v. *Brunetti*, supra, 279 Conn. 57–58.

er's consent or lack thereof, no conclusion—*indeed, no inference*—reasonably can be drawn from her failure to sign the form" [emphasis added]). Accordingly, we concluded that "the defendant has failed to satisfy the first prong of *Golding* because the facts revealed by the record are inadequate to establish whether the alleged constitutional violation did, in fact, occur."[20] Id., 64.

Our other recent case law is consistent with *Brunetti* and makes clear that we consistently have declined to grant *Golding* review to fourth amendment claims wherein the predicate factual record was not completely developed before the trial court. See *State* v. *Dalzell*, 282 Conn. 709, 721, 924 A.2d 809 (2007) (This court declined to decide whether pretextual traffic stops violate the state constitution because "the trial court . . . made no findings regarding [the officer's] motivation for stopping the defendant's vehicle. Furthermore, to allow this claim to be presented for the first time on appeal would work a grave injustice on the state as it did not have any opportunity to develop a factual record to dispute the defendant's claim of pretext."); *State* v. *Canales*, 281 Conn. 572, 582, 916 A.2d 767 (2007) (following *Brunetti* and finding record inadequate for review of claim that defendant's statements were product of illegal arrest "because the defen-

---

[20] In so concluding, we relied on *State* v. *Medina*, supra, 228 Conn. 300–302, wherein this court "declined to review an unpreserved constitutional claim regarding the alleged involuntariness of the confession of the defendant . . . because the record was inadequate for review." *State* v. *Brunetti*, supra, 279 Conn. 60. We emphasized that in *Medina* the defendant's claim in the trial court, namely, that his confession was not knowing and voluntary because he had not received *Miranda* warnings, arose from a different factual predicate than his state constitutional claims on appeal, "namely, that his confession was involuntary due to his impaired mental state." Id. We further emphasized that the defendant's failure in *Medina* to raise that claim deprived the state of the opportunity to litigate against it, and left us without the " 'benefit of a complete factual inquiry into [the defendant's] mental condition at the time his statements were made.' " Id., quoting *State* v. *Medina*, supra, 300.

dant did not argue at the suppression hearing that the arrest lacked probable cause, [and] the state did not offer evidence concerning probable cause"); accord *State* v. *Batts*, 281 Conn. 682, 694, 916 A.2d 788 (defendant could not prove constitutional violation under third prong of *Golding* with respect to claim that state should bear "heightened standard of proof" for justifying stops based on racial profiling because record was "entirely devoid of evidence of racial profiling"), cert. denied, 552 U.S. 1047, 128 S. Ct. 667, 169 L. Ed. 2d 524 (2007).

Thus, we agree with the state that the Appellate Court improperly considered *any* illegality attendant to Morgan's patdown of the defendant. Given the fact that the state was not alerted to the need to develop a factual record concerning whether potentially permissible bases, such as consent,[21] existed for the patdown search, we conclude that it was improper for the Appellate Court to label the patdown negatively or to draw any adverse inferences from it on the basis of Morgan's testimony, which may not have presented a complete picture of what had occurred with respect to the patdown. Thus, we decline to consider the patdown as anything other than a historical fact, and ascribe to it no legal significance.

## II

## FEDERAL CONSTITUTIONAL CLAIMS

Accordingly, we now turn to the federal constitutional issues presented by the present case. First, we must consider whether Morgan's acts of questioning the defendant about topics unrelated to the reason for the traffic stop, as well as asking for consent to search, were themselves constitutionally permissible during a

---

[21] See, e.g., *United States* v. *Jahkur*, 409 F. Sup. 2d 28, 31–32 (D. Mass. 2005); *State* v. *Caraveo*, 222 Ariz. 228, 233, 213 P.3d 377 (App. 2009).

routine traffic stop. If we conclude that they were, we then must address the defendant's alternative grounds for affirmance under the federal constitution, namely that: (1) his consent was not voluntary; and (2) Morgan's search exceeded the scope of the defendant's consent.

A

Permissible Scope of Investigation during
Routine Traffic Stops

The state, relying on *Arizona* v. *Johnson*, supra, 555 U.S. 323, and *Ohio* v. *Robinette*, supra, 519 U.S. 33, claims that, under the restrictions of *Terry* v. *Ohio*, supra, 392 U.S. 1, questioning during a routine traffic stop need not be carefully tailored to the initial purpose of the stop, so long as the stop's overall duration is not "measurably extended" beyond the time necessary to accomplish the tasks attendant to that reason for the stop. In response, the defendant contends that Morgan ordered him from his car at a point when the traffic stop should have ended with the issuance of the traffic ticket and the return of the defendant's papers, thus creating an independent stop for *Terry* purposes that improperly lacked its own separate basis of reasonable suspicion beyond the moving violation. The defendant further argues that, because Morgan had not yet issued the ticket and had retained his documentation, the defendant was not free to leave at the time Morgan asked for consent to search, thereby rendering his consent the fruit of an improper stop not supported by reasonable suspicion. We conclude that Morgan's questions, including his request for consent to search, were permissible because they did not measurably extend the duration of the traffic stop.

Courts considering the constitutionality under the fourth amendment of a police officer's interaction with a motorist during a routine traffic stop apply the principles developed under the line of case law implementing the central holding of *Terry* v. *Ohio*, supra, 392 U.S.

1.[22] See, e.g., *Arizona* v. *Johnson*, supra, 555 U.S. 330; *Berkemer* v. *McCarty*, 468 U.S. 420, 439, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984); *United States* v. *Bell*, 555 F.3d 535, 539–40 (6th Cir.), cert. denied, 557 U.S. 945, 129 S. Ct. 2887, 174 L. Ed. 2d 595 (2009); *United States* v. *Turvin*, 517 F.3d 1097, 1099–1101 (9th Cir. 2008); *Salmeron* v. *State*, 280 Ga. 735, 736–37, 632 S.E.2d 645 (2006); *State* v. *Washington*, 898 N.E.2d 1200, 1204 (Ind. 2008). Under *Terry*, "where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot . . . the officer may briefly stop the suspicious person and make reasonable inquiries aimed at confirming or dispelling his suspicions. . . .

---

[22] We note that the state contends, in its brief, that *Terry* restrictions are inapplicable to the routine traffic stop in the present case because Morgan had probable cause to believe that the defendant had committed a traffic violation. Indeed, the state notes that, the provisions of General Statutes § 51-164o (b) notwithstanding, the defendant constitutionally could have been subjected to custodial arrest for the minor traffic offense; *Atwater* v. *Lago Vista*, 532 U.S. 318, 354, 121 S. Ct. 1536, 149 L. Ed. 2d 549 (2001); and, because he was not placed under arrest, Morgan was not required to inform the defendant of his right to remain silent. At oral argument before this court, the state cited *Arizona* v. *Johnson*, supra, 129 S. Ct. 781, and acknowledged, however, that in the absence of an arrest, the police cannot detain a stopped motorist indefinitely. This is consistent with the well established general proposition that an automobile stop occasioned by a traffic violation is more akin to a *Terry* stop than a custodial arrest, and is, therefore, governed by *Terry* principles, even when the police officer has probable cause to believe that the motorist has violated a traffic law. See, e.g., id., 786; *United States* v. *Bell*, 555 F.3d 535, 539–40 (6th Cir.), cert. denied, 557 U.S. 945, 129 S. Ct. 2887, 174 L. Ed. 2d 595 (2009). But see *United States* v. *Childs*, 277 F.3d 947, 953 (7th Cir.) (en banc) ("[A]lthough traffic stops usually proceed like *Terry* stops, the [c]onstitution does not require this equation. Probable cause makes all the difference . . . ." [Citation omitted.]), cert. denied, 537 U.S. 829, 123 S. Ct. 126, 154 L. Ed. 2d 43 (2002); D. Moran, "Traffic Stops, Littering Tickets, and Police Warnings: The Case for a Fourth Amendment Non-Custodial Arrest Doctrine," 37 Am. Crim. L. Rev. 1143, 1149–50 (2000) (arguing that traffic stops do not fit into three delineated fourth amendment categories of investigative stops, custodial arrests or consensual encounters, and that "[t]his tripartite categorization has resulted in strained, and ultimately erroneous, efforts in both the federal and state courts to categorize traffic violation stops as *Terry* stops").

"It is well established, however, that [t]he police officer is not entitled to seize and search every person whom he sees on the street or of whom he makes inquiries. Before he places a hand on the person of a citizen in search of anything, he must have constitutionally adequate, reasonable grounds for doing so. In the case of the self-protective search for weapons, he must be able to point to particular facts from which he reasonably inferred that the individual was armed and dangerous. . . . The authority to permit a reasonable search for weapons for the protection of the police officer is narrowly drawn applying only where he has reason to believe that he is dealing with an armed and dangerous individual . . . . The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger. . . . And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or hunch, but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." (Citations omitted; internal quotation marks omitted.) *State v. Nash*, 278 Conn. 620, 631–32, 899 A.2d 1 (2006).

A *Terry* stop does not give law enforcement officers carte blanche to stop and detain citizens indefinitely or unreasonably because, "if an investigative stop continues indefinitely, at some point it can no longer be justified as an investigative stop. But our cases impose no rigid time limitation on *Terry* stops. While it is clear that the brevity of the invasion of the individual's [f]ourth [a]mendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion . . . we have emphasized the need to consider the law enforcement purposes to be served by the stop as well

as the time reasonably needed to effectuate those purposes." (Citation omitted; internal quotation marks omitted.) *United States* v. *Sharpe,* 470 U.S. 675, 685, 105 S. Ct. 1568, 84 L. Ed. 2d 605 (1985). Thus, the Supreme Court has rejected attempts to impose "a hard-and-fast time limit" on *Terry* stops, in favor of a reasonableness inquiry where, "[i]n assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant. . . . A court making this assessment should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing." (Citations omitted.) Id., 686.

Applying this reasoning in the traffic stop context, the United States Supreme Court recently followed *Muehler* v. *Mena,* supra, 544 U.S. 100–101, wherein it had determined that the police did not violate the fourth amendment rights of a woman detained during the execution of a search warrant by questioning her about her immigration status,[23] and concluded that "[a] lawful

[23] In *Muehler* v. *Mena,* supra, 544 U.S. 95, 100, an action brought under 42 U.S.C. § 1983 wherein the plaintiff had alleged that the police violated her fourth amendment rights by handcuffing her for several hours during the execution of a search warrant on her home, the Supreme Court concluded that the police had not violated the fourth amendment "by questioning her about her immigration status during the detention." The court emphasized that the questioning was not a "discrete [f]ourth [a]mendment event," and stated that "mere police questioning does not constitute a seizure." (Internal quotation marks omitted.) Id., 101. The court further concluded that, because the detention was not "prolonged by the questioning, there was no additional seizure within the meaning of the [f]ourth [a]mendment. Hence, the officers did not need reasonable suspicion to ask [the plaintiff] for her name, date and place of birth, or immigration status." Id. Relying on *Illinois* v. *Caballes,* 543 U.S. 405, 125 S. Ct. 834, 160 L. Ed. 2d 842 (2005), which had upheld the use of a narcotics-sniffing dog during a routine traffic stop, the court further emphasized that the key constitutional inquiry remained the duration of the detention; so long as the questioning did not extend the time of detention,

roadside stop begins when a vehicle is pulled over for investigation of a traffic violation. The temporary seizure of driver and passengers ordinarily continues, and remains reasonable, for the duration of the stop. Normally, the stop ends when the police have no further need to control the scene, and inform the driver and passengers they are free to leave. . . . An officer's inquiries into matters unrelated to the justification for the traffic stop, this [c]ourt has made plain, do not convert the encounter into something other than a lawful seizure, *so long as those inquiries do not measurably extend the duration of the stop.*"[24] (Citation omitted; emphasis added.) *Arizona* v. *Johnson,* supra, 555 U.S. 333; see id., 327, 334 (concluding that passenger was seized incident to lawful traffic stop of driver and that police officer properly could frisk passenger with reasonable suspicion that he was armed and dangerous); see also *Illinois* v. *Caballes,* 543 U.S. 405, 408–409, 125 S. Ct. 834, 160 L. Ed. 2d 842 (2005) (use of trained

---

it did not require an independent fourth amendment justification. *Muehler* v. *Mena,* supra, 101.

[24] Although the majority opinion in *Ohio* v. *Robinette,* supra, 519 U.S. 35, 39–40, was cast in terms of voluntariness, and concluded that a "lawfully seized" defendant need not be informed that he is "free to go" before a consent to search during a routine traffic stop will be deemed voluntary, it necessarily must be read, given its statement that the defendant was subject to a seizure at the time of being questioned; id., 35; as permitting such brief, incidental questioning during the course of a routine traffic stop. We note, however, that in his dissent, Justice Stevens attacked the underlying predicate of the majority's determination, namely, that the defendant was "lawfully seized." Id., 49. Specifically, Justice Stevens concluded that the defendant had been detained because he would not have felt free to leave at the time that the officer asked him for consent to search, primarily because the "question itself sought an answer *'before you get gone.'* " (Emphasis added.) Id., 47. Justice Stevens also determined that, "by the time [the defendant] was asked for consent to search his automobile, the lawful traffic stop had come to an end; [he] had been given his warning, and the speeding violation provided no further justification for detention. The continued detention was therefore only justifiable, if at all, on some other grounds." Id., 50. Justice Stevens then concluded that, because there was no reasonable suspicion to justify a further detention, "[the officer's] continued detention of [the defendant] constituted an illegal seizure." Id., 50–51.

narcotics sniffing dog around exterior of car during lawful traffic stop was permissible because it did not implicate privacy interests and "the duration of the stop . . . was entirely justified by the traffic offense and the ordinary inquiries incident to such a stop"); cf. 4 W. LaFave, Search and Seizure (4th Ed. 2004 & 2009–2010 Sup.) § 9.3, p. 91.

Thus, questions permissible under *Terry* during a routine traffic stop include inquiries about whether the car or driver are carrying contraband, as well as concomitant requests for consent to search the vehicle. See 4 W. LaFave, supra (4th Ed. 2004), § 9.3 (d), p. 389 and § 9.3 (e), p. 397, and (2009–2010 Sup.), § 9.3, pp. 91, 94 (noting that *Illinois* v. *Caballes*, supra, 543 U.S. 405, supports requests for consent to search that do not extend duration of stop). These inquiries are permissible even if they are irrelevant to the initial purpose of the stop, namely, the traffic violation, so long as they do not "measurably extend" the stop beyond the time necessary to complete the investigation of the traffic violation and issue a citation or warning. Consideration of that time period necessarily includes the completion of tasks attendant to the traffic stop, including "a check of the driver's license, vehicle registration, and criminal history, and the writing of the citation or warning," as well as background questions about the destination and purpose of the driver's trip. *United States* v. *Olivera-Mendez*, 484 F.3d 505, 509 (8th Cir. 2007); see also, e.g., *Salmeron* v. *State*, supra, 280 Ga. 737 ("[i]t does not unreasonably expand the scope or duration of a valid traffic stop for an officer to prolong the stop to immediately investigate and determine if the driver is entitled to continue to operate the vehicle by checking the status of the driver's license, insurance, and vehicle registration" [internal quotation marks omitted]). Indeed, given that complications with respect to these tasks may well result in an extension of the time of detention without

rendering it unreasonable under the fourth amendment, "[w]hether a particular detention is reasonable in length is a fact-intensive question, and there is no per se time limit on all traffic stops." *United States* v. *Olivera-Mendez*, supra, 510; see also *Byndloss* v. *State*, 391 Md. 462, 469–72, 492, 893 A.2d 1119 (2006) (upholding traffic stop wherein motorist was detained for approximately thirty minutes, even after officer already had drafted written warning, because of computer and communication problems that impeded completion of license and warrants checks, which allowed time for narcotics sniffing dog to be brought to scene).

Accordingly, decisions in the wake of *Arizona* v. *Johnson*, supra, 555 U.S. 323, hold similarly and, in upholding the conduct of such stops as reasonable, uniformly have emphasized the de minimis nature of the nontraffic related questioning and requests for consent to search within the context of the stop as a whole.[25]

[25] Cases on point released subsequent to *Muehler* v. *Mena*, supra, 544 U.S. 93, but prior to *Arizona* v. *Johnson*, supra, 555 U.S. 323, are similarly illustrative. See *United States* v. *Turvin*, supra, 517 F.3d 1101–1102 (noting that fourteen minute period from commencement of stop until consent was obtained was "no longer than an ordinary traffic stop could reasonably take," and that "brief pauses to ask questions during traffic stops, even if those questions are unrelated to the purpose of the stop, may be permissible under *Muehler*"); *United States* v. *Valenzuela*, 494 F.3d 886, 890 (10th Cir.) (officer properly asked defendant about presence of " 'weapons or other illegal items,' " as well as for permission to search, because questioning was simple and "did not appreciably lengthen the duration of the stop"), cert. denied, 552 U.S. 1032, 128 S. Ct. 636, 169 L. Ed. 2d 411 (2007); *United States* v. *Hernandez*, 418 F.3d 1206, 1209 n.3 (11th Cir. 2005) ("it is unreasonable extensions of the duration—not the scope of conversation—that could render an otherwise justified detention unreasonable for [f]ourth [a]mendment purposes"), cert. denied, 549 U.S. 889, 127 S. Ct. 303, 166 L. Ed. 2d 155 (2006); *United States* v. *Bowers*, 490 F. Sup. 2d 285, 291–92 (D. Conn. 2007) (police officer reasonably asked about presence of illegalities and for consent to search in seat belt violation stop that lasted less than ten minutes); *Salmeron* v. *State*, supra, 280 Ga. 736 (following *Muehler* and concluding that request for consent to search during valid traffic stop does not violate fourth amendment so long as stop is not unreasonably prolonged); *State* v. *Washington*, supra, 898 N.E.2d 1203, 1205 (with no claim of excessive delay, police officer properly questioned moped driver about whether he had drugs

See, e.g., *United States* v. *Harrison*, 606 F.3d 42, 45 (2d

on him, and then asked him for permission to search after he admitted having "dime bags"); *Ellis* v. *Commonwealth*, 52 Va. App. 220, 228, 662 S.E.2d 640 (2008) ("[t]he brief, incremental delay caused by the officer's questions regarding drugs did not violate the [f]ourth [a]mendment and, a fortiori, did not constitute an exploitive basis for securing [the defendant's] consent"); accord *People* v. *Harris*, 228 Ill. 2d 222, 237, 886 N.E.2d 947 (2008) ("a warrant check on the occupants of a lawfully stopped vehicle does not violate fourth amendment rights, so long as the duration of the stop is not unnecessarily prolonged for the purpose of conducting the check and the stop is otherwise executed in a reasonable manner" [internal quotation marks omitted]). But see *State* v. *Smith*, 286 Kan. 402, 419, 184 P.3d 890 (concluding that *Muehler* did not alter "the rules regarding the limited scope of a *Terry* stop" or permit "law enforcement officers to expand the scope of a traffic stop to include a search not related to the purpose of the stop"), cert. denied, 555 U.S. 1062, 129 S. Ct. 628, 172 L. Ed. 2d 639 (2008); *State* v. *Duran*, 138 N.M. 414, 424, 120 P.3d 836 (2005) (concluding that travel plan questions are permissible under fourth amendment rule that "all questions asked by police officers during a traffic stop must be . . . reasonably related to the initial justification for the stop or are supported by reasonable suspicion"); *State* v. *Rivera*, 384 S.C. 356, 362, 682 S.E.2d 307 (App. 2009) (The court concluded that, once the officer had decided that he would issue a warning citation, the purpose of the traffic stop had ended, and "continued questioning concerning the transport of drugs on the interstate exceeded the scope of the stop. This amounted to a second and illegal detention unless [the officer] entertained a reasonable suspicion of illegal activity to warrant that detention."); see also footnotes 28 and 54 of this opinion and the accompanying text.

Other jurisdictions had concluded similarly under the fourth amendment even prior to the publication of *Muehler*. See *United States* v. *Childs*, 277 F.3d 947, 953–54 (7th Cir.) (en banc) ("[b]y asking one question about marijuana, [the] officer . . . did not make the custody of [the defendant passenger during a traffic stop] an 'unreasonable' seizure," particularly given existence of probable cause to suspect traffic violation, which meant that "neither the driver nor [the defendant] had a right to be released the instant the steps to check license, registration, and outstanding warrants, and to write a ticket, had been completed"), cert. denied, 537 U.S. 829, 123 S. Ct. 126, 154 L. Ed. 2d 43 (2002); *United States* v. *Shabazz*, 993 F.2d 431, 437 (5th Cir. 1993) (The court rejected a challenge to police questioning and a request for consent to search that "occurred while the officers were waiting for the results of the computer check. Therefore, the questioning did nothing to extend the duration of the initial, valid seizure."); *State* v. *Kremen*, 754 A.2d 964, 967–68 (Me. 2000) (reasonable suspicion was not required to justify questioning and request to search vehicle during lawful traffic stop), cert. denied, 531 U.S. 1079, 121 S. Ct. 777, 148 L. Ed. 2d 675 (2001); *State* v. *Snell*, 323 Mont. 157, 161, 99 P.3d 191 (2004) (same); *State* v. *Akuba*, 686 N.W.2d

Cir. 2010) (per curiam) (extension of traffic stop by five to six minutes to question driver and passengers was reasonable and did not violate fourth amendment); *United States* v. *Everett*, 601 F.3d 484, 495–96 (6th Cir. 2010) (adopting reasonableness standard for determining whether questioning on unrelated subjects improperly extended duration of routine traffic stop); *United States* v. *Taylor*, 596 F.3d 373, 376 (7th Cir.) (officers did not violate fourth amendment during traffic stop for seat belt infraction by questioning defendant briefly about presence of "weapons, drugs, or illegal items on his person or in the vehicle" and then requesting consent to search), cert. denied, 561 U.S. 1017, 130 S. Ct. 3485, 177 L. Ed. 2d 1076 (2010); *United States* v. *Derverger*, 337 Fed. Appx. 34, 35–36 (2d Cir. 2009) (per curiam) ("[w]e conclude without any need for further factfinding that the five minutes of questioning [about the defendant's nervous demeanor and contents of his car] did not significantly extend the time [the defendant] was detained" during stop for seat belt violation); *United States* v. *Rivera*, 570 F.3d 1009, 1013–15 (8th Cir. 2009) (concluding that trooper's questions about whether defendant " 'had guns or anything illegal in the truck' " did not "measurably extend" stop because they were asked immediately after questioning during first four to six minutes of seventeen minute stop, related directly

406, 415 (S.D. 2004) ("[a]n officer does not impermissibly expand the scope of a traffic stop merely by asking the driver questions, even if the subject of the questioning is unrelated to the original purpose of the stop, as long as the questioning does not unduly extend the duration of the initial, valid seizure"); *State* v. *Gaulrapp*, 207 Wis. 2d 600, 609, 558 N.W.2d 696 (App. 1996) (police officer did not impermissibly lengthen duration of traffic stop by asking one question about presence of drugs or weapons and then requesting consent to search); accord *Kothe* v. *State*, 152 S.W.3d 54, 65–66 (Tex. Crim. App. 2004) (noting that fourth amendment does not prescribe "particular order" for conducting traffic stop and it was not unreasonable for officer to wait for results of warrant check, despite fact that he had dispelled original basis for stop by determining that defendant was not intoxicated).

to stop, and delays were caused by waiting for results of background check and confirmation of consent; after defendant withdrew consent, narcotics-sniffing dog alerted presence of narcotics); *United States* v. *Bell*, supra, 555 F.3d 538, 542–43 (officers did not improperly extend length of stop, despite their lack of reasonable suspicion of criminal activity beyond initial violation, because K-9 officer was able to respond and effect dog sniff of car approximately twelve minutes into stop while other officer waited for results of license check, wrote speeding warning and discussed it with defendant); *United States* v. *Cousin*, United States District Court, Docket No. 1:09-CR-90, 2010 U.S. Dist. LEXIS 3688, *9 (E.D. Tenn. January 19, 2010) (during traffic stop, "[a]n officer may ask a handful of questions, including asking for consent to search the vehicle, and not unreasonably detain an individual"); *United States* v. *McBride*, United States District Court, Docket No. 1:09-CR-21-TS, 2009 U.S. Dist. LEXIS 113405, *10, 18–20, 22 (N.D. Ind. December 4, 2009) (officer's question prior to issuing ticket about whether defendant "had any dead bodies or anything in his car," followed by request for consent to search, did not violate fourth amendment because time to inquire was only approximately two minutes out of twenty-two minute stop, and therefore "negligible" in context of entire stop); *D.A.* v. *State*, 10 So. 3d 674, 676–78 (Fla. App.) (despite having already decided not to issue summons for expired temporary registration, police officer properly asked driver whether vehicle contained anything illegal), review denied, 20 So. 3d 848 (Fla. 2009); *Boyd* v. *State*, 300 Ga. App. 455, 456, 458 and n.1, 685 S.E.2d 319 (2009) (questions about driver's methamphetamine use did not violate fourth amendment despite fact that they were unrelated to purpose of stop); *State* v. *Morlock*, 289 Kan. 980, 993, 218 P.3d 801 (2009) (noting that questioning of passenger did not extend stop because it took place

during "concededly legitimate hunt for the [rental] agreement"); *People* v. *Edwards*, 14 N.Y.3d 741, 742, 925 N.E.2d 576, 898 N.Y.S.2d 538, 539 (2010) (per curiam) ("The initial stop of [the] defendant's vehicle was permissible and the police officers' subjective motivation to investigate possible drug activity does not negate the objective reasonableness of the officers' actions . . . . In addition . . . as a matter of law, the officers did not inordinately prolong the detention beyond what was reasonable under the circumstances to address the traffic infraction . . . ." [Citations omitted.]).

We emphasize, however, that in evaluating the duration of a traffic stop, the reviewing court still must consider the stop through the lens of the time reasonably necessary to effectuate the initial purpose of the traffic stop, and expansions of the stop beyond that time are constitutionally impermissible in the absence of an independent basis of objectively reasonable, articulable suspicion. See, e.g., *United States* v. *White*, 584 F.3d 935, 949 (10th Cir. 2009), cert. denied, 559 U.S. 985, 130 S. Ct. 1721, 176 L. Ed. 2d 202 (2010); *United States* v. *Bell*, supra, 555 F.3d 541; see also *United States* v. *Alix*, 630 F. Sup. 2d 145, 157–58 (D. Mass. 2009) (forty-five minute stop with multiple frisks and no reasonable suspicion to believe that driver or passenger was dangerous was unreasonable, particularly when their actions did not contribute to length of stop); *People* v. *Burei*, 391 Ill. App. 3d 1, 8–9, 908 N.E.2d 538 (2009) (traffic stop was prolonged beyond time necessary to issue summons for cracked windshield by continuing to question defendant, eventually obtaining consent to search vehicle). Moreover, judicial review of routine traffic stops goes beyond a strict stopwatch test; reasonableness is not measured solely by the temporal duration of the stop alone but, rather, requires scrupulous consideration of the reasonableness of the officers' actions during the time of the stop. See *United States*

v. *Peralez*, 526 F.3d 1115, 1119–21 (8th Cir. 2008) (traffic stop, while lasting only sixteen minutes, was unreasonably extended when questions unrelated to purpose of stop "constituted the bulk of the interaction between the trooper and the van's occupants" and video recording showed that "off-topic questions more than doubled the time [the defendant] was detained").

A review of the Appellate Court's opinion in the present case indicates, then, that it did not apply the correct legal standard, in that it relied on pre-*Muehler* case law,[26] and stated that, "[i]n determining if a seizure has

[26] Prior to the United States Supreme Court's 2005 decision in *Muehler* v. *Mena*, supra, 544 U.S. 100–101, some federal and state jurisdictions had interpreted *Terry* to mean that questioning must be limited to the purpose of the traffic stop, and could not be extended beyond that purpose without either consent or an independent basis of reasonable suspicion of criminal activity, which might well have been yielded by permissible and reasonable inquiries about travel plans. In so concluding, these courts relied on the United States Supreme Court's statement in *Terry* v. *Ohio*, supra, 392 U.S. 19–20, that the determination of whether a seizure and search pursuant to a *Terry* stop were reasonable "is a dual one—whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." See *United States* v. *Holt*, 264 F.3d 1215, 1228 (10th Cir. 2001) (en banc); *Caldwell* v. *State*, 780 A.2d 1037, 1045–46 (Del. 2001) (decision based on federal constitution); *People* v. *Gonzalez*, 204 Ill. 2d 220, 235–36, 789 N.E.2d 260 (2003) (adopting reasonableness analysis under federal and state constitutions to determine whether police conduct altered fundamental nature of stop), overruled by *People* v. *Harris*, 228 Ill. 2d 222, 240, 886 N.E.2d 947 (2008); *State* v. *McKinnon-Andrews*, 151 N.H. 19, 25–27, 846 A.2d 1198 (2004) (concluding accordingly under both federal and state constitutions); *People* v. *Banks*, 85 N.Y.2d 558, 562–63, 650 N.E.2d 833, 626 N.Y.S.2d 986 (unclear whether holding is based on federal or state constitution), cert. denied, 516 U.S. 868, 116 S. Ct. 187, 133 L. Ed. 2d 124 (1995); *Commonwealth* v. *Strickler*, 563 Pa. 47, 70–71 n.20, 757 A.2d 884 (2000) ("*Terry* . . . and its progeny strongly suggest that a traffic stop [viewed as the equivalent of a *Terry* stop] is not an appropriate vehicle within which to make inquiries about potential unlawful conduct unrelated to the stop not supported by reasonable suspicion"); *State* v. *Hansen*, 63 P.3d 650, 660 (Utah 2002) (federal constitution); *O'Boyle* v. *State*, 117 P.3d 401, 415–16 (Wyo. 2005) (federal constitution). We note that a post-*Muehler* case relied on extensively by the defendant holds similarly. See *State* v. *Smith*, 286 Kan. 402, 419, 184 P.3d 890 (concluding that *Muehler* did not alter "the rules regarding the limited scope of a

exceeded the scope of a permissible motor vehicle stop, the court must determine whether the officer's action was justified at its inception and whether it was reasonably related in scope to the circumstances that justified the interference in the first place. See *State* v. *Carcare*, 75 Conn. App. 756, 767, 818 A.2d 53 (2003); see also *United States* v. *Jones*, 234 F.3d 234, 240–41 (5th Cir. 2000) (holding that although initial stop of defendants' vehicle for speeding was valid, continued detention, after completing computer check on drivers' licenses and rental papers revealed clean records, was unreasonable and violated fourth amendment).[27] With respect to

*Terry* stop" or "[allow] law enforcement officers to expand the scope of a traffic stop to include a search not related to the purpose of the stop"), cert. denied, 555 U.S. 1062, 129 S. Ct. 628, 172 L. Ed. 2d 639 (2008). Finally, other jurisdictions, including Massachusetts, Minnesota, New Hampshire, New Jersey, Pennsylvania and Wyoming, also had held similarly under their state constitutions. See part III D of this opinion.

Particularly in light of *Arizona* v. *Johnson*, supra, 555 U.S. 331–33, we agree with the Illinois Supreme Court's observation that this more restrictive type of fourth amendment analysis has, with respect to the federal constitution, been "unequivocally overruled by" the holding of *Muehler*. See *People* v. *Harris*, supra, 228 Ill. 2d 240; see also *United States* v. *Alcaraz-Arellano*, 441 F.3d 1252, 1258 (10th Cir. 2006) ("[a]lthough *Holt* held that further questioning is justifiable only if it is reasonable in relation to the initial purpose of the traffic stop . . . the scope of this holding has been limited by the Supreme Court's decision in *Muehler*" [citation omitted]); *United States* v. *Turvin*, supra, 517 F.3d 1099–1100 (noting that *Muehler* had "overruled" Ninth Circuit case law "that required police officers to have reasonable suspicion to ask questions beyond the scope of a traffic stop"); *People* v. *Harris*, supra, 244 (emphasizing that duration remains the "sole focus of the scope inquiry" and "overrul[ing] *Gonzalez* to the extent that it holds that the reasonableness of a traffic stop must be judged not only by its duration, but by the additional criterion of whether the actions of the officer alter the fundamental nature of the stop"); *State* v. *Morlock*, supra, 218 P.3d 807–808 (explaining, in contradiction to *State* v. *Smith*, supra, 286 Kan. 419, that "*Johnson* therefore also confirmed that an officer's inquiries into matters unrelated to the justification for the stop did not necessarily require reasonable suspicion" and "eliminated any doubt that the *Muehler* rationale applied to traffic stops").

[27] Indeed, the cited portions of *United States* v. *Jones*, supra, 234 F.3d 234, the Fifth Circuit decision that was relied upon by the Appellate Court and also cited by the defendant in his brief in this certified appeal, appear to be inconsistent with that court's subsequent en banc opinion in *United*

whether the results of the initial stop aroused further suspicion warranting a prolonged inquiry, [t]he police officer's decision . . . must be based on more than a hunch or speculation. . . . In justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion."[28] (Internal quotation marks omit-

States v. Brigham, 382 F.3d 500 (5th Cir. 2004). In Jones, after receiving word that the computer checks revealed that the defendants had clean records, the officer spent three minutes reiterating previously asked questions prior to asking for consent to search, despite the fact that the warning citation had been prepared and needed only the driver's signature for the stop to be complete. United States v. Jones, supra, 240–41. The court concluded that "the basis for the stop was essentially completed when the dispatcher notified the officers about the defendants' clean records, three minutes before the officers sought consent to search the vehicle." Id., 241. The court concluded that the failure to issue the citation and allow the defendants to leave violated the fourth amendment. Id.

In Brigham, the en banc Fifth Circuit noted, however, that police officers could question a motorist on any subject during a traffic stop; United States v. Brigham, supra, 382 F.3d 508; emphasized that "there is . . . no constitutional stopwatch on traffic stops"; id., 511; and, noting the fourth amendment touchstone of reasonableness, declined to impose a particular sequence or constitutionally mandated protocol on questioning and computer checks during traffic stops. Id.; see also Kothe v. State, 152 S.W.3d 54, 66 (Tex. Crim. App. 2004) (rejecting challenge to traffic stop based on officer's running of warrant check after already having determined that driver was not intoxicated, because fourth amendment reasonableness does not "require rigid adherence to 'the least intrusive means' of investigation defined by Monday-morning reviewing courts").

[28] The Appellate Court also noted that, in State v. Story, 53 Conn. App. 733, 741, 732 A.2d 785, cert. denied, 251 Conn. 901, 738 A.2d 1093 (1999), it had "concluded that a police officer's request for consent to search on the basis of nothing more than a hunch was not improper because the officer did not request the consent to search until after the stop had concluded and the defendant was free to leave at the time of the request. Mindful of Story, if we now sanction arbitrary requests for consent searches by the police prior to the conclusion of a stop, we effectively close the door on a criminal defendant's ability ever to contest the validity of a consent to search during a motor vehicle stop." (Emphasis in original.) State v. Jenkins, supra, 104 Conn. App. 431–32. We disagree with the Appellate Court's prediction, in that, post-Arizona v. Johnson, supra, 555 U.S. 331–33, a defendant still may challenge the overall duration of a traffic stop as unreasonable under the circumstances, as well as make an analytically separate claim with respect to the voluntariness of his consent to search.

ted.) *State* v. *Jenkins*, supra, 104 Conn. App. 427; see also id., 427–28 ("the defendant's relevant claim on appeal relates to whether Morgan improperly expanded the scope of the stop by questioning the defendant about whether he was engaged in unrelated illegal activity and then performing a search of the defendant's person and his car, after the initial purpose for effectuating the stop had been achieved").

Applying the proper legal standard to the facts of the present case, we conclude that Morgan did not measurably or unreasonably prolong his traffic stop of the defendant. In so concluding, we note that it is undisputed that the traffic stop for unsignaled lane changes was valid at its inception, and also that, under *Pennsylvania* v. *Mimms*, supra, 434 U.S. 111 and n.6, Morgan properly ordered the defendant to step out of the car for purposes of explaining the ticket. The total relevant duration of the stop, namely, from the time that the defendant was pulled over until the time that he gave his consent to the search of the Altima, was at most fifteen minutes; indeed, the defendant was under arrest twenty minutes from the inception of the stop. See *United States* v. *Rivera*, supra, 570 F.3d 1013–14 ("when a motorist gives consent to search his vehicle, he necessarily consents to an extension of the traffic stop while the search is conducted"). Moreover, during that fifteen minute time period prior to searching the defendant's Altima, Morgan engaged only in activities that themselves related directly to the traffic stop, namely, questioning the defendant about his travels, checking the defendant's license and rental agreement, performing a warrants check and then writing the ticket. Morgan asked only two brief off-topic questions concerning the presence of illegalities in the vehicle or on the defendant's person near the end of the stop, after explaining the ticket to the defendant, but before

giving it to him.[29] Unlike the protracted questioning in *United States* v. *Peralez*, supra, 526 F.3d 1120–21, which dominated the encounter in that case, these two questions in the present case did not create more than a de minimis extension of the overall stop, and therefore

[29] We note that several courts have held the timing of the questioning or requests for consent to have independent constitutional significance, and have emphasized that questioning *after* discrete events such as the issuance of a ticket or warning, or the return of a driver's paperwork, may create a detention distinct from the initial stop, which then would require independent justification such as consent or reasonable suspicion. Put differently, these courts conclude that the return of the paperwork marks the end of the initial traffic stop, and determining the consensual nature of the subsequent interaction requires analysis of whether the driver reasonably would have felt free to leave under *United States* v. *Mendenhall*, 446 U.S. 544, 554, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980). See *State* v. *Ferris*, 355 Md. 356, 364, 378–79, 735 A.2d 491 (1999) (concluding that officer improperly subjected motorist to second seizure when, after handing him ticket and returning his license, he asked him to step out of car at night on shoulder of highway to answer questions about use and possession of narcotics without first advising him that he was free to depart); accord *State* v. *Story*, 53 Conn. App. 733, 745–47, 732 A.2d 785 (*Hennessy, J.*, dissenting) (concluding that traffic stop had ended after trooper returned defendant's identification and issued ticket, and that request for defendant and passenger to exit car, answer questions and consent to car search amounted to separate seizure not justified by reasonable suspicion), cert. denied, 251 Conn. 901, 738 A.2d 1093 (1999); see also *People* v. *Banks*, 85 N.Y.2d 558, 562, 650 N.E.2d 833, 626 N.Y.S.2d 986 ("once [the trooper's] license and stolen vehicle radio check came back negative and he prepared the traffic tickets for the seat belt violations, the initial justification for seizing and detaining [the] defendant and [the driver] was exhausted," and retention of their licenses pending arrival of backup officer was illegal seizure without independent justification), cert. denied, 516 U.S. 868, 116 S. Ct. 187, 133 L. Ed. 2d 124 (1995); *People* v. *Rainey*, 49 App. Div. 3d 1337, 1339, 853 N.Y.S.2d 807 (The court held that *Banks* was not controlling "because, in [*Banks*], the driver of the vehicle had been detained after he was issued traffic tickets. Here, the [t]rooper testified that he had not given the driver a traffic ticket before backup arrived, and there was no evidence to the contrary."), appeal denied, 10 N.Y.3d 963, 893 N.E.2d 453, 863 N.Y.S.2d 147 (2008). We need not, however, determine in this appeal whether any of these events, alone or in some combination, terminate a traffic stop as a matter of law because there is no evidence that Morgan returned the license, rental papers and infraction ticket to the defendant; thus, the factual predicate of this appeal is an ongoing traffic stop, and the relevant legal inquiry is whether it was measurably or unreasonably extended.

were permissible under *Muehler* and *Johnson*. Moreover, Morgan did not need to delay the stop in order to conduct the search, as Sutton, his backup officer, arrived while he was still in the process of writing the ticket. Accordingly, we conclude that the traffic stop was not unreasonably prolonged and was not an illegal detention that violated the fourth amendment.

## B

### Whether the Defendant's Consent Was Voluntary

Having determined that the traffic stop itself was not conducted in a manner that violated the fourth amendment, we now must consider whether the defendant voluntarily consented to the search of his vehicle.[30] This is because the lawfulness of the defendant's seizure is a question different from whether the consent to search was voluntary. See, e.g., *United States* v. *Valenzuela*, 494 F.3d 886, 891 (10th Cir.), cert. denied, 552 U.S. 1032, 128 S. Ct. 636, 169 L. Ed. 2d 411 (2007); *Salmeron* v. *State*, supra, 280 Ga. 739. Raising this claim as an alternate ground upon which we may affirm the judgment of the Appellate Court; see Practice Book § 84-11 (a);[31] the defendant contends that his consent

---

[30] Because we conclude that the defendant was not subjected to an illegal seizure, we need not consider whether the evidence taken from the consent search was the fruit of the poisonous tree subject to the attenuation analysis of *Brown* v. *Illinois*, supra, 422 U.S. 603–604. See, e.g., *State* v. *Nowell*, 262 Conn. 686, 700, 817 A.2d 76 (2003). We consider only whether the defendant's consent was voluntary under the totality of the circumstances.

[31] Practice Book § 84-11 (a) provides in relevant part: "Upon the granting of certification, the appellee may present for review alternative grounds upon which the judgment may be affirmed provided those grounds were raised and briefed in the appellate court. . . . If such alternative grounds for affirmation or adverse rulings or decisions to be considered in the event of a new trial were not raised in the appellate court, the party seeking to raise them in the supreme court must move for special permission to do so prior to the filing of that party's brief. Such permission will be granted only in exceptional cases where the interests of justice so require." The state acknowledges that the defendant raised these claims properly before the Appellate Court, and we may, therefore, review them without special permission.

to the search of his car was not free and voluntary under the totality of the circumstances; see *Schneckloth* v. *Bustamonte*, 412 U.S. 218, 248–49, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973); because: (1) Morgan and Sutton behaved in a "subtly coercive" manner since they were armed, the defendant was a minority from out of state who was alone in his car, and the traffic stop took place on a dark area of the turnpike; (2) Morgan already had escalated the encounter by patting down the defendant without justification; (3) neither officer informed the defendant of his right to refuse to consent to the search; and (4) the defendant was not free to leave because Morgan had not yet returned his license, rental agreement and ticket. In response, the state contends that the trial court's findings of fact on this issue are not clearly erroneous—namely, that the police officers did not act in a coercive or deceptive manner—and further relies on the spontaneous nature of the defendant's invitation to Morgan to search his car in response to Morgan's question about the presence of any illegalities therein. Having reviewed the record, we conclude that the trial court properly determined that the defendant's consent was free and voluntary under the totality of the circumstances.

"A warrantless search is not unreasonable under either the fourth amendment to the constitution of the United States or article first, § 7, of the constitution of Connecticut if a person with authority to do so has freely consented to the search. . . . The state bears the burden of proving that the consent was free and voluntary[32] . . . . The state must affirmatively estab-

---

[32] We note that the state had the burden of proving the voluntariness of the consent to the search by a preponderance of the evidence. See *United States* v. *Isiofia*, 370 F.3d 226, 230 (2d Cir. 2004); *State* v. *Ortiz*, 17 Conn. App. 102, 103, 550 A.2d 22 (per curiam), cert. denied, 209 Conn. 828, 552 A.2d 1216 (1988); accord *State* v. *Lawrence*, 282 Conn. 141, 177, 920 A.2d 236 (2007) (state and federal constitutions require "the state to prove the voluntariness of a confession by a preponderance of the evidence, rather than by proof beyond a reasonable doubt").

lish that the consent was voluntary; mere acquiescence to a claim of lawful authority is not enough to meet the state's burden. . . . The question whether consent to a search has in fact been freely and voluntarily given, or was the product of coercion, express or implied . . . is a question of fact to be determined from the totality of all the circumstances. . . . As a question of fact, it is normally to be decided by the trial court upon the evidence before that court together with the reasonable inferences to be drawn from that evidence. . . . We may reverse [the trial court's factual] findings on appeal only if they are clearly erroneous." (Internal quotation marks omitted.) *State* v. *Azukas*, 278 Conn. 267, 275, 897 A.2d 554 (2006). Thus, "[w]hether there was valid consent to a search is a factual question that will not be lightly overturned on appeal."[33] (Internal quotation marks omitted.) *State* v. *Nowell*, 262 Conn. 686, 699, 817 A.2d 76 (2003).

"In determining whether a defendant's will was overborne in a particular case, the [c]ourt has assessed the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the

---

[33] Relying on *Ornelas* v. *United States*, 517 U.S. 690, 116 S. Ct. 1657, 134 L. Ed. 2d 911 (1996), the defendant contends that we should engage in de novo review of the trial court's determination about the voluntariness of his consent. In *Ornelas*, the Supreme Court concluded that, "as a general matter determinations of reasonable suspicion and probable cause should be reviewed de novo on appeal. Having said this, we hasten to point out that a reviewing court should take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers." Id., 699. The *Ornelas* decision is, however, limited only to appellate review of determinations of probable cause and reasonable suspicion and, inasmuch as the defendant has not cited any cases extending that decision to the more subjective voluntariness determination; see *Schneckloth* v. *Bustamonte*, supra, 412 U.S. 229 ("account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents"); we continue to apply the clearly erroneous standard of review to trial courts' determinations with respect to the voluntariness of consents to search.

interrogation. Some of the factors taken into account have included the youth of the accused . . . his lack of education . . . or his low intelligence . . . the lack of any advice to the accused of his constitutional rights . . . the length of detention . . . the repeated and prolonged nature of the questioning . . . and the use of physical punishment such as the deprivation of food or sleep . . . ." (Citations omitted.) *Schneckloth* v. *Busta- monte,* supra, 412 U.S. 226. In analyzing these factors, the Supreme Court noted that it had "determined the factual circumstances surrounding the confession, assessed the psychological impact on the accused, and evaluated the legal significance of how the accused reacted." Id.

In evaluating the voluntariness of the defendant's consent, we note that, "while the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent." Id., 249. The Supreme Court has emphasized that this rule remains applicable to requests for consent to search during traffic stops, calling it "unrealistic to require police officers to always inform detainees that they are free to go before a consent to search may be deemed voluntary." *Ohio* v. *Robinette,* supra, 519 U.S. 40 (following *Schneckloth*); see also, e.g., *People* v. *Red- dersen,* 992 P.2d 1176, 1182–83 (Colo. 2000) (consent to search given during ongoing traffic stop was voluntary, despite officer's failure to advise motorist of his right to refuse or to give warning pursuant to *Miranda* v. *Arizona,* 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 [1966]).

Moreover, that consent to search is given while a defendant is being detained does not render it involuntary per se, as "the fact of custody alone has never been enough in itself to demonstrate a coerced confession or consent to search." *United States* v. *Watson,* 423

U.S. 411, 424, 96 S. Ct. 820, 46 L. Ed. 2d 598 (1976); see also id., 424–25 (The court noted that consent was given on public street, "not in the confines of the police station," and that "[t]here was no overt act or threat of force against [the defendant] proved or claimed. There were no promises made to him and no indication of more subtle forms of coercion that might flaw his judgment."); *State* v. *Winot*, 95 Conn. App. 332, 349, 897 A.2d 115 (2006) (The defendant's consent, given while under arrest in the back of a police cruiser, was voluntary because he "does not claim to have been threatened in any way by anyone at the scene. He has not alleged that improper promises were made to him or that he was subjected to any other more subtle forms of coercion that might improperly have impaired his judgment."), rev'd in part on other grounds, 294 Conn. 753, 988 A.2d 188 (2010). Thus, it is significant that the defendant's consent was obtained during a routine traffic stop that, while not itself consensual in nature, also was not unreasonable by fourth amendment standards; see part II A of this opinion; which accords with the trial court's factual findings that "[t]here is no evidence that the length of the stop was excessive or overbearing" and that "[t]he defendant was never threatened or restrained."

With respect to the remainder of the defendant's claims,[34] although the officers did not inform him of his right to refuse to consent to the search, this factor is mitigated by the spontaneity of the defendant's invitation to Morgan to check his vehicle, in response to Morgan's question limited to the presence of "anything illegal" in the car. The spontaneous nature of that invitation, which was not given in response to a specific

---

[34] As noted previously, we decline to consider the defendant's second proffered ground for finding his consent involuntary, namely, that Morgan already had escalated the encounter by patting down the defendant without justification. See part I of this opinion.

request for consent to search, renders "inapposite" the officers' failure to advise the defendant of his right to refuse to consent to the search. *United States* v. *Brown*, 563 F.3d 410, 416 (9th Cir. 2009); see also id. ("[a]lthough [the agent] admittedly did not notify [the co-occupant of the house] that she had a right not to consent to search, this factor is not an absolute requirement for a finding of voluntariness . . . and also seems inapposite given that [the co-occupant] volunteered consent without any prompting whatsoever" [citation omitted]); *United States* v. *Pedroza*, 269 F.3d 821, 827 (7th Cir. 2001) (rejecting claim that consent was involuntary because "[the defendant] volunteered permission for the agents to search his home and the [vehicle] even before the agents asked for it"). Indeed, numerous federal and state courts have considered the spontaneity of consent, or an invitation to search without a prior request, as a "strong indication of [its] voluntariness."[35] *State* v. *Kennedy*, 290 Or. 493, 504, 624 P.2d 99 (1981). Thus, the trial court properly found significant that "it was the defendant who told the detective to check his vehicle upon the mere inquiry as to whether or not there was anything illegal in his car."

We further disagree with the defendant's claim that Morgan and Sutton behaved in a "subtly coercive" manner because they were armed, the defendant was a minority from out of state who was alone in his car, and the traffic stop took place on a dark area of the

---

[35] See also, e.g., *United States* v. *Walker*, 922 F. Sup. 724, 727 (N.D.N.Y. 1996) (noting that defendant's "original consent to search the vehicle was spontaneous, unsolicited, and without any indication that it was produced by coercion"); *State* v. *Sullivan*, 49 S.W.3d 800, 812 and n.8 (Mo. App. 2001) (consent was voluntary when defendant responded to question of her knowledge of narcotics investigation by stating that police officer could search her car); *State* v. *Lowe*, 135 N.M. 520, 525, 90 P.3d 539 (App.) (taint attenuated from illegal detention when defendant volunteered spontaneously to permit officer to search her car), cert. quashed, 103 P.3d 1098 (N.M. 2004).

turnpike. The defendant has not proffered any evidence to contradict, or demonstrated a void of supporting evidence, with respect to the trial court's finding that "there was no untoward conduct on the part of either . . . Morgan or . . . Sutton" and that "there was no threatening, coercive or overpowering behavior exhibited at any time during this incident." The fact that the police officers were armed with their duty sidearms does not render the atmosphere coercive, particularly as there is no evidence that the officers ever drew or unholstered their weapons. See *State* v. *Reynolds*, 264 Conn. 1, 45, 836 A.2d 224 (2003) ("[a]lthough the presence of *drawn* weapons is certainly a factor in determining voluntariness . . . it is not dispositive" [emphasis added; internal quotation marks omitted]), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004); see also id., 45–46 (noting that coercive effect of displayed weapons was mitigated by manner of interaction, which did not involve threatening language or intrusion into subject's home late at night or early in morning); *State* v. *Boyd*, 57 Conn. App. 176, 181, 749 A.2d 637 (The presence of drawn weapons was not dispositive of the defendant's coercion claim because "[t]he defendant was not greeted with a phalanx of weapons when he opened his apartment door for the police. Rather, one officer had his weapon drawn at the defendant's door while another with his weapon drawn remained at the bottom of the apartment stairs."), cert. denied, 253 Conn. 912, 754 A.2d 162 (2000). Thus, viewing the totality of the circumstances, we conclude that the trial court's determination that the defendant's consent was voluntary was not clearly erroneous.

C

Scope of the Defendant's Consent

The defendant next proffers a second ground for affirming the judgment of the Appellate Court, namely,

that the state did not prove that he actually had consented to a complete search of the Altima's passenger compartment. Relying on *Florida* v. *Jimeno*, 500 U.S. 248, 111 S. Ct. 1801, 114 L. Ed. 2d 297 (1991), the defendant contends that, by extensively searching his car, Morgan exceeded the scope of his consent, which he claims was limited only to an invitation to check for beer on floor by the passenger seat. In response, the state also relies on *Jimeno* and argues that it was objectively reasonable for Morgan to construe the defendant's invitation as an actual consent to a search. We agree with the state and conclude that it was objectively reasonable for Morgan to interpret the defendant's consent as extending to a search of the Altima's passenger compartment and unlocked storage areas therein.

"The standard for measuring the scope of a suspect's consent under the [f]ourth [a]mendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" Id., 251. "The scope of a search is generally defined by its expressed object." Id. "Although objective reasonableness is a question of law [over which our review is plenary], the factual circumstances are highly relevant when determining what a reasonable person would have believed to be the outer bounds of the consent that was given."[36] *United States* v. *Mendoza-Gonzalez*, 318 F.3d 663, 667 (5th Cir.), cert. denied, 538 U.S. 1049, 123 S. Ct. 2114, 155 L. Ed. 2d 1091 (2003); see also, e.g., *United States* v. *Rich*, 992 F.2d 502, 505 (5th Cir.) ("[o]bjective reasonableness is a question of law that is reviewed de

---

[36] But see *United States* v. *Canipe*, 569 F.3d 597, 604 (6th Cir.) (applying clearly erroneous standard of review to District Court's determination that search did not exceed scope of consent), cert. denied, 558 U.S. 1036, 130 S. Ct. 655, 175 L. Ed. 2d 499 (2009); *United States* v. *Gutierrez-Mederos*, 965 F.2d 800, 803 (9th Cir. 1992) (same), cert. denied, 507 U.S. 932, 113 S. Ct. 1315, 122 L. Ed. 2d 702 (1993).

novo"), cert. denied, 510 U.S. 933, 114 S. Ct. 348, 126 L. Ed. 2d 312 (1993).

In *Jimeno*, the Supreme Court concluded that it was "reasonable for an officer to consider a suspect's general consent to a search of his car to include consent to examine a paper bag lying on the floor of the car." *Florida* v. *Jimeno*, supra, 500 U.S. 251. The court noted that "the terms of the search's authorization were simple" because the defendant had granted the officer "permission to search his car, and did not place any explicit limitation on the scope of the search," after the officer "had informed [the defendant] that he believed [the defendant] was carrying narcotics, and that he would be looking for narcotics in the car. We think that it was objectively reasonable for the police to conclude that the general consent to search [the defendant's] car included consent to search containers within that car which might bear drugs. A reasonable person may be expected to know that narcotics are generally carried in some form of a container." Id.

Post-*Jimeno* case law makes clear that, on the basis of the exchange between Morgan and the defendant, Morgan reasonably could have understood the defendant's invitation to "check" the Altima as an invitation to search the interior of the car and unlocked compartments therein, including its center console. First, Morgan's question about the presence of "anything illegal" in the car reasonably is understood as directing the defendant's attention to contraband such as narcotics or weapons, despite the fact that he did not mention those items specifically.[37] See *United States* v. *Canipe*,

[37] We disagree with the defendant's reliance on *United States* v. *Isiofia*, 370 F.3d 226 (2d Cir. 2004), in support of his argument that Morgan exceeded the scope of the consent by not elaborating about the nature of the contraband that he inquired about. *Isiofia* is inapposite, because the issue in that case was voluntariness and the court concluded on appeal that the District Court, in conducting a totality of the circumstances analysis to determine whether the defendant had voluntarily given his consent, properly considered as a factor the agents' failure to inform the defendant of the type of

569 F.3d 597, 606 (6th Cir.) ("[w]hen [the investigator] asked [the defendant] whether he had anything in his vehicle that might be unlawful or about which he should know, his questioning placed [the defendant] on notice that any unlawful item would be the subject of his search"), cert. denied, 558 U.S. 1036, 130 S. Ct. 655, 175 L. Ed. 2d 499 (2009); *United States* v. *Snow*, 44 F.3d 133, 135 (2d Cir. 1995) ("[i]t is self-evident that a police officer seeking general permission to search a vehicle is looking for evidence of illegal activity"); cf. *State* v. *McConnelee*, 690 N.W.2d 27, 31 (Iowa 2004) ("[c]onsidering their conversation was limited to the nature of the leafy substance that was in plain view, we think it unlikely that the defendant would respond to the officer's comments with an unsolicited invitation to the officer to 'search the whole car' "). Moreover, a general consent to search a vehicle "reasonably include[s] permission to search any container that might have held illegal objects." *United States* v. *Canipe*, supra, 606; see also *United States* v. *Snow*, supra, 135 ("[i]t is just as obvious that such evidence [of illegal activity] might be hidden in closed containers"); *United States* v. *Harris*, 928 F.2d 1113, 1118 (11th Cir. 1991) ("the defendant knew the officer was looking for drugs; therefore, both [the] defendant and the officer would reasonably interpret the consent as constituting consent to search in places where narcotics would reasonably be hidden"); cf. *United States* v. *Neely*, 564 F.3d 346, 351 (4th Cir. 2009) (per curiam) (containers "physically part of" area to be searched are included within scope of consent, but consent limited to trunk does not "physically encompass the interior of [a] vehicle").

We further disagree with the defendant's reliance on the fact that Morgan "never used the word 'search,' "

evidence they expected to seize or the crime they expected to charge. See id., 233–34. *Isiofia* does not involve a claim that the officers had exceeded the scope of consent that was given.

in support of his argument that "it is not linguistically and constitutionally reasonable to find that the defendant actually consented to the search of his car . . . ." Case law, none of which is contradicted by the defendant in his brief, establishes that Morgan reasonably understood the defendant's invitation to "check" the car—made presumably in the hopes that Morgan would see only the beer on the floor by the passenger seat and then go on his way—as an invitation to search the vehicle.[38] See *United States* v. *Neely*, supra, 564 F.3d 350 ("[b]y asking whether [the officer] would like to 'check' the trunk, [the defendant] consented to a search of his trunk"); *United States* v. *Walker*, 922 F. Sup. 724, 731 (N.D.N.Y. 1996) (concluding that defendant "first

---

[38] Relying on Morgan's testimony during cross-examination that he did not record in his report the specific words used by the defendant, the defendant argues that the trial court committed clear error when it found that the exact words of his consent were "go ahead and check. You can check if you want." We disagree. Morgan's testimony on cross-examination, while acknowledging that he did not quote the defendant verbatim in his report, nevertheless does not contradict Morgan's earlier statements that the defendant had invited him to "check" the car.

In any event, we note that courts have concluded that other words synonymous with "check" also have the legal effect of a request to "search." See *United States* v. *Canipe*, supra, 569 F.3d 604 (defendant's "consent to let the officers 'look in' his truck 'would be understood by most people to involve a search' of the vehicle, not merely permission to peer through its windows"); *United States* v. *Mendoza-Gonzalez*, supra, 318 F.3d 667–68 (rejecting defendant's argument that "a reasonable person would have assumed he had consented to only a quick look inside of the trailer, rather than a search of the containers within, because this is what [the border patrol agent] had . . . literally requested," because "it is established law . . . that a request to 'look in' a vehicle is the equivalent of a request for general consent to search"); *United States* v. *Rich*, supra, 992 F.2d 506 (officer's request to " 'have a look in' " vehicle is proper request for permission to search because "any words, when viewed in context, that objectively communicate to a reasonable individual that the officer is requesting permission to examine the vehicle and its contents constitute a valid search request"); *State* v. *Stephens*, 946 P.2d 734, 735, 737 (Utah App. 1997) ("we conclude that [the police officer] could have reasonably believed that [the] defendant's general consent to 'look' or 'check' under the front seat for weapons or drugs extended to the contents of the leather case" found under front seat).

gave permission to conduct a search when he told [the trooper] 'you can check the car' while pointing at the vehicle"); *State* v. *Stephens*, 946 P.2d 734, 735, 737 (Utah App. 1997) ("we conclude that [the police officer] could have reasonably believed that [the] defendant's general consent to 'look' or 'check' under the front seat for weapons or drugs extended to the contents of the leather case" found under front seat). Accordingly, we conclude that Morgan did not exceed the scope of the defendant's consent by searching the interior of the defendant's Altima, including its unlocked center console compartment.

## III

## STATE CONSTITUTIONAL CLAIMS

As his final proffered alternative ground for affirming the judgment of the Appellate Court, the defendant provides an analysis under *State* v. *Geisler*, 222 Conn. 672, 684–86, 610 A.2d 1225 (1992), and contends that we should adopt a rule, pursuant to article first, § 7, of the Connecticut constitution;[39] see footnote 2 of this opinion; providing that, to validate a request for consent to search made during a routine traffic stop, a police officer must: (1) have "reasonable and articulable suspi-

[39] The defendant also relies upon article first, § 9, of the Connecticut constitution, which provides: "No person shall be arrested, detained or punished, except in cases clearly warranted by law." We agree with the state that the defendant's reliance on this section is, in essence, superfluous, because, in the search and seizure context, article first, § 9, is our criminal due process provision that does not provide protections greater than those afforded by either the fourth amendment or its coordinate specific state constitutional provision, article first, § 7. See *State* v. *Lamme*, 216 Conn. 172, 184, 579 A.2d 484 (1990) (article first, § 9, does not preclude *Terry* stops or other detentions not founded upon probable cause); see also *State* v. *Oquendo*, 223 Conn. 635, 669 n.1, 613 A.2d 1300 (1992) (*Borden, J.,* dissenting) ("Article first, § 7, is, of course, our state counterpart to the federal fourth amendment. Article first, § 9 . . . is our criminal due process clause, and has not generally been regarded as adding significantly to search and seizure analysis." [Internal quotation marks omitted.]).

cion of illegal activity" prior to asking for consent; and (2) inform the motorist that he or she is free to leave and to refuse consent.[40] The defendant, supported by the amicus curiae Connecticut Criminal Defense Lawyers Association, contends that we should adopt this new constitutional rule in order to address the psychological pressures experienced by Connecticut citizens stopped by the police and to provide them with heightened protection from the specter of racial profiling, pretextual stops and other arbitrary police actions based on non-criminal factors. In response, the state contends that the defendant's proposed constitutional rules are unworkable, would vitiate the purpose of consent searches and that existing federal constitutional protections are sufficient. The state also contends that, because the record lacks evidence of racial profiling or other bias, the defendant and the amicus "[ask] this

---

[40] The defendant also asks for a requirement that the state prove, at a subsequent suppression hearing, the voluntariness of the consent by a heightened standard of proof. The defendant's analysis of this particular request is, however, limited to a sentence supported by a footnote citing three cases, *State* v. *Hight*, 146 N.H. 746, 781 A.2d 11 (2001), *State* v. *Johnson*, 68 N.J. 349, 346 A.2d 66 (1975), and *State* v. *Ibarra*, 953 S.W.2d 242 (Tex. Crim. App. 1997). Of these three cases, only *Ibarra* mentions the standard of proof applicable at a suppression hearing. The paucity of analysis with respect to this element of the defendant's proposed rule renders it inadequately briefed, and we decline to consider further this portion of the defendant's claim because the evidentiary standard applicable in a suppression hearing to determine the voluntariness of consent is a question deserving of its own analysis under *State* v. *Geisler*, supra, 222 Conn. 684–86. Compare *State* v. *Akuba*, 686 N.W.2d 406, 412 (S.D. 2004) ("[M]ost courts no longer require clear and convincing evidence. Today we conform our burden of proof to that used by the United States Supreme Court and the [United States Court of Appeals for the Eighth Circuit]. They hold that 'in deciding whether a consent was voluntary, courts should require the prosecution to prove voluntariness by a preponderance of the evidence.' "), with *State* v. *Ibarra*, supra, 243–45 (rejecting state's claim that state constitutional standard should be changed from clear and convincing evidence to conform with federal preponderance of evidence standard). See also *State* v. *Lawrence*, 282 Conn. 141, 177, 920 A.2d 236 (2007) (state constitution requires "the state to prove the voluntariness of a confession by a preponderance of the evidence, rather than by proof beyond a reasonable doubt").

court to presume a serious impropriety" in devising a new constitutional rule. We agree with the state and conclude that article first, § 7, of the Connecticut constitution does not provide criminal defendants with greater protections than does the federal constitution in the context of unrelated questioning, including requests for consent to search, made during routine traffic stops.

"It is well established that federal constitutional and statutory law establishes a minimum national standard for the exercise of individual rights and does not inhibit state governments from affording higher levels of protection for such rights. . . . Furthermore, although we often rely on the United States Supreme Court's interpretation of the amendments to the constitution of the United States to delineate the boundaries of the protections provided by the constitution of Connecticut, we have also recognized that, in some instances, our state constitution provides protections beyond those provided by the federal constitution, as that document has been interpreted by the United States Supreme Court. . . . The analytical framework by which we determine whether, in any given instance, our state constitution affords broader protection to our citizens than the federal constitutional minimum is well settled. In *State* v. *Geisler*, [supra, 222 Conn. 684–86], we enumerated the following six factors to be considered in determining that issue: (1) persuasive relevant federal precedents; (2) the text of the operative constitutional provisions; (3) historical insights into the intent of our constitutional forebears; (4) related Connecticut precedents; (5) persuasive precedents of other state courts; and (6) contemporary understandings of applicable economic and sociological norms, or as otherwise described, relevant public policies." (Internal quotation marks omitted.) *State* v. *McKenzie-Adams*, 281 Conn. 486, 509–10, 915 A.2d 822, cert. denied, 552 U.S. 888, 128 S. Ct. 248, 169 L. Ed. 2d 148 (2007).

"The *Geisler* factors serve a dual purpose: they encourage the raising of state constitutional issues in a manner to which the opposing party—the state or the defendant—can respond; and they encourage a principled development of our state constitutional jurisprudence. Although in *Geisler* we compartmentalized the factors that should be considered in order to stress that a systematic analysis is required, we recognize that they may be inextricably interwoven. . . . [N]ot every *Geisler* factor is relevant in all cases." (Citation omitted.) *State* v. *Morales*, 232 Conn. 707, 716 n.10, 657 A.2d 585 (1995). Moreover, a proper *Geisler* analysis does not require us simply to tally and follow the decisions favoring one party's state constitutional claim; a deeper review of those decisions' underpinnings is required because we follow only "persuasive" decisions. See *Kerrigan* v. *Commissioner of Public Health*, 289 Conn. 135, 240–41, 957 A.2d 407 (2008) ("the state court cases that have determined that gay persons do not constitute a quasi-suspect class, like the federal cases described in this part of the opinion, employed a flawed analysis, and, therefore, they do not constitute persuasive authority").

## A

### Operative Constitutional Text

With respect to the first *Geisler* factor, namely, the operative constitutional text, we agree with the state that the language of article first, § 7, does not support the defendant's claim of greater protections than are provided under the fourth amendment. See footnotes 1 and 2 of this opinion. The state provision "closely resembles" the fourth amendment; *State* v. *Barton*, 219 Conn. 529, 540, 594 A.2d 917 (1991); particularly as "both proscribe only unreasonable searches and seizures." *State* v. *Dukes*, supra, 209 Conn. 121; see also, e.g., *Washington* v. *Meachum*, 238 Conn. 692, 719, 680

A.2d 262 (1996) (describing provisions as "virtually identical"). Although the "linguistic similarity undermines the defendant's contention that the state constitution provides a greater opportunity to challenge the legality of a search than the federal constitution"; *State* v. *Davis*, 283 Conn. 280, 306, 929 A.2d 278 (2007); our inquiry does not end here, because "this court has never considered itself bound to adopt the federal interpretation in interpreting the Connecticut constitution. Our system of federalism requires no less. But of even weightier concern is the authority of our state constitution, the fundamental charter of our state, and it is this court's duty to interpret and enforce our constitution. Here we note that the United States Supreme Court or its individual members have often called the attention of state courts to their independent responsibility for the constitutional laws of their states. Thus, in a proper case, 'the law of the land' may not, in state constitutional context, also be 'the law of the state of Connecticut.' " *State* v. *Dukes*, supra, 113–14.

## B

### Connecticut and Federal Case Law

We also agree with the state that contemporary federal case law governing the police conduct during routine traffic stops; see parts II A and B of this opinion; similarly does not support the defendant's interpretation of the state constitution.[41] With respect to Connecti-

[41] In their dissents, neither Justice Katz nor Justice Palmer disputes our conclusion under *Arizona* v. *Johnson*, supra, 555 U.S. 323, and *Muehler* v. *Mena*, supra, 544 U.S. 93, "that recent federal precedent suggests that the permissibility of a consent search following a routine traffic stop is dictated by the duration of the stop." Justice Katz does, however, posit that this "holding constitutes a substantive departure from settled fourth amendment jurisprudence," which requires the scope of the investigation during a *Terry* stop to be "carefully tailored to its underlying justification . . . ." *Florida* v. *Royer*, 460 U.S. 491, 500, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983). Justice Katz' critique of this recent body of federal case law is not without support. See, e.g., 4 W. LaFave, supra, (4th Ed. 2004) § 9.3 (d), p. 391 ("[t]he correct rule is that . . . in strict accordance with *Terry* and its progeny, questioning

cut case law, although we have in the past interpreted article first, § 7, to "[afford] protections to the citizens of this state beyond those provided by the fourth amendment to the federal constitution, as that provision has been interpreted by the United States Supreme Court";[42]

during a traffic stop must be limited to the purpose of the traffic stop and thus may not be extended to the subject of drugs"). Nevertheless, until the United States Supreme Court concludes otherwise, we deem the body of case law discussed in part II B of this opinion to be dispositive of both the defendant's federal constitutional claims and the federal factor of the *Geisler* analysis.

[42] See, e.g., *State* v. *Miller*, 227 Conn. 363, 386–87, 630 A.2d 1315 (1993) ("a warrantless automobile search supported by probable cause, but conducted after the automobile has been impounded at the police station, violates article first, § 7"); *State* v. *Oquendo*, 223 Conn. 635, 647–53, 613 A.2d 1300 (1992) (rejecting *California* v. *Hodari D.*, 499 U.S. 621, 626, 111 S. Ct. 1547, 113 L. Ed. 2d 690 [1991], and instead adhering to Connecticut precedents defining seizure as whether reasonable person would have felt free to leave due to restraint of movement by physical force or show of authority); *State* v. *Geisler*, supra, 222 Conn. 676, 690 (rejecting *New York* v. *Harris*, 495 U.S. 14, 21, 110 S. Ct. 1640, 109 L. Ed. 2d 13 [1990], and concluding that "the exclusionary rule under article first, § 7 requires that evidence derived from an unlawful warrantless entry into the home be excluded unless the taint of the illegal entry is attenuated by the passage of time or intervening circumstances"); *State* v. *Marsala*, 216 Conn. 150, 171, 579 A.2d 58 (1990) (rejecting *United States* v. *Leon*, 468 U.S. 897, 920, 104 S. Ct. 3405, 82 L. Ed. 2d 677 [1984], and concluding that article first, § 7, does not have good faith exception for invalid warrants); accord *State* v. *Joyce*, 229 Conn. 10, 15, 639 A.2d 1007 (1994) (concluding that warrantless chemical analysis of defendant's clothing left at fire scene violated article first, § 7). But see *State* v. *Johnson*, 286 Conn. 427, 443–50, 944 A.2d 297 (rejecting claim that article first, § 7, requires stricter standard than totality of circumstances for assessing probable cause for warrantless arrests based on informant's tips), cert. denied, 555 U.S. 883, 129 S. Ct. 236, 172 L. Ed. 2d 144 (2008); *State* v. *Davis*, supra, 283 Conn. 323–24 (following federal " 'reasonable expectation of privacy' " standard and declining to adopt automatic standing rule under article first, § 7); *State* v. *Trine*, 236 Conn. 216, 234, 673 A.2d 1098 (1996) (following federal "plain feel" doctrine and concluding that "article first, § 7 does not categorically bar a police officer from seizing, without a warrant, nonthreatening contraband that the officer feels during a lawful patdown search"); *State* v. *DeFusco*, 224 Conn. 627, 639, 620 A.2d 746 (1993) (warrantless police searches of curbside garbage containers are permissible under article first, § 7, because defendant lacks reasonable expectation of privacy therein); *State* v. *Barton*, supra, 219 Conn. 543–45 (overruling *State* v. *Kimbro*, 197 Conn. 219, 496 A.2d 498 [1985], which had adopted former

*State* v. *Wilkins*, 240 Conn. 489, 505, 692 A.2d 1233 (1997); we also have concluded that "[a]pplications of *Terry* principles in the context of motor vehicle stops are already embodied in our state constitution." Id., 508–509. Thus, in *Wilkins*, we determined, in accordance with the United States Supreme Court's interpretation of the fourth amendment in *Michigan* v. *Long*, 463 U.S. 1032, 1049, 103 S. Ct. 3469, 77 L. Ed. 2d 1201 (1983), that the state constitution permitted police officers, with reasonable and articulable suspicion that a suspect is potentially dangerous, to conduct a limited protective search of a motor vehicle for weapons during a routine traffic stop. *State* v. *Wilkins*, supra, 509–11; see also id., 501, 504 (officer acted reasonably under state constitution by separating vehicle occupants and detaining suspect in cruiser until backup arrived to allow patdowns to be conducted safely); *State* v. *Dukes*, supra, 209 Conn. 122 (following *Pennsylvania* v. *Mimms*, supra, 434 U.S. 106, and concluding that state constitution permits police officer to require motorist to exit vehicle during routine traffic stop); accord *State* v. *Mikolinski*, 256 Conn. 543, 554, 775 A.2d 274 (2001) ("sobriety checkpoints operated pursuant to neutral criteria are permissible under article first, § 7"); *State* v. *Lamme*, 216 Conn. 172, 184, 579 A.2d 484 (1990) (concluding that article first, § 9, is due process provision that does not preclude *Terry* stops or other detentions not founded upon probable cause).

Moreover, the defendant has not identified any on point Connecticut case law interpreting the federal constitution that conflicts with the federal constitutional principles recently articulated in *Arizona* v. *Johnson*,

federal *Aguilar-Spinelli* test; see *Aguilar* v. *Texas*, 378 U.S. 108, 84 S. Ct. 1509, 12 L. Ed. 2d 723 (1964), *Spinelli* v. *United States*, 393 U.S. 410, 89 S. Ct. 584, 21 L. Ed. 2d 637 (1969); for scrutiny of search warrant applications based on confidential informants' tips pursuant to article first, § 7, in favor of current federal " 'totality of the circumstances' " standard under *Illinois* v. *Gates*, 462 U.S. 213, 103 S. Ct. 2317, 76 L. Ed. 2d 527 [1983]).

supra, 129 S. Ct. 781, and *Muehler* v. *Mena*, supra, 544 U.S. 93.[43] Cf. *State* v. *Oquendo*, 223 Conn. 635, 647–52, 613 A.2d 1300 (1992) (rejecting *California* v. *Hodari D.*, 499 U.S. 621, 626, 111 S. Ct. 1547, 113 L. Ed. 2d 690 [1991], and instead adhering to Connecticut precedents defining seizure as whether reasonable person would have felt free to leave due to restraint of movement by physical force or show of authority). We therefore agree with the state that Connecticut case law does not support the defendant's arguments in support of a more comprehensive state constitutional rule.[44]

## C

### Constitutional History

With respect to the relevant constitutional history, we agree with the defendant that the "original 1818

[43] Justice Katz cites to several of this court's decisions, namely, *State* v. *Wilkins*, supra, 240 Conn. 508, *State* v. *Lamme*, supra, 216 Conn. 184, *State* v. *Edwards*, 214 Conn. 57, 72, 570 A.2d 193 (1990), and *State* v. *Carter*, 189 Conn. 611, 618, 458 A.2d 369 (1983), in support of the unremarkable proposition that, "under our state constitution, a *Terry* stop must be both justified at inception *and reasonably circumscribed*." (Emphasis added.) The dissent does not, however, point to any Connecticut case law definitively indicating that brief off-the-topic questioning, which does not measurably extend the length of the *Terry* detention, is per se unreasonable under our state constitution. Cf. *State* v. *Edwards*, supra, 73 (declining to "[extend] a *Terry* stop to include transporting a suspect to a police station for open ended questioning").

[44] The defendant cites *State* v. *Conger*, 183 Conn. 386, 439 A.2d 381 (1981), in support of the proposition that the present case differs from *State* v. *Wilkins*, supra, 240 Conn. 509–11, and *State* v. *Dukes*, supra, 209 Conn. 104–106, because in the present case, officer safety was not an issue, and the defendant was not under arrest at the time of the request for consent to search. In *State* v. *Conger*, supra, 387, 391, this court concluded that the defendant, who sought to contest the legality of his stop while driving a stolen truck, had standing to raise a fourth amendment claim, because "[t]he defendant, as an occupant of the truck, has an interest in continuing his travels without government intrusion. Thus his fourth amendment rights could have been violated by the stopping of the truck even though the truck was stolen." In our view, *Conger* does not support the defendant's argument because it does not consider the propriety of the traffic stop itself under either the federal or state constitutions.

state constitution predates the automobile age," and that article first, § 7, "was adopted in the automobile age and should be interpreted to include protection of individual citizens while in cars from the abuse of governmental power." With respect, however, to whether the historical circumstances surrounding the adoption of article first, § 7, support the defendant's claim to *greater* protections under that provision than are afforded by the federal constitution, we have stated that "[t]he declaration of rights adopted in 1818 appears to have its antecedents in the Mississippi constitution of 1817, which in turn derived from the federal bill of rights and the Virginia declaration of rights of 1776. . . . The search and seizure provision in our 1818 constitution, then article first, § 8, closely resembles the fourth amendment to the United States constitution. Although its enumeration was changed to article first, § 7, when the 1965 constitution incorporated article first, § 4, into article seventh, its language has not been altered since its original adoption. . . . The language of article first, § 7, which was based upon the fourth amendment, was adopted with little debate. . . . Thus, the circumstances surrounding the adoption of article first, § 7, lend weight to the view that, in most cases, a practice permitted under the fourth amendment is permissible under article first, § 7." (Citations omitted; internal quotation marks omitted.) *State* v. *Mikolinski*, supra, 256 Conn. 548–49; see also *State* v. *Davis*, supra, 283 Conn. 316 ("it reasonably may be argued that the lack of any evidence indicating that article first, § 7, was intended to be more broadly protective of privacy rights than the fourth amendment gives rise to a contrary inference").

## D

### Sister State Case Law

The defendant relies specifically on state constitutional case law from ten states, Alaska, Kansas, Massa-

chusetts, Minnesota, Montana, New Jersey, Pennsylvania, Vermont, Washington and Wyoming in support of his argument that we should interpret article first, § 7, to preclude, in the context of a routine traffic stop, requests for consent to search and other questioning unrelated to the purpose of the stop.[45] Only those cases from Alaska, Kansas, Massachusetts, Minnesota, New Jersey, Pennsylvania and Wyoming warrant any significant discussion.[46]

---

[45] The defendant also relies on sister state case law interpreting the federal constitution, as well as some decisions applying state statutes restricting the scope of traffic stops. To the extent that the case law interprets the federal constitution, it, like those federal decisions preceding *Muehler* v. *Mena*, supra, 544 U.S. 93, and *Arizona* v. *Johnson*, supra, 555 U.S. 323, lacks current persuasive value for purposes of this *Geisler* analysis. See *Kerrigan* v. *Commissioner of Public Health*, supra, 289 Conn. 240–41.

[46] The defendant's reliance on case law from Montana, Vermont and Washington is misplaced because the cited cases do not stand for the proposition that those states have implemented increased state constitutional protections in the area of consent searches. With respect to Montana, the defendant cites *State* v. *Hill*, 322 Mont. 165, 94 P.3d 752 (2004). Putting aside the distinction that consent was sought after the trooper had acted to end the stop by returning the defendant's paperwork and telling him that " 'we're done' "; id., 168; *Hill* does not hold that Montana's constitution provides motorists in that state with enhanced state constitutional protections. Id., 170; see also id., 174 (defendant lacks reasonable expectation of privacy in unlawfully possessed rental vehicle). Indeed, the Montana Supreme Court issued a decision subsequent to *Hill* holding to the contrary. See *State* v. *Snell*, 323 Mont. 157, 161, 99 P.3d 191 (2004) ("It is undisputed that [the officer] had particularized suspicion to stop [the defendant's] vehicle. Montana law does not require additional justification for requesting consent.").

Similarly, *State* v. *Cunningham*, 183 Vt. 401, 954 A.2d 1290 (2008), also does not stand for the proposition that the Vermont constitution provides greater protection to motorists during routine traffic stops than does the fourth amendment with respect to the scope of questioning or requests for consent to search. In *Cunningham*, the court merely held unreasonable under the state constitution the detention, not supported by reasonable suspicion, of a motorist for forty-six minutes pending the arrival of a drug-sniffing dog, after the motorist had refused to give officers consent to search his car. Id., 405, 415–16; see also id., 415 n.6 (emphasizing that court did not adopt "bright-line canine-response timing rule," and also that it did not need to consider vitality of *Illinois* v. *Caballes*, supra, 543 U.S. 409–10, under state constitution because, unlike in *Caballes*, arrival of drug-sniffing dog in *Cunningham* measurably prolonged duration of stop).

In our view, the most comprehensive and persuasive of these cited decisions is *State* v. *Carty*, 170 N.J. 632, 635, 790 A.2d 903, modified, 174 N.J. 351, 806 A.2d 798 (2002), wherein the New Jersey Supreme Court concluded, under that state's constitution, that "in order for a consent to search a motor vehicle and its occupants to be valid, law enforcement personnel must have a reasonable and articulable suspicion of criminal wrongdoing prior to seeking consent to search a lawfully stopped motor vehicle." The court emphasized its long history of elevating state constitutional protections beyond those provided by the fourth amendment in the area of consent searches, including its separate requirement, in contravention of *Schneckloth* v. *Bustamonte*, supra, 412 U.S. 248–49, that individuals give knowing and voluntary consent to searches. *State* v. *Carty*, supra, 639, discussing *State* v. *Johnson*, 68 N.J. 349, 354, 346 A.2d 66 (1975). Most significantly, the New Jersey court also relied upon an extensive record demonstrating that state police officers frequently had utilized coercive tactics that had violated both a federal consent decree and state police policy.[47] *State* v. *Carty*,

Finally, the defendant relies on *State* v. *Glossbrener*, 146 Wash. 2d 670, 49 P.3d 128 (2002), in support of the proposition that Washington has a state constitutional rule restricting the scope and duration of routine traffic stops to the initial purpose of the stop, in the absence of an independent basis of reasonable suspicion to justify further investigation. The defendant's reliance on *Glossbrener* is, however, misplaced; Washington does in fact have such a rule, but it is statutory, and not constitutional. Id., 676–77; see Wash. Rev. Code Ann. § 46.61.021 (2) (West 2005) ("[w]henever any person is stopped for a traffic infraction, the officer may detain that person for a reasonable period of time necessary to identify the person, check for outstanding warrants, check the status of the person's license, insurance identification card, and the vehicle's registration, and complete and issue a notice of traffic infraction"). Second, *Glossbrener* was not a consent search case but, rather, implicated the limitations of a safety-based protective frisk of a stopped motor vehicle's passenger compartment. *State* v. *Glossbrener*, supra, 679–81.

[47] The court further emphasized that 95 percent of detained motorists from whom consent was sought had agreed to searches of their vehicles, but that only 20 percent of those searches yielded any contraband, which "undermined" the court's confidence in the "effectiveness of roadside con-

supra, 644–45; see also id., 647 (reasonable suspicion rule "serves the prophylactic purpose of preventing the police from turning a routine traffic stop into a fishing expedition for criminal activity unrelated to the stop"). We decline to follow *Carty* because the record in the present case lacks the evidence of specific instances of law enforcement abuses by police officers in our jurisdiction similar to that which prompted the New Jersey court to interpret its state constitution to provide enhanced protections to motorists on that state's highways. See *State* v. *Snell*, 323 Mont. 157, 161, 99 P.3d 191 (2004) (declining to follow *Carty* because defendant "does not argue—much less establish—that Montana law enforcement officers are abusing their authority").

Like the New Jersey Supreme Court, the Minnesota Supreme Court has interpreted its state constitution to require that officers have "reasonable, articulable suspicion" of criminal activity prior to asking for consent to search during a routine traffic stop. *State* v. *Fort*, 660 N.W.2d 415, 416 (Minn. 2003). *Fort*, however, is *legally* inapposite, because in that case, the Minnesota court was constrained to follow its then recent precedent in a dog sniff case that had interpreted both the fourth amendment, pre-*Illinois* v. *Caballes*, supra, 543 U.S. 408–409, and the state constitution, to limit "the scope and duration of a traffic stop investigation . . . to the justification for the stop."[48] *State* v. *Fort*, supra,

---

sents as a law enforcement technique . . . ." *State* v. *Carty*, supra, 170 N.J. 645.

[48] Contrary to Justice Katz' assertion, we do not suggest that *State* v. *Fort*, supra, 660 N.W.2d 416, is in any way "undermined" by *Illinois* v. *Caballes*, supra, 543 U.S. 408–409, at least not as a matter of Minnesota state constitutional law. Rather, we view *Fort* as having limited persuasive value with respect to our Connecticut state constitutional inquiry because, in *Fort*, the Minnesota Supreme Court was constrained to follow relevant recent precedent under its state constitution, namely, *State* v. *Wiegand*, supra, 645 N.W.2d 135–37. In contrast, our state constitutional jurisprudential landscape lacks an analytically dispositive precedent like *Wiegand*. See part III B of this opinion.

418; see id., 418–19, discussing *State* v. *Wiegand*, 645 N.W.2d 125, 135–37 (Minn. 2002) (requiring reasonable and articulable suspicion of narcotics related activity to justify exterior dog sniff of car).

Case law from the high courts of Massachusetts and Pennsylvania is similarly restrictive, as both states also do not permit police to inquire beyond the purpose of a traffic stop in the absence of a reasonable suspicion of criminal activity. The case law from these states, however, is not persuasive because of the cursory state constitutional analyses contained in those opinions. See *Commonwealth* v. *Torres*, 424 Mass. 153, 158, 674 N.E.2d 638 (1997) ("police inquiry in a routine traffic stop must end on the production of a valid license and registration unless the police have grounds for inferring that either the operator or his passengers were involved in the commission of a crime . . . or engaged in other suspicious conduct" [internal quotation marks omitted]);[49] *Commonwealth* v. *Strickler*, 563 Pa. 47, 69, 757 A.2d 884 (2000) ("[o]ur jurisprudence under [the Pennsylvania constitution], however, would not sustain a consent search conducted in the context of, but which is wholly unrelated in its scope to, an ongoing detention, since there can be no constitutionally-valid detention independently or following a traffic or similar stop absent reasonable suspicion . . . and the scope of a detention is circumscribed by the reasons that justify it" [citation omitted]); id., 70 n.20 ("[a]s noted, [*Terry* v. *Ohio*, supra, 392 U.S. 1] and its progeny strongly

---

[49] The lack of an independent state constitutional analysis makes *Commonwealth* v. *Torres*, supra, 424 Mass. 153, particularly difficult to rely upon, especially given the fact that the motions to suppress at issue were founded upon both the fourth amendment and the Massachusetts constitution. Id., 154. But see *Commonwealth* v. *Gonsalves*, 429 Mass. 658, 662–63, 711 N.E.2d 108 (1999) (characterizing *Torres* as state constitutional decision and relying on it in rejecting *Pennsylvania* v. *Mimms*, supra, 434 U.S. 111, and precluding police officers from requiring motorists to exit their vehicles without "reasonable belief" of danger to officer or others).

suggest that a traffic stop [viewed as the equivalent of a *Terry* stop] is not an appropriate vehicle within which to make inquiries about potential unlawful conduct unrelated to the stop not supported by reasonable suspicion").[50] Indeed, we agree with a Pennsylvania appellate court's characterization of this point in *Strickler* as dicta. See *Commonwealth* v. *Acosta*, 815 A.2d 1078, 1087 n.8 (Pa. Super.) (concluding on record that defendant's consent to search during traffic stop was product of coercion and citing *Strickler* in dicta for proposition that "there is some question regarding the constitutionality of [the police officer's] attempt to secure [the defendant's] consent during the investigative detention"), appeal denied, 576 Pa. 710, 839 A.2d 350 (2003).

In *O'Boyle* v. *State*, 117 P.3d 401, 411 (Wyo. 2005), the Wyoming Supreme Court did not adopt a specific rule such as that followed in *State* v. *Carty*, supra, 170 N.J. 632, but emphasized a reasonableness inquiry

---

[50] In *Commonwealth* v. *Strickler*, supra, 563 Pa. 47, the Pennsylvania Supreme Court sought to apply the United States Supreme Court's then recent decision in *Ohio* v. *Robinette*, supra, 519 U.S. 33. In *Strickler*, the court concluded that the encounter in that case, which had occurred after the officer had returned the defendant's license to him, thanked him for his cooperation, and decided not to cite him for public urination on the side of the road; *Commonwealth* v. *Strickler*, supra, 53; was not itself a subsequent seizure despite the officer's failure to inform the defendant specifically that he was free to leave because, inter alia, the officer did not act coercively and had informed the defendant that he was not required to consent to the search. Id., 76–78. The court then applied a similar analysis to determine that the defendant's consent to the search was voluntary. Id., 79–80. Prior to performing these analyses, the court emphasized its adoption of "an interpretation of [*Robinette*] which allows for the possibility of a mere encounter following a traffic stop or similar detention . . . ." Id., 72. The court noted, in dicta, that the Supreme Court's decision in *Robinette* reasonably could be read "as deeming all circumstances connected with the overall encounter [therein] to reflect a single, albeit constitutionally-permissible detention," thus validating the request for consent to search in the Supreme Court case, which had been decided solely on voluntariness grounds. Id., 69. The Pennsylvania court noted, however, that this view of the detention would not comport with its understanding of *Terry* stops under the state constitution. Id., 69–70.

influenced by local factors, specifically, the fact that Wyoming's "location along a nationally recognized drug trafficking corridor likely results in a disproportionately large percentage of Wyoming's disproportionately small population being subjected to what have become routine requests to relinquish their privacy rights by detention, invasive questioning and searches—all without reasonable suspicion of criminal activity other than the offense giving rise to the stop."[51] Given the fact that the defendant had not yet been placed under arrest and there was no reasonable suspicion of criminal activity, the court then concluded that the scope of the traffic stop had been improperly expanded because he had been detained in the cruiser during the stop and questioned extensively about his family, travel plans and profession. *O'Boyle* v. *State*, supra, 410. Aside from *O'Boyle*'s lack of a specific legal standard beyond reasonableness,[52] it is factually inapposite given the brief

---

[51] We find misplaced the defendant's reliance on another Wyoming case, *Garvin* v. *State*, 172 P.3d 725 (Wyo. 2007). *Garvin* does not establish an elevated state constitutional standard or develop the analysis of *O'Boyle* v. *State*, supra, 117 P.3d 411–12. Indeed, any such discussion would be superfluous because the analysis in *Garvin* focused solely on the court's record based legal determination that a state trooper had reasonable suspicion to detain a motorist pending the arrival of a drug-sniffing dog. See *Garvin* v. *State*, supra, 729–30.

[52] Our independent research has revealed three other states, Indiana, New Hampshire and Tennessee, that utilize, in essence, reasonableness standards under their state constitutions in this context. For example, in *State* v. *Washington*, supra, 898 N.E.2d 1202–1203, the defendant claimed that a police officer had violated the fourth amendment and the Indiana constitution by questioning the defendant during a routine traffic stop about whether he had weapons or drugs on his person. After rejecting the defendant's federal constitutional claims; see id., 1205; the Indiana Supreme Court noted that "[t]he determination of the reasonableness of a search and seizure under the Indiana [c]onstitution turns 'on a balance of: 1) the degree of concern, suspicion, or knowledge that a violation has occurred, 2) the degree of intrusion the method of search or seizure imposes on the citizen's ordinary activities, and 3) the extent of law enforcement needs.' " Id., 1206, quoting *Litchfield* v. *State*, 824 N.E.2d 356, 361 (Ind. 2005). The court then applied those factors to conclude that the initial stop of the defendant was appropriate because the officer had observed the defendant commit multiple

and limited questioning that took place in this case prior

traffic violations, "the degree of police intrusion was slight" because the "officer merely asked the defendant a brief question, one that not only asked if he had drugs, but also if he had weapons or other items that may harm the officer," and the "question to the defendant was consistent with the officer's concern for his own safety and law enforcement's responsibilities to deter crime, to intercept criminal activity, and to apprehend its perpetrators." *State* v. *Washington*, supra, 1206. Thus, the court concluded that "[t]he officer's question whether the defendant held contraband on his person, notwithstanding the absence of reasonable suspicion, was not unreasonable under the totality of the circumstances and did not violate . . . the Indiana [c]onstitution." Id., 1208.

Similarly, in *State* v. *McKinnon-Andrews*, 151 N.H. 19, 25, 846 A.2d 1198 (2004), the New Hampshire Supreme Court adopted a tripartite test to determine whether the *Terry* scope requirement has been exceeded in the context of a traffic stop, and evaluated "whether: (1) the question is reasonably related to the initial justification for the stop; (2) the law enforcement officer had a reasonable articulable suspicion that would justify the question; and (3) in light of all the circumstances, the question impermissibly prolonged the detention or changed its fundamental nature." The court noted that, "[i]f the question is reasonably related to the purpose of the stop, no [constitutional] violation occurs. If the question is not reasonably related to the purpose of the stop, we must consider whether the law enforcement officer had a reasonable, articulable suspicion that would justify the question. If the question is so justified, no [constitutional] violation occurs. In the absence of a reasonable connection to the purpose of the stop or a reasonable, articulable suspicion, we must consider whether in light of all the circumstances and common sense, the question impermissibly prolonged the detention or changed the fundamental nature of the stop." (Internal quotation marks omitted.) Id. Indeed, the New Hampshire Supreme Court specifically has declined to adopt the rule of *State* v. *Carty*, supra, 170 N.J. 632, requiring requests for consent to search to be justified by a reasonable suspicion of criminal activity. See *State* v. *Carbo*, 151 N.H. 550, 552, 864 A.2d 344 (2004).

Finally, the Tennessee Supreme Court, in *State* v. *Cox*, 171 S.W.3d 174 (Tenn. 2005), concluded that a detective properly obtained consent to search a motorist's vehicle and her nearby motel room during a traffic stop, emphasizing that the duration and scope of traffic stops are measured by the time reasonably necessary to accomplish the traffic enforcement purpose of the stop. Id., 179–80, 186. The court concluded that the totality of the circumstances test for determining the voluntariness of consent; see *Schneckloth* v. *Bustamonte*, supra, 412 U.S. 243; provided motorists with adequate protection under the state constitution, and rejected the defendant's request, founded on *State* v. *Carty*, supra, 170 N.J. 632, seeking state constitutional rules requiring the police to: (1) have reasonable suspicion of criminal activity in order to seek a motorist's consent to search; and (2) inform

to the defendant volunteering permission for Morgan to search the Altima.[53]

With respect to state constitutional decisions issued after the United States Supreme Court's decision in *Muehler* v. *Mena,* supra, 544 U.S. 93, the Kansas decision relied upon by both Justice Katz in her dissent and the defendant, *State* v. *Smith,* 286 Kan. 402, 184 P.3d 890, cert. denied, 555 U.S. 1062, 129 S. Ct. 628, 172 L. Ed. 2d 639 (2008), is facially on-point but, upon closer review, ultimately lacking in persuasive value. In *Smith,* the court concluded that *Muehler* v. *Mena,* supra, 100–101, does not "[allow] law enforcement officers to expand the scope of a traffic stop to include a search not related to the purpose of the stop, even if a detainee has given permission for the search. Rather, we continue to adhere to our longstanding rule that consensual searches during the period of a detention for a traffic stop are invalid under the [f]ourth [a]mendment . . .

motorists of their right to decline to consent to a search. See *State* v. *Cox,* supra, 181–84; see also *State* v. *Brown,* 294 S.W.3d 553, 562 (Tenn. 2009) (concluding that "[the] time, manner, and scope of [the trooper's] investigation did not exceed the proper parameters of a traffic stop" when request for consent to search was made "less than ten minutes" from start of stop and occurred while waiting for license and vehicular information).

[53] In relying on state constitutional case law from Arkansas and Washington requiring law enforcement officers to give warnings prior to seeking consent to search a home in the "knock and talk" context; see, e.g., *State* v. *Brown,* 356 Ark. 460, 466, 156 S.W.3d 722 (2004); *State* v. *Ferrier,* 136 Wash. 2d 103, 118–19, 960 P.2d 927 (1998); Justice Palmer quotes *O'Boyle* v. *State,* supra, 117 P.3d 412, for the proposition that the "the standards [that have been] . . . applied in [cases involving] premises searches—where the individual is on his or her own premises and likely feels freer to turn law enforcement away—[are] even more applicable in the context of roadside vehicle searches—where the traveler has been stopped for a traffic offense and is not free to leave." (Internal quotation marks omitted.) This observation by the Wyoming Supreme Court is, however, inconsistent with the well established proposition that, "[i]n contrast to an individual's expectation of privacy in his own home, a diminished expectation inheres with automobiles." *United States* v. *Cantu,* 405 F.3d 1173, 1179 (10th Cir. 2005); see also, e.g., *State* v. *Pittman,* 209 Conn. 596, 602, 553 A.2d 155 (1989) ("there is a diminished expectation of privacy in an automobile").

and [the state constitution]."[54] *State* v. *Smith*, supra, 419. *Smith* is unpersuasive because it lacks an independent state constitutional analysis. Moreover, as noted previously, the Kansas Supreme Court's more recent decision in *State* v. *Morlock*, supra, 289 Kan. 988, makes clear that, to the extent *Smith* is analyzing the *federal* constitution, it no longer is good law because *Arizona* v. *Johnson*, supra, 129 S. Ct. 787–88, "eliminated any doubt that the *Muehler* rationale applied to traffic stops."[55] See also footnote 28 of this opinion.

---

[54] The court stated that, under Kansas law, during a routine traffic stop, "a law enforcement officer may request the motorist's driver's license, car registration, and proof of insurance; conduct a computer check; issue a citation; and take those steps reasonably necessary to protect officer safety. The stop can last only as long as necessary to complete those tasks, and those tasks must be diligently pursued. . . . If no information raising a reasonable and articulable suspicion of illegal activity is found during the time period necessary to perform the computer check and other tasks incident to a traffic stop, the motorist must be allowed to leave without further delay." (Citations omitted; internal quotation marks omitted.) *State* v. *Smith*, supra, 286 Kan. 410–11.

[55] We note also that the federal constitutional analysis in *State* v. *Smith*, supra, 286 Kan. 412, also is unpersuasive to the extent that it criticized the state's intermediate appellate court for relying on a "contemporary line of [decisions from the United States Court of Appeals for the Tenth Circuit] in holding that the scope restrictions previously enforced in Kansas were altered by *Mena*," and cited three cases in support of the proposition that "some panels of the Tenth Circuit have recognized a distinction between the permissibility of asking questions on any topic and of conducting a search based upon a question like 'may I search?' In these cases, even though the Tenth Circuit panels allowed questions outside the purpose of a traffic stop, they held the searches were *not* constitutionally permissible." (Emphasis added.) See also id., 419 (criticizing Tenth Circuit panels for failing to explain why rule requiring return of license and completion of stop remains in effect).

We respectfully disagree with the Kansas court's reading of the cases upon which it relied in support of its conclusion that the Tenth Circuit's bright line rule requiring the return of a driver's documents and the completion of the stop in order for a consent to be valid, could not be squared with the more expansive view of questioning and requests for consent to search followed subsequent to *Mena*. First, in *United States* v. *Valenzuela*, supra, 494 F.3d 890–91 and n.2, the Tenth Circuit concluded that the District Court properly had denied the defendant's motion to suppress because a detective did not violate the defendant's fourth amendment rights by asking

Finally, we find the Alaska Court of Appeals decision in *Brown* v. *State*, 182 P.3d 624 (Alaska App. 2008), to lack persuasive value because of a significant internal inconsistency in the opinion. The Alaska court relied on a comprehensive survey of academic literature and existing case law; id., 630–32; in support of its determination that "federal law does not afford sufficient protection to motorists who are asked to consent to a search of their person, their vehicle, or their belongings during a traffic stop."[56] Id., 629. The court observed that, "because most people need to travel by car, and

him about the presence of weapons " 'or other illegal items' " in his vehicle, and then "[asking] for consent to search," since that questioning "did not appreciably lengthen the duration of the stop." The court rejected the defendant's reliance on the bright-line rule, noting that it pertained only to voluntariness and that "the validity of [the] [d]efendant's consent to search is not at issue in this case." Id., 891. Second, in *United States* v. *Yeomans*, 211 Fed. Appx. 753, 758 (10th Cir.) (unpublished opinion), cert. denied, 550 U.S. 948, 127 S. Ct. 2282, 167 L. Ed. 2d 1115 (2007), the Tenth Circuit noted that the failure to return the driver's documents meant only that the officer's interaction with the driver and the defendant, his passenger, "never became consensual" and "when the questioning about drugs occurred, and [the defendant and the driver] consented to a search of their car, the traffic stop continued to be a detention, not a consensual encounter." The court then concluded that the District Court had properly denied the defendant's motion to suppress, because it determined that "questioning about drugs did not unreasonably extend the detention, and therefore did not violate the [f]ourth [a]mendment." Id., 759. Finally, in *United States* v. *Guerrero-Espinoza*, 462 F.3d 1302, 1308 n.6 (10th Cir. 2006), which appears to be sui generis because of its facts, the court emphasized that *Mena* did not apply because the trooper already had ended the traffic stop by returning the driver's documents and speeding warning to him while they sat in the cruiser away from the defendant, a passenger in the stopped car. The court then concluded that, because the defendant was not aware that the stop was over since those events had taken place out of his presence, he would not have felt free to leave, thus rendering his consent involuntary. Id., 1309–10.

[56] The decision in *Brown* describes the state's defense of the consent search during the routine traffic stop in that case as "eminently defensible under federal law," including *Muehler* v. *Mena*, supra, 544 U.S. 100–101. *Brown* v. *State*, supra, 182 P.3d 628–29; see also id., 632 ("the [f]ourth [a]mendment as interpreted by the United States Supreme Court, and as applied by various federal circuit courts and state courts, offers little protection to motorists in this situation").

because of the near-inevitability that people will commit traffic infractions, the 'routine' traffic stop has become the doorway to widespread and probing searches of persons, vehicles, and luggage." Id., 631–32. The Alaska court then stated that "[t]he facts of this case present an example of an apparently ongoing and unjustified infringement of the privacy rights of Alaska citizens. And, as we have explained here, it is uncertain whether the [fourth amendment] offers any remedy. We therefore conclude that [the Alaska state constitution] must be interpreted to grant broader protections than its federal counterpart in situations like this." Id., 633–34. Curiously, however, the Alaska court then backpedaled somewhat, and stated that, "we need not decide whether [the state constitution] should be interpreted to completely preclude requests for searches during a routine traffic stop unless the search is related to the ground for the stop or is otherwise supported by a reasonable suspicion of criminality. We leave that question for another day." Id., 634. The court then held simply that the record in *Brown* "present[ed] a particularly egregious example of this police practice" because of the trooper's failure to inform the defendant of the reason for the stop or its disposition prior to requesting consent to search. Id. Justice Katz' attempts to salvage *Brown* notwithstanding, this limitation necessarily diminishes the persuasive value of the case in support of the defendant's request for a specific state constitutional rule in Connecticut. See also *Murphy* v. *Anchorage*, Alaska Court of Appeals, Docket No. A-10345, No. 5576, 2010 Alaska App. LEXIS 28, *11 (March 17, 2010) (memorandum opinion) (noting that defendant "misinterprets *Brown* by asserting that we *did* adopt this general restriction on police authority during traffic stops" [emphasis in original]); *Bostwick* v. *State*, Alaska Court of Appeals, Docket No. A-10224, No. 5569, 2010 Alaska App. LEXIS 21, *5, 7–8 (February 24, 2010)

(memorandum opinion) (describing *Brown* as "limited to its facts" and stating that this case, which involved "far from a routine traffic stop," also "does not require us to resolve" issue of whether consent searches during routine traffic stops require reasonable suspicion).

## E

### Economic and Sociological Factors

With respect to the relevant economic and sociological factors, the defendant first contends that, as a practical matter, many citizens do not feel free to refuse consent to a search during a routine traffic stop. Numerous commentators, in articles revealed by our independent research, support this assertion.[57] See, e.g., S. Chanenson, "Get the Facts, Jack! Empirical Research and the Changing Constitutional Landscape of Consent Searches," 71 Tenn. L. Rev. 399, 451–52 (2004) (discussing study that showed that 89.3 percent of 9028 people studied granted consent to search during traffic stops in Maryland and Ohio); W. LaFave, "The 'Routine Traffic Stop' from Start to Finish: Too Much 'Routine,' Not Enough Fourth Amendment," 102 Mich. L. Rev. 1843, 1891 (2004) ("[g]uilty or innocent, most motorists stopped and asked by police for consent to search their

---

[57] It also has been argued that requests for consent searches in the context of routine traffic stops should be deemed a practice that is impermissible per se, particularly given the perceived ineffectiveness of warnings. See C. Lassiter, "Eliminating Consent from the Lexicon of Traffic Stop Interrogations," 27 Cap. U. L. Rev. 79, 133–34 (1998) (discussing ineffectiveness of warnings in preventing involuntary consent, particularly by uncounseled motorists, and stating that "voluntary uncounseled consent to search and seizure which would lead to the discovery of self-incriminating evidence strains faith in the law"). But see B. Lawrence, note, "The Scope of Police Questioning During a Routine Traffic Stop: Do Questions Outside the Scope of the Original Justification for the Stop Create Impermissible Seizures if they do not Prolong the Stop?," 30 Fordham Urb. L.J. 1919, 1948 (2003) (supporting constitutionality of questioning and requests for consent to search that do not prolong traffic stops because "the state interest in drug interdiction outweighs the minimal privacy interest" implicated by questioning).

vehicles will expressly give permission to search their vehicles, resulting in thousands upon thousands of motor vehicle searches of innocent travelers each year" [internal quotation marks omitted]). With respect to the defendant's request for a state constitutional prophylactic rule requiring law enforcement officers to inform motorists of their right to refuse, endorsed by Justice Palmer in his dissent, even those commentators supporting that position have acknowledged, however, that warnings do not significantly reduce the rate of consent. See S. Chanenson, supra, 466 (likening warnings to " 'chicken soup' " in that they cannot hurt, could help); M. Phillips, note, "Effective Warnings Before Consent Searches: Practical, Necessary, and Desirable," 45 Am. Crim. L. Rev. 1185, 1206–1208 (2008) (observing that "warnings would appear to be futile, as one of the features that make them practical—their negligible effect on the rate of consent—also make them ineffective," but arguing that their administration might reduce coercive or racially discriminatory atmosphere in consent stops). We note specifically that the defendant's request for a rule requiring reasonable suspicion prior to seeking consent to search is supported by noted Professor Wayne R. LaFave.[58] See W. LaFave, supra, 102 Mich. L. Rev. 1893, citing State v. Fort, supra, 660 N.W.2d 415; see also 4 W. LaFave, supra, (4th Ed. 2004) § 9.3 (e), p. 397 (same).

The defendant and the amicus also emphasize the "national concern" regarding racial profiling and pretextual stops. The defendant cites General Statutes § 54-

[58] We note that Professor LaFave has been highly critical of the United States Supreme Court's recent Terry and traffic stop jurisprudence, in particular criticizing the drug dog case, Illinois v. Caballes, supra, 543 U.S. 405, upon which the subsequent decisions in Muehler v. Mena, supra, 544 U.S. 93, and Arizona v. Johnson, supra, 555 U.S. 323, are founded, as "ill-considered"; 4 W. LaFave, supra, (2009–2010 Sup.) § 9.3, p. 94; see also, e.g., id., pp. 77–78 (describing Caballes as significant departure from prior Terry precedents limiting scope of stop).

1*l* et seq., the Alvin W. Penn Racial Profiling Prohibition Act, which, inter alia, prohibits law enforcement officers from "engag[ing] in racial profiling" and provides in relevant part that "[t]he detention of an individual based on any noncriminal factor or combination of noncriminal factors is inconsistent with this policy."[59] In response, the state argues that, beyond evidence limited to the race of the participants—specifically, that Morgan is white, and that the defendant and Sutton, the backup officer, are African-American—there is no evidence in the record that Morgan's actions were racially motivated. We agree with the state and emphasize that the record does not contain *any* evidence whatsoever that Morgan's actions were racially motivated, or that the "insidious" practice of racial profiling or other abusive conduct by the police; *State* v. *Donohue*, 251 Conn. 636, 648 and n.11, 742 A.2d 775 (1999), cert. denied, 531 U.S. 924, 121 S. Ct. 299, 148 L. Ed. 2d 240 (2000); is present, in Newington or statewide, let alone to the extent that it must be remedied by the pronouncement of a new state constitutional rule. See *State* v. *Batts*, supra, 281 Conn. 694 ("[T]he record is entirely devoid of evidence of racial profiling. At best, the facts in the record and reasonable inferences therefrom establish that the defendant is African-American and [the police

[59] General Statutes § 54-1*l* provides: "(a) This section and section 54-1m shall be known as the 'Alvin W. Penn Racial Profiling Prohibition Act'.

"(b) For the purposes of this section, 'racial profiling' means the detention, interdiction or other disparate treatment of an individual solely on the basis of the racial or ethnic status of such individual.

"(c) No member of the Division of State Police within the Department of Public Safety, a municipal police department or any other law enforcement agency shall engage in racial profiling. The detention of an individual based on any noncriminal factor or combination of noncriminal factors is inconsistent with this policy.

"(d) The race or ethnicity of an individual shall not be the sole factor in determining the existence of probable cause to place in custody or arrest an individual or in constituting a reasonable and articulable suspicion that an offense has been or is being committed so as to justify the detention of an individual or the investigatory stop of a motor vehicle."

officer] knew the defendant's race before approaching him because of his previous surveillance of the defendant.").

F

Conclusion

Having performed a complete *Geisler* analysis of the defendant's state constitutional claims in this appeal, we conclude that article first, § 7, does not provide greater protection than does the federal constitution with respect to consent searches during routine traffic stops, and we decline to adopt the rules proposed by the defendant. Our own constitutional language, precedents and history do not support a ready departure from the federal case law in this area, particularly because the recent United States Supreme Court decisions do not represent a sea change from prior Connecticut precedent. See *State* v. *Oquendo*, supra, 223 Conn. 647–49. Moreover, the only relevant sister state constitutional decision that provides greater protection than the fourth amendment in this context, but is written persuasively, is *State* v. *Carty*, supra, 170 N.J. 632. That decision, however, is founded upon a factual predicate of local law enforcement abuses that simply does not exist on this record, disinclining us to follow it. See *State* v. *Snell*, supra, 323 Mont. 161 (declining to follow *Carty* because defendant "does not argue—much less establish—that Montana law enforcement officers are abusing their authority"); *Commonwealth* v. *Strickler*, supra, 563 Pa. 80–81 n.28 (declining to "take judicial notice that police employ tactics such as consent searches on a selective, discriminatory basis against members of protected classes, primarily on Pennsylvania interstate highways used as conduits by traffickers of illegal drugs" and noting that "the assertion of such discriminatory conduct finds no support in the record of any of the consolidated cases"); cf. *O'Boyle* v. *State*,

supra, 117 P.3d 411–12 (adopting state constitutional reasonableness inquiry influenced by local factors). Lastly, although the defendant's proposal finds some support in the academic community, those studies do not indicate that adoption of the defendant's proposal is likely to have any significant effect on protecting motorists' rights beyond that of a scrupulous application of the governing federal principles. We therefore decline to adopt a new state constitutional standard at this time.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to affirm the judgment of the trial court.

In this opinion VERTEFEUILLE and ZARELLA, Js., concurred.

KATZ, J., dissenting. Both the fourth amendment to the United States constitution and article first, § 7, of the Connecticut constitution protect individuals against unreasonable searches and seizures. In this case, it is undisputed that the initial stop of the defendant, Christopher Jenkins, for improperly changing lanes was reasonable and, therefore, valid under both of these provisions. See *State* v. *Jenkins*, 104 Conn. App. 417, 427, 934 A.2d 281 (2007). The question before us is whether the subsequent consent search of the defendant's vehicle, conducted after Officer Michael Morgan, a detective with the Newington police department, had completed a check of the defendant's personal and vehicular information, asked the defendant to step out of the vehicle, frisked him and explained the ticket to him, also was reasonable. I do not contest the majority's conclusion in part II of its opinion that, under the weight of recent federal precedent, the scope of the traffic stop was not improper under the federal constitution. Such a development, however, clearly would constitute a

move toward a more restrictive view of the fourth amendment than previously had been established under federal law. I disagree, however, with the majority's conclusion in part III of its opinion that the conduct in the present case did not violate the Connecticut constitution solely because Morgan's request for consent to search the defendant's vehicle did not measurably extend the *duration* of the traffic stop.[1] In my view, under article first, § 7, of the Connecticut constitution, before a police officer can shift the purpose and scope of a roadside detention from a routine traffic stop to a consent search, the officer must have reasonable and articulable suspicion of illegal activity unrelated to the initial traffic violation.[2] Accordingly, I respectfully dissent.

"It is well established that federal constitutional . . . law establishes a minimum national standard for the exercise of individual rights and does not inhibit state governments from affording higher levels of protection for such rights. . . . *State* v. *Oquendo*, 223 Conn. 635, 649, 613 A.2d 1300 (1992). Moreover, we have held that [i]n the area of fundamental civil liberties—which

---

[1] I agree with the majority's conclusion in part I of its opinion that, because the defendant failed to create an adequate record before the trial court regarding the validity of the patdown search, the Appellate Court improperly considered that conduct in analyzing the defendant's claims regarding the vehicle search, other than as a historical fact.

[2] In addition to asking the court to adopt this standard under the state constitution, the defendant requests that this court adopt the following rules: (1) an officer conducting a routine traffic stop that has not elevated into a justifiable investigatory stop must inform the motorist that he is free to leave and free to refuse consent to search as a prerequisite to obtaining consent after the traffic stop has ended; (2) the state must show that any exchange between an officer and a motorist clearly and unambiguously supports the conclusion that the motorist actually consented to the search performed; and (3) the state should be held to a higher standard of proof for consent searches that occur during routine, noncriminal traffic stops. The defendant has offered no analysis directly addressing these claims or any case law that would tend to support them. I therefore decline to address them.

includes all protections of the declaration of rights contained in article first of the Connecticut constitution—we sit as a court of last resort . . . . In such constitutional adjudication, our first referent is Connecticut law and the full panoply of rights Connecticut citizens have come to expect as their due. Accordingly, decisions of the United States Supreme Court defining fundamental rights are persuasive authority to be afforded respectful consideration, but they are to be followed by Connecticut courts only when they provide no less individual protection than is guaranteed by Connecticut law. . . . *State* v. *Marsala*, 216 Conn. 150, 160, 579 A.2d 58 (1990). Recognizing that our state constitution is an instrument of progress . . . is intended to stand for a great length of time and should not be interpreted too narrowly or too literally . . . we have concluded in several cases that the state constitution provides broader protection of individual rights than does the federal constitution. See, e.g., [*State* v. *Oquendo*, supra], 652; *State* v. *Marsala*, supra, 171; *State* v. *Dukes*, 209 Conn. 98, 112, 547 A.2d 10 (1988), and cases cited therein." (Citation omitted; internal quotation marks omitted.) *State* v. *DeFusco*, 224 Conn. 627, 632, 620 A.2d 746 (1993). "Specifically, we have held that article first, § 7, affords protections to the citizens of this state beyond those provided by the fourth amendment to the federal constitution, as that provision has been interpreted by the United States Supreme Court. See *State* v. *Miller*, 227 Conn. 363, 379, 630 A.2d 1315 (1993); *State* v. *Geisler*, 222 Conn. 672, 690, 610 A.2d 1225 (1992); *State* v. *Marsala*, supra, [160–61]; *State* v. *Dukes*, supra, [122–23]." *State* v. *Wilkins*, 240 Conn. 489, 504–505, 692 A.2d 1233 (1997).

"The analytical framework by which we determine whether, in any given instance, our state constitution affords broader protection to our citizens than the federal constitutional minimum is well settled. In *State* v.

*Geisler*, [supra, 222 Conn. 684–86], we enumerated the following six factors to be considered in determining that issue: (1) persuasive relevant federal precedents; (2) the text of the operative constitutional provisions; (3) historical insights into the intent of our constitutional forebears; (4) related Connecticut precedents; (5) persuasive precedents of other state courts; and (6) contemporary understandings of applicable economic and sociological norms, or as otherwise described, relevant public policies." (Internal quotation marks omitted.) *State* v. *McKenzie-Adams*, 281 Conn. 486, 509–10, 915 A.2d 822, cert. denied, 552 U.S. 888, 128 S. Ct. 248, 169 L. Ed. 2d 148 (2007).

I agree with the majority that neither the text nor the constitutional history of article first, § 7, support the defendant's claim to greater protections under the state constitution than the federal constitution. I disagree, however, with the majority's analyses of persuasive relevant federal precedents, related Connecticut precedents, the persuasive precedents of other state courts and contemporary understandings of public policy. I believe that these four factors necessitate a conclusion that article first, § 7, requires us to examine both the temporal and *substantive* scope of a routine traffic stop and that, more specifically, a consent search during a routine traffic stop is not valid unless there is a reasonable and articulable suspicion to believe that a detained driver or passenger has engaged in, or is about to engage in, criminal activity.

I

FEDERAL PRECEDENTS

As I previously have noted herein, I do not dispute the majority's conclusion that recent federal precedent suggests that the permissibility of a consent search following a routine traffic stop is dictated by the duration of the stop. For the reasons that follow, however, it

is my view that such a holding constitutes a substantive departure from settled fourth amendment jurisprudence.

As both the majority and the state properly recognize, the reasonableness of traffic stops under the fourth amendment is analyzed under the framework established in *Terry* v. *Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). See *Arizona* v. *Johnson*, 555 U.S. 323, 330, 129 S. Ct. 781, 172 L. Ed. 2d 694 (2009); *State* v. *Wilkins*, supra, 240 Conn. 508–509. Under *Terry*, "[c]ertain seizures are reasonable under the fourth amendment even in the absence of probable cause if there is a reasonable and articulable suspicion that a person has committed or is about to commit a crime. *Florida* v. *Royer*, 460 U.S. 491, 498, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983); *Terry* v. *Ohio*, [supra, 24] . . . . When a reasonable and articulable suspicion exists, the detaining officer may conduct an investigative stop of the suspect in order to confirm or dispel his suspicions." (Internal quotation marks omitted.) *State* v. *Brown*, 279 Conn. 493, 517, 903 A.2d 169 (2006).

The United States Supreme Court had been careful, however, to limit the boundaries of such warrantless stops. The court acknowledged that it had "held in the past that a search which is reasonable at its inception may violate the [f]ourth [a]mendment by virtue of its intolerable intensity and scope. . . . The scope of the search must be strictly tied to and justified by the circumstances which rendered its initiation permissible." (Citations omitted; internal quotation marks omitted.) *Terry* v. *Ohio*, supra, 392 U.S. 17–19. Although the court declined to set out bright-line limitations on the scope of the search, it warned that "[t]he manner in which the seizure and search were conducted is, of course, as vital a part of the inquiry as whether they were warranted at all. The [f]ourth [a]mendment proceeds as much by limitations upon the scope of governmental

action as by imposing preconditions upon its initiation. . . . The entire deterrent purpose of the rule excluding evidence seized in violation of the [f]ourth [a]mendment rests on the assumption that limitations upon the fruit to be gathered tend to limit the quest itself." (Citation omitted; internal quotation marks omitted.) Id., 28–29. Subsequently, in *Florida* v. *Royer*, supra, 460 U.S. 500, the court clarified that "[t]he scope of [an investigative] detention must be carefully tailored to its underlying justification . . . [and the] investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop."

Drawing from the scope analyses set forth in *Terry* and *Royer*, several federal courts had required that routine traffic stops, justified under *Terry*, be reasonable in both duration *and manner*. See, e.g., *United States* v. *Boyce*, 351 F.3d 1102, 1111 (11th Cir. 2003) ("[T]here are two possible tests for when a police investigation exceeds the scope of a routine traffic stop. . . . The first test comes from the Tenth Circuit and limits the questions a police officer may ask to those questions that are justified by reasonable suspicion of criminal activity or reasonable safety concerns. . . . The second test comes from the Fifth Circuit and holds that questions unrelated to the reason for the initial stop are only unlawful if they extend the duration of the initial seizure." [Citations omitted.]); *United States* v. *Holt*, 229 F.3d 931, 935 (10th Cir. 2000) ("the [United States] Supreme Court has indicated that although the permissible scope of an investigatory detention depends on the particular facts and circumstances of each case, it must in any case last no longer than is necessary to effectuate the purpose of the stop *and be carefully tailored to its underlying justification*" [emphasis added; internal quotation marks omitted]). Accordingly, these courts had required that, during a routine traffic stop, an "officer's actions must be reason-

ably related in scope to the circumstances which justified the interference in the first place. . . . The traffic stop may be expanded beyond its original purpose . . . if during the initial stop the detaining officer acquires reasonable suspicion of criminal activity, that is to say the officer must acquire a particularized and objective basis for suspecting the particular person stopped of criminal activity." (Citations omitted; internal quotation marks omitted.) *United States* v. *Clarkson*, 551 F.3d 1196, 1201 (10th Cir. 2009); see also *United States* v. *Henderson*, 463 F.3d 27, 46 (1st Cir. 2006) (concluding that traffic stop exceeded bounds of *Terry* stop because officer's "demand for [the defendant's] identifying information and his subsequent investigation of [the defendant] expanded the scope of the stop, changed the target of the stop, and prolonged the stop"); *United States* v. *Alix*, 630 F. Sup. 2d 145, 156 (D. Mass. 2009) (The District Court cited First Circuit cases that analyzed the scope of traffic stops and concluded that they "suggest a functional standard as well as a temporal one: What degree of intrusiveness and what duration was justified by the rationale for the stop?").

The United States Supreme Court recently seemed to refute this reasonableness in manner approach in *Arizona* v. *Johnson*, supra, 555 U.S. 332–34, wherein it addressed whether police questioning of a detained motorist during a traffic stop had exceeded the scope of the initial detention. Ultimately, the court stated a broad, unqualified conclusion that "[a]n officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." Id., 333. In reaching this conclusion, the court relied heavily on its prior decision in *Muehler* v. *Mena*, 544 U.S. 93, 96, 125 S. Ct. 1465, 161 L. Ed. 2d 299 (2005), which in turn had relied on *Illinois* v. *Caballes*, 543

U.S. 405, 407, 125 S. Ct. 834, 160 L. Ed. 2d 842 (2005), neither of which involved *Terry* stops, or searches that were independent of the underlying justifications. See *Arizona* v. *Johnson*, supra, 333–34; *Muehler* v. *Mena*, supra, 101.[3]

The majority reads this recent jurisprudence as dictating that the requirement of reasonableness in *Terry* is satisfied as long as the duration of a routine traffic stop is not unreasonably extended. This conclusion, if correct; see footnote 3 of this dissenting opinion; indicates that the United States Supreme Court has

---

[3] In *Muehler* v. *Mena*, supra, 544 U.S. 101, the court noted: "Our recent opinion in *Illinois* v. *Caballes*, [supra, 543 U.S. 405], is instructive. There, we held that a dog sniff performed during a traffic stop does not violate the [f]ourth [a]mendment. We noted that a lawful seizure can become unlawful if it is prolonged beyond the time reasonably required to complete that mission, but accepted the state court's determination that the duration of the stop was not extended by the dog sniff. . . . Because we held that a dog sniff was not a search subject to the [f]ourth [a]mendment, we rejected the notion that the shift in purpose from a lawful traffic stop into a drug investigation was unlawful because it was not supported by any reasonable suspicion. . . . Likewise here, the initial . . . detention was lawful; the Court of Appeals did not find that the questioning extended the time [the defendant] was detained. Thus no additional [f]ourth [a]mendment justification for inquiring about [the defendant's] immigration status was required." (Citations omitted; internal quotation marks omitted.)

Because neither *Muehler* nor *Caballes* involved a separate search under the fourth amendment, the United States Supreme Court cases relied on by the state and the majority do not squarely address the proper analysis of a shift in purpose between a lawful *Terry* stop and a consent search. Nonetheless, because I recognize that the weight of federal precedent after *Arizona* v. *Johnson*, supra, 555 U.S. 333–34, tends toward applying a purely durational analysis to both police inquiries and requests for consent made within a routine traffic stop; see *United States* v. *Everett*, 601 F.3d 484, 489–90 (6th Cir. 2010); *United States* v. *Taylor*, 596 F.3d 373, 375–76 (7th Cir. 2010); *United States* v. *Rivera*, 570 F.3d 1009, 1013–15 (8th Cir. 2009); *United States* v. *Cousin*, United States District Court, Docket No.1:09-CR-89, 2010 U.S. Dist. LEXIS 3688, *8–10 (E.D. Tenn. January 19, 2010); *United States* v. *Mbodji*, United States District Court, Docket No. 1:09-CR-29, 2010 U.S. Dist. LEXIS 53356, *13–14 (E.D. Tenn. January 8, 2010); *United States* v. *McBride*, United States District Court, Docket No. 1:09-CR-21-TS, 2009 U.S. Dist. LEXIS 113405, *12–13 (N.D. Ind. December 4, 2009); I do not contest the majority's conclusion regarding federal law.

departed significantly from its prior jurisprudence requiring *Terry* stops to be both substantively and temporally reasonable. I find the reasoning of *Royer* and the federal cases applying *Royer* to be persuasive because they best effectuate the scope limitation originally established in *Terry*, and consistently followed by this court. Accordingly, I believe that a more exacting analysis of the scope of a *Terry* stop than the purely temporal approach endorsed by the majority is required under the Connecticut constitution. Indeed, it is precisely in situations in which the United States Supreme Court has eschewed precedents protective of individual rights in favor of more permissive approaches that this court has found that the Connecticut constitution requires adherence to the earlier, more protective doctrines. See *State* v. *Linares*, 232 Conn. 345, 382–83, 655 A.2d 737 (1995) (rejecting modern "public forum" analysis established by United States Supreme Court in favor of traditional case-by-case balancing approach); *State* v. *Marsala*, supra, 216 Conn. 171 (rejecting good faith exception to exclusionary rule adopted by United States Supreme Court); *State* v. *Dukes*, supra, 209 Conn. 120 (disavowing *United States* v. *Robinson*, 414 U.S. 218, 234–35, 94 S. Ct. 467, 38 L. Ed. 2d 427 [1973], which allowed suspicionless full body searches in situations beyond full custodial arrest).

II

CONNECTICUT PRECEDENTS

A review of this court's precedents indicates that we never before have adopted the broadly permissive approach to the scope of *Terry* stops, including routine traffic stops, championed by the state and suggested by the United States Supreme Court's recent decisions. This court consistently has concluded that, under our state constitution, a *Terry* stop must be both justified at inception and reasonably circumscribed. See *State*

v. *Wilkins*, supra, 240 Conn. 507 ("[a]rticle first, §§ 7 and 9, of our state constitution permit a police officer in appropriate circumstances *and in an appropriate manner* to detain an individual for investigative purposes even though there is no probable cause to make an arrest" [emphasis added]); *State* v. *Lamme*, 216 Conn. 172, 184, 579 A.2d 484 (1990) ("circumscribed nature" of *Terry* stop minimizes risk of due process violation under Connecticut constitution); *State* v. *Edwards*, 214 Conn. 57, 72, 570 A.2d 193 (1990) ("[a] *Terry* stop that is justified at its inception can become constitutionally infirm if it lasts longer or becomes more intrusive than necessary to complete the investigation for which that stop was made" [internal quotation marks omitted]); *State* v. *Carter*, 189 Conn. 611, 618, 458 A.2d 369 (1983) ("The results of the initial stop may arouse further suspicion or may dispel the questions in the officer's mind. If the latter is the case, the stop may go no further and the detained individual must be free to go. If, on the contrary, the officer's suspicions are confirmed or are further aroused, the stop may be prolonged and the scope enlarged *as required by the circumstances*." [Emphasis added; internal quotation marks omitted.]). This court never has adopted the purely temporal analysis set forth in *Caballes*, *Muehler* and *Johnson*, and, in fact, has yet to cite to these cases. Therefore, our precedents weigh in favor of a more exacting analysis of the scope of a *Terry* stop than the purely temporal approach endorsed by the majority.

Our jurisprudence also supports the specific rule that the defendant asks us to adopt—that an officer conducting a routine traffic stop must have a reasonable and articulable suspicion of criminal activity unrelated to the initial traffic stop before asking for consent to search a vehicle. This court has required that a *Terry* stop be grounded upon "reasonable and articulable suspicion that the individual has committed or is about to

commit a crime"; (internal quotation marks omitted) *State* v. *Nash*, 278 Conn. 620, 632, 899 A.2d 1 (2006); while a *Terry* frisk requires that the officer has "a reasonable and articulable suspicion that a suspect is armed and dangerous before [he] may commence a protective patdown search during an investigative stop." Id., 633. Indeed, we have cautioned that, "[b]efore [a police officer] places a hand on the person of a citizen in search of anything, he must have constitutionally adequate, reasonable grounds for doing so. In the case of the self-protective search for weapons, he must be able to point to particular facts from which he reasonably inferred that the individual was armed and dangerous." (Internal quotation marks omitted.) Id., 631. Like the transition from a *Terry* stop to a *Terry* frisk, the transition from a routine traffic stop to a consent search involves a shift in purpose and procedure. As such, our precedents suggest this shift must be grounded in reasonable suspicion relevant to the police encounter's new direction, namely, reasonable and articulable suspicion of criminal activity unrelated to the initial routine traffic violation.

## III

### SISTER STATE PRECEDENTS

State courts have taken widely varying approaches to the proper analysis of the scope of a routine traffic stop. Some states either have expressly adopted the purely durational test under their state constitutions or have held that their state constitutions provide no greater rights than the federal constitution.[4] Others have

---

[4] See *State* v. *Teagle*, 217 Ariz. 17, 23, 170 P.3d 266 (App. 2007) ("any additional delay attributable to asking for defendant's consent was de minimus and did not unreasonably extend the traffic stop"); *People* v. *Vibanco*, 151 Cal. App. 4th 1, 14, 60 Cal. Rptr. 3d 1 (2007) ("[i]nvestigative activities beyond the original purpose of a traffic stop . . . are permissible as long as they do not prolong the stop beyond the time it would otherwise take"); *Holland* v. *States*, 696 So. 2d 757, 759 (Fla. 1997) ("the conformity clause [of article first, § 12, of the Florida constitution] not only binds the Florida courts to follow the United States Supreme Court's interpretation of the

determined that their constitutions require, generally, a more exacting analysis of the scope of routine traffic stops and therefore require such stops to be substantively reasonable under the circumstances.[5] A significant group of states has distinguished between

---

[f]ourth [a]mendment to the United States [c]onstitution but also to 'provide no greater protection than those interpretations' "); *People* v. *Harris*, 288 Ill. 2d 222, 237, 886 N.E.2d 947 (2008) (adopting durational test for scope of inquiry of traffic stop); *Colbert* v. *Commonwealth*, 43 S.W.3d 777, 778 (Ky.) (Kentucky constitutional protections offer no greater protection than fourth amendment), cert. denied, 534 U.S. 964, 122 S. Ct. 375, 151 L. Ed. 2d 285 (2001); *State* v. *Patterson*, 868 A.2d 188, 191 (Me.) (fourth amendment and article first, § 5, of Maine constitution "offer identical protection against unreasonable searches and seizures"), cert. denied, 546 U.S. 815, 126 S. Ct. 339, 163 L. Ed. 2d 51 (2005); *People* v. *Chapman*, 425 Mich. 245, 252, 387 N.W.2d 835 (1986) (Michigan constitution generally provides no greater protections than fourth amendment); *State* v. *Robinette*, 80 Ohio St. 3d 234, 238, 685 N.E.2d 762 (1997) (protections of Ohio constitution are coextensive with fourth amendment); *State* v. *Cox*, 171 S.W.3d 174, 181–82 (Tenn. 2005) (applying durational test to scope of routine traffic stop and declining to adopt rule requiring reasonable suspicion for consent searches during such stops).

[5] In *State* v. *Washington*, 898 N.E.2d 1200, 1206 (Ind. 2008), the Indiana Supreme Court held that, under the Indiana constitution, a consent search during a routine traffic stop must be substantively reasonable. The reasonableness inquiry turns "on a balance of: (1) the degree of concern, suspicion, or knowledge that a violation has occurred, (2) the degree of intrusion the method of search or seizure imposes on the citizen's ordinary activities, and (3) the extent of law enforcement needs." (Internal quotation marks omitted.) Id.

In *State* v. *McKinnon-Andrews*, 151 N.H. 19, 25, 846 A.2d 1198 (2004), the New Hampshire Supreme Court adopted a three factor test to determine whether the permissible scope of a routine traffic stop has been exceeded: "(1) the question is reasonably related to the initial justification for the stop; (2) the law enforcement officer had a reasonable articulable suspicion that would justify the question; and (3) in light of all the circumstances, the question impermissibly prolonged the detention or changed its fundamental nature." See also *State* v. *Carbo*, 151 N.H. 550, 552, 864 A.2d 344 (2004) ("In *McKinnon-Andrews*, we dealt with the issue of expanding the scope of a police stop by adopting a three-part test to evaluate the validity of the police conduct. . . . This test is designed to regulate police conduct by not allowing police to fundamentally alter . . . the nature of the stop by converting it into a general inquisition about past, present and future wrongdoing, absent an independent basis for reasonable suspicion or probable cause." [Citation omitted; internal quotation marks omitted.]).

acceptable investigatory techniques during a routine traffic stop and such techniques once the purpose of that traffic stop has been effectuated. Within this group, some states have, by statute, required a reasonable suspicion before consent searches may be undertaken after the purposes of the traffic stop have been effectuated.[6]

In *State* v. *McClendon*, 350 N.C. 630, 636, 517 S.E.2d 128 (1999), the North Carolina Supreme Court held: "As we have stated previously, [a]rticle I, [§] 20 of our North Carolina [c]onstitution, like the [f]ourth [a]mendment [to the federal constitution], protects against unreasonable searches and seizures. . . . In order to further detain a person after lawfully stopping him, an officer must have reasonable suspicion, based on specific and articulable facts, that criminal activity is afoot." (Citation omitted.) Although *McClendon* involved a dog sniff, I nonetheless find it persuasive as a general statement of the court's approach to the scope of a routine traffic stop.

In *State* v. *Cunningham*, 183 Vt. 401, 409–10, 954 A.2d 1290 (2008), the Vermont Supreme Court held that, "[u]nder both the [f]ourth [a]mendment and [a]rticle 11 [of the Vermont constitution], a traffic stop is a seizure and must be supported by a reasonable suspicion of criminal activity. . . . We also inquire into whether [the subsequent investigation] was reasonably related in scope to the circumstances which justified the interference in the first place. . . . An investigative stop, based at its inception on a reasonable suspicion, may reveal further information that justifies greater restrictions on a suspect's liberty, up to and including arrest." (Citations omitted; internal quotation marks omitted.) The majority attempts to distinguish *Cunningham* because it concerned a dog sniff rather than a consent search. I nonetheless find it persuasive as a general statement of the court's approach to the scope of a routine traffic stop.

Similarly, in *O'Boyle* v. *State*, 117 P.3d 401, 410–12 (Wyo. 2005), the Wyoming Supreme Court held that article first, § 4, of the Wyoming constitution requires that searches conducted during routine traffic stops, including consent searches, be reasonable under the circumstances. The majority attempts to distinguish *O'Boyle* on the ground that the decision was dependent on local factors. While the Wyoming Supreme Court did look to the impact of drug interdiction traffic stops on Interstate 80, a national drug trafficking route that bisects the state, the court grounded its decision on prior precedents interpreting the state's constitutional search and seizure protections as well as general policy concerns favoring the protection of citizens' privacy rights. Id., 411.

Although these cases do not require the exact relief the defendant in the present case seeks, they nonetheless are persuasive evidence that suspicion of a traffic violation, without more, does not authorize free ranging roadside investigations fettered only by temporal limitations.

[6] See Ala. Code § 32-1-4 (Cum. Sup. 2009) ("[e]xcept when an arresting officer cites a person with an [electronic ticket], the officer shall, upon the giving by such person of a sufficient written bond, approved by the arresting officer, to appear at such time and place, forthwith release the person from

Others have applied the same standard based on state or federal constitutional provisions.[7] More importantly,

custody"); Mont. Code Ann. § 46-5-403 (2007) ("[a] stop authorized by [§] 46-5-401 or [§] 46-6-411 may not last longer than is necessary to effectuate the purpose of the stop"); Or. Rev. Stat. § 810.410 (3) (2007) ("A police officer . . . [c] May make an inquiry into circumstances arising during the course of a detention and investigation under paragraph [b] of this subsection that give rise to a reasonable suspicion of criminal activity. . . . [e] May request consent to search in relation to the circumstances referred to in paragraph [c] of this subsection or to search for items of evidence otherwise subject to search or seizure under [Or. Rev. Stat.] § 133.535."); R.I. Gen. Laws § 31-21.2-5 (b) (Sup. 2009) ("[n]o operator or owner-passenger of a motor vehicle shall be requested to consent to a search by a law enforcement officer of his or her motor vehicle which is stopped solely for a traffic violation, unless there exists reasonable suspicion or probable cause of criminal activity"); Wash. Rev. Code § 46.61.021 (2) (2008) ("[w]henever any person is stopped for a traffic infraction, the officer may detain that person for a reasonable period of time necessary to identify the person, check for outstanding warrants, check the status of the person's license, insurance identification card, and the vehicle's registration, and complete and issue a notice of traffic infraction"); see also *State* v *McPherson*, 892 So. 2d 448, 451 (Ala. Crim. App. 2004) (under Ala. Code § 32-1-4 [1975], once officer has completed ticketing driver, "[t]he officer may further detain the driver only if he has probable cause to arrest the driver for some other non-traffic offense . . . or has a reasonable suspicion of the driver's involvement in some other criminal activity justifying further detention for investigatory purposes" [citation omitted]); *Sims* v. *State*, 356 Ark. 507, 513, 514, 157 S.W.3d 530 (2004) (The court relied in part on Ark. R. Crim. P. 3.1 to conclude that "as part of a valid traffic stop, a police officer may detain a traffic offender while the officer completes certain routine tasks, such as computerized checks of the vehicle's registration and the driver's license and criminal history, and the writing up of a citation or warning. . . . During this process, the officer may ask the motorist routine questions . . . [including] whether the officer may search the vehicle, and he may act on whatever information is volunteered. . . . [O]nce the purposes of the initial traffic stop [were] completed, the officer could not further detain the vehicle or its occupants unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify a further detention."); *State* v. *Case*, 338 Mont. 87, 95, 162 P.3d 849 (2007) (noting that under Mont. Code Ann. § 46-5-403, routine traffic stop cannot exceed time necessary to effectuate purpose of stop).

[7] See *People* v. *Brandon*, 140 P.3d 15, 19–20 (Colo. App. 2005) (drawing on state and federal law in concluding that "[o]nce the underlying basis for an initial traffic stop has concluded . . . [l]engthening the detention for further questioning beyond that related to the initial stop is permissible if [1] the officer has an objectively reasonable and articulable suspicion illegal activity has occurred or is occurring; or [2] the initial detention has become a consensual encounter"); *Commonwealth* v. *Torres*, 424 Mass. 153, 158,

a persuasive minority has adopted the rule the defendant urges us to apply: that consent searches undertaken anytime during the course of a routine traffic violation be justified by reasonable and articulable suspicion of criminal activity independent of the initial traffic violation.

I begin with the several cases in which state courts have drawn from both federal and state constitutional provisions in limiting the scope of roadside traffic stops and requiring a reasonable and articulable suspicion of criminal activity unrelated to the initial stop before a police officer validly can ask for consent during a roadside search. In *State* v. *Smith* 286 Kan. 402, 419, 184 P.3d 890, cert. denied, 555 U.S. 1062, 129 S. Ct. 628, 172 L. Ed. 2d 639 (2008), the Kansas Supreme Court held

674 N.E.2d 638 (1997) (relying on both federal and state constitutional provisions in concluding that "[i]t is well settled that a police inquiry in a routine traffic stop must end on the production of a valid license and registration unless the police have grounds for inferring that either the operator or his passengers were involved in the commission of a crime . . . or engaged in other suspicious conduct" [internal quotation marks omitted]); *State* v. *King*, 157 S.W.3d 656, 662 (Mo. App. 2004) (Relying on federal constitution in concluding that "[t]he [traffic stop] may only last for the time necessary for the law enforcement officer to conduct a reasonable investigation of the traffic violation . . . . Once the traffic stop is completed, the person detained must be permitted to leave unless the law enforcement officer has an objectively reasonable suspicion, based on specific, articulable facts, that the person is involved in criminal activity." [Citations omitted.]); *State* v. *Draganescu,* 276 Neb. 448, 461, 755 N.W.2d 57 (2008) (Relying on state constitutional grounds set forth in *State* v. *Louthan,* 275 Neb. 101, 744 N.W.2d 454 [2008], in concluding that "[t]o detain a motorist for further investigation past the time reasonably necessary to conduct a routine investigation incident to a traffic stop, an officer must have a reasonable, articulable suspicion that the motorist is involved in criminal activity unrelated to the traffic violation. Reasonable suspicion for further detention must exist after the point that an officer issues a citation.").

The majority suggests that the analytical approach set forth in these cases is not implicated in the present case because the factual predicate in this case is an *ongoing* traffic stop. I believe that they nonetheless illuminate our sister courts' discomfort with overreaching in connection with traffic stops, but, because I would conclude that the Connecticut constitution requires a rule limiting the use of consent searches at any point during a routine traffic stop, I do not primarily rely on these cases.

that "we continue to adhere to our longstanding rule that consensual searches [unrelated to the grounds for a traffic stop] during the period of a detention for a traffic stop are invalid under the [f]ourth [a]mendment to the United States [c]onstitution and § 15 of the Kansas [c]onstitution [b]ill of [r]ights."[8] In *Commonwealth v. Strickler*, 563 Pa. 47, 69, 757 A.2d 884 (2000), the Pennsylvania Supreme Court, noted that "[a]rticle I, § 8 of the Pennsylvania [c]onstitution . . . would not sustain a consent search conducted in the context of, but which is wholly unrelated in its scope to, an ongoing detention, since there can be no constitutionally-valid detention independently or following a traffic or similar stop absent reasonable suspicion, see, e.g., *Commonwealth v. Melendez*, 544 Pa. 323, 329, [676 A.2d 226] (1996), and the scope of a detention is circumscribed by the reasons that justify it." It is true that, for the purposes of the *Geisler* analysis, we are concerned only with sister state precedents relevant to the question of whether state constitutions afford more protections than the federal constitution. Each of these courts, however, expressly cited to the search and seizure provisions of its own state constitution and before framing its ultimate conclusion based on both state and federal constitutional provisions. Thus, although I recognize the limitation on the previously discussed precedents,

---

[8] Subsequently in *State* v. *Morlock*, 289 Kan. 980, 988–89, 218 P.3d 801 (2009), the Kansas Supreme Court noted that: "[T]he *Muehler* [c]ourt's test of 'no extension' of the detention's duration was expanded [four] years later by the *Johnson* [c]ourt to become a test of 'no measurable extension.' *Johnson* also eliminated any doubt that the *Muehler* rationale applied to traffic stops. . . . *Johnson* therefore also confirmed that an officer's inquiries into matters unrelated to the justification for the stop did not necessarily require reasonable suspicion." (Citations omitted.) The court's analysis was confined, however, to the federal constitution, and did not address any limitations imposed by the state constitution or undermine its requirement that reasonable and articulable suspicion of criminal activity unrelated to the initial stop must exist before a police officer validly can ask for consent during a routine traffic stop.

I am nonetheless persuaded by their reasoning that the scope of a routine traffic stop should not be measured merely by its duration.

I next turn to the New Jersey Supreme Court's holding in *State* v. *Carty,* 170 N.J. 632, 790 A.2d 903 (2002). In that case, the court analyzed whether evidence discovered during a roadside consent search was admissible when the state trooper had requested consent without having an articulable suspicion of any criminal activity besides an initial speeding violation. The court first determined that "[r]oadside consent searches are . . . more akin to an investigatory stop that does involve a detention. Such a stop traditionally has required reasonable and articulable suspicion." Id., 640. The court then held that a consent search during a lawful motor vehicle stop is valid only if there is a "reasonable and articulable suspicion to believe that an errant motorist or passenger has engaged in, or is about to engage in, criminal activity." Id., 647. The court explained that "[t]he requirement of reasonable and articulable suspicion is derived from our [s]tate [c]onstitution[9] and serves to validate the continued detention associated with the search. It also serves the prophylactic purpose of preventing the police from turning a routine traffic stop into a fishing expedition for criminal activity unrelated to the stop." Id.

I agree with the majority that *Carty* differs from the present case on three grounds: (1) the New Jersey Supreme Court consistently has afforded a higher level of scrutiny to consent searches than does the United States Supreme Court; (2) the New Jersey police were

[9] Like the Connecticut constitution, article first, paragraph seven, of the New Jersey constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated; and no warrant shall issue except upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the papers and things to be seized."

subject to both a federal decree and state police policy limiting coercive investigatory techniques; and (3) the court had before it an extensive factual record demonstrating the violation of the federal decree and state police policy. Despite these distinctions, however, there are several reasons why *Carty* is relevant and persuasive. First, although this court has not afforded greater protections than the federal courts concerning consent searches *specifically*, this court also has found that the Connecticut constitution provides greater protection against official searches and seizures, *generally*. See *State* v. *Wilkins*, supra, 240 Conn. 504–505; *State* v. *Miller*, supra, 227 Conn. 379–80; *State* v. *Geisler*, supra, 222 Conn. 690; *State* v. *Marsala*, supra, 216 Conn. 159–60; *State* v. *Dukes*, supra, 209 Conn. 122–23. Second, although the New Jersey Supreme Court notes that its holding is consistent with the consent decree and state police policy limiting coercive investigatory techniques, it does not rely exclusively upon them. *State* v. *Carty*, supra, 170 N.J. 647. Finally, much of the data before the court merely corroborated significant legal scholarship, of which we may take judicial notice,[10] demonstrating the psychological pressure faced by detained motorists and the ways in which that pressure may be manipulated to obtain consent to search. Id., 644–45. Indeed, the court's analysis emphasized the universal impact of consent searches, observing that "[m]any persons, perhaps most, would view the request of a police officer to make a search as having the force of law. . . . In the context of motor vehicle stops, where the individual is at the side of the road and confronted by a uniformed officer seeking to search his or her vehicle, it is not a stretch of the imagination to assume that the individual feels compelled to consent." (Citation omitted; internal quotation marks omitted.)

---

[10] Indeed, the majority takes notice of many of these studies in its discussion of the *Geisler* factor relating to public policy.

Id., 644. I therefore find the New Jersey Supreme Court's well reasoned and thorough opinion to have significant persuasive weight within the context of the *Geisler* analysis.

I also find persuasive the Minnesota Supreme Court's decision requiring that officers have reasonable and articulable suspicion of criminal activity independent of the initial traffic violation before asking for consent to search during a traffic stop. See *State* v. *Fort*, 660 N.W.2d 415, 418–19 (Minn. 2003). Therein, the court noted that "the scope and duration of a traffic stop investigation must be limited to the justification for the stop." Id., 418. It relied on an earlier case, *State* v. *Wiegand*, 645 N.W.2d 125, 135 (Minn. 2002), for support. The court explained: "In *Wiegand*, the defendants were stopped for a burned-out headlight, but the police conducted a search using a narcotics-detection dog in the absence of reasonable articulable suspicion of drug-related activity. [Id., 128–29, 137]. We reversed the defendants' convictions holding, among other things, that under [a]rticle [first], [§] 10, of the Minnesota [c]onstitution any expansion of the scope or duration of a traffic stop must be justified by a reasonable articulable suspicion of other criminal activity. [Id., 135]." *State* v. *Fort*, supra, 418–19. Under this framework, although the initial traffic stop was proper, "the investigative questioning, consent inquiry, and subsequent search went beyond the scope of the traffic stop and was unsupported by any reasonable articulable suspicion." Id., 419. Accordingly, the court affirmed the trial court's order suppressing evidence discovered during the consent search.[11]

---

[11] Although the majority suggests that *Fort* is undermined because *Wiegand* no longer would be good law after *Illinois* v. *Caballes*, supra, 543 U.S. 405, that conclusion is unwarranted because the court in *Fort* grounded its reliance on *Wiegand* on the proposition that *"under [article first, § 10], of the Minnesota [c]onstitution* any expansion of the scope or duration of a traffic stop must be justified by a reasonable articulable suspicion of other criminal activity." (Emphasis added.) *State* v. *Fort*, supra, 660 N.W.2d 419.

Similarly, the Court of Appeals of Alaska recently held that "an officer's questions about other potential crimes, and an officer's requests for permission to conduct a search, are significant events under the search and seizure provision of the Alaska [c]onstitution, [article first, § 14]. More specifically, we conclude that, under the circumstances presented in this case, the officer conducting the traffic stop was prohibited from requesting [the defendant's] permission to conduct a search that was (1) unrelated to the basis for the stop and (2) not otherwise supported by a reasonable suspicion of criminality." *Brown* v. *State*, 182 P.3d 624, 626 (Alaska App. 2008). In reaching this conclusion, the court acknowledged that federal precedents, including *Muehler* v. *Mena*, supra, 544 U.S. 93, did not prevent the officer from engaging in a consent search completely unrelated to the initial traffic stop. *Brown* v. *State*, supra, 629 ("we conclude that federal law does not afford sufficient protection to motorists who are asked to consent to a search of their person, their vehicle, or their belongings during a traffic stop"). The court noted, however, that the Alaska Supreme Court and Court of Appeals repeatedly had interpreted article first, § 14, of that state's constitution to provide greater protection to the citizens of Alaska than that provided by the fourth amendment to the federal constitution. Id., 633. Drawing from state search and seizure jurisprudence interpreting the Alaska constitution, as well as public policy concerns and sister state precedent, the court concluded that the Alaska constitution "must be interpreted to grant broader protections than its federal counterpart" in situations involving consent searches during routine traffic stops.[12] Id., 634.

---

[12] Despite this specific language, the majority dismisses the import of *Brown* v. *State*, supra, 182 P.3d 624, because the Alaska Court of Appeals ultimately concluded that, under the specific facts of the case, it "need not decide whether [the state constitution] should be interpreted to completely preclude requests for searches during a routine traffic stop unless the search is related to the ground for the stop or is otherwise supported by a reasonable

## IV

## RELEVANT PUBLIC POLICY

Routine requests to search a detained motorist, in the absence of any suspicion of criminal activity beyond an initial traffic violation, represent a real and disturbing burden on motorists[13] and a substantial breach

suspicion of criminality. We leave that question for another day. Because [the defendant's] case presents a particularly egregious example of this police practice, our holding in [the defendant's] case can be more narrow." Id., 634.

In revisiting *Brown*, the Alaska Court of Appeals has characterized that case as setting forth various considerations, not a per se rule that the detention becomes unreasonable—and thus constitutionally invalid—if the duration, manner, or scope of the investigation lasts longer than necessary to effectuate the purpose of the stop. See *Murphy* v. *Anchorage*, Alaska Court of Appeals, Docket No. A-10345, No. 5576, 2010 Alaska App. LEXIS 28, *11–12 (March 17, 2010) (memorandum decision); *Bostwick* v. *State*, Alaska Court of Appeals, Docket No. A-10224, No. 5569, 2010 Alaska App. LEXIS 21, *6–7 (February 24, 2010) (memorandum decision); *Skjervem* v. *State*, 215 P.3d 1101, 1105 (Alaska App. 2009). In my view, the Alaska court's qualification on the reach of the holding in *Brown* is insufficient to discount the persuasive value of the court's analysis in that case. That analysis emphasized the importance of considering the substantive reasonableness of a routine traffic stop, and highlighted the dangers of suspicionless consent searches during such stops. By contrast, the court's subsequent case-by-case application of factors seems arbitrary and inconsistent with the per se rules adopted by other states specifically to counter the same dangers. Moreover, even if the nondurational factors articulated in *Brown* are relied on by that court only occasionally, such an approach is inconsistent with the majority's per se rule that duration is the *only* factor relevant for fourth amendment purposes.

[13] The defendant and the amicus curiae focus much of their analysis of relevant policy considerations on what this court has labeled the "insidious specter of [racial] profiling." (Internal quotation marks omitted.) *State* v. *Donahue*, 251 Conn. 636, 648, 742 A.2d 775 (1999), cert. denied, 531 U.S. 924, 121 S. Ct. 299, 148 L. Ed. 2d 240 (2000). While I agree with the state that the record does not support a finding of racial bias in this particular case, I note the body of research demonstrating the way consent searches during routine traffic stops function as tools of racial and ethnic profiling, and the disproportionate impact of such searches on minority drivers. See, e.g., J. Burkoff, "Search Me?," 39 Tex. Tech. L. Rev. 1109, 1123 (2007) ("consent searches which are undertaken largely upon the basis of an individual's race, class, or ethnicity have increasingly become a major social and political concern in the United States, and rightly so"); D. Harris, " 'Driving

of privacy. See *Ohio* v. *Robinette*, 519 U.S. 33, 48, 117 S. Ct. 417, 136 L. Ed. 2d 347 (1996) (Stevens, J., dissenting) ("I . . . assume that motorists—even those who are not carrying contraband—have an interest in preserving the privacy of their vehicles and possessions from the prying eyes of a curious stranger"); *Brown* v. *State*, supra, 182 P.3d 630 ("These searches result in a substantial interruption of motorists' travels. Because drugs are easily concealed in crevices, behind paneling, and under seats and carpeting, a search for drugs can be a painstaking business."); *State* v. *Retherford*, 93 Ohio App. 3d 586, 593–94, 639 N.E.2d 498 (1994) (noting that motorists are routinely delayed in travels and asked to relinquish right of privacy in vehicles and luggage); *O'Boyle* v. *State*, 117 P.3d 401, 415 (Wyo. 2005) (*"Terry* has been whittled away to the point that in some jurisdictions routine traffic stops are commonly turned into drug investigations through a variety of techniques including . . . seeking consent for a full roadside exploration of the motorist's car . . . . The result is a far cry from a straightforward and unadorned traffic stop . . . ." [Citations omitted; internal quotation marks omitted.]); R. Whorf, "Consent Searches Following Routine Traffic Stops: The Troubled Jurisprudence of a Doomed Drug Interdiction Technique," 28 Ohio N.U. L. Rev. 1, 18–20 (2001–2002) (discussing how consent searches, especially suspicionless consent

While Black' and All Other Traffic Offenses: The Supreme Court and Pretextual Traffic Stops," 87 J. Crim. L. & Criminology 544, 546–47 (1997) (discussing police use of traffic code to stop disproportionate number of African-American and Hispanic drivers); A. Mucchetti, "Driving While Brown: A Proposal for Ending Racial Profiling in Emerging Latino Communities," 8 Harv. Latino L. Rev. 1, 2 (2005) ("The criminalization of race takes on special meaning in the context of traffic stops. Statistics and studies overwhelmingly support the contention that racial profiling . . . has occurred for decades on our nation's streets and highways."); W. Oliver, "With an Evil Eye and an Unequal Hand: Pretextual Stops and Doctrinal Remedies to Racial Profiling," 74 Tul. L. Rev. 1409, 1411 (2000) (discussing use of pretextual stops and consent searches).

searches, infringe on dignitary interests). Although, ostensibly, a driver in this situation may refuse consent, most detained motorists will feel compelled to grant permission to search their vehicles, regardless of whether they in fact are carrying contraband. See 4 W. LaFave, Search and Seizure (4th Ed. 2004) § 9.3 (e), p. 395 and notes; *Brown* v. *State*, supra, 630 (listing studies demonstrating that "the vast majority of motorists who are subjected to this type of request will accede to the officer and allow the search"); *State* v. *Carty*, supra, 170 N.J. 644–45 (noting that "[i]n the context of motor vehicle stops, where the individual is at the side of the road and confronted by a uniformed officer seeking to search his or her vehicle, it is not a stretch of the imagination to assume that the individual feels com-pelled to consent" and listing studies indicating that nearly 95 percent of detained motorists granted consent to search). Recognizing these concerns, many states have enacted statutory provisions protecting motorists detained because of a routine traffic violation from consent searches except when the circumstances evi-dence criminal activity independent of the traffic viola-tion. See footnote 6 of this dissenting opinion.

Although we have no specific data evidencing the frequency of consent searches during routine traffic stops in Connecticut, the fact that so many people must drive in order to fulfill their daily work, family and educational needs means that many Connecticut citi-zens may be subject to requests for consent searches and the significant interruption that such searches entail. See *Brown* v. *State*, supra, 182 P.3d 631–32 ("because most people need to travel by car, and because of the near-inevitability that people will commit traffic infractions, the 'routine' traffic stop has become the doorway to widespread and probing searches of persons, vehicles, and luggage"). Moreover, research suggests that these searches have in fact become more

frequent, in part because of the dual wars on drugs and terrorism. See *Brown* v. *State*, supra, 629 (listing "[c]ases from other states [that] show that this police practice is not an isolated phenomenon"); 4 W. LaFave, supra, p. 395 ("[r]equesting consent has apparently become yet another part of the 'routine' of 'routine traffic stops' "); S. Lazos Vargas, "Missouri, The 'War on Terrorism' and Immigrants: Legal Challenges Post 9/11," 67 Mo. L. Rev. 775, 813, 826 (2002). I therefore conclude that there are strong public policy arguments weighing in favor of limiting consent searches undertaken during routine traffic stops.

## V

## CONCLUSION

Having reviewed the relevant *Geisler* factors, I conclude that article first, § 7, of the Connecticut constitution provides greater protection than the federal constitution with respect to consent searches during routine traffic stops in that it requires that the scope of a *Terry* stop be reasonable both in substance and duration. This conclusion is supported by this court's long emphasis on the overall reasonableness of *Terry* searches, especially in light of the uncertain and conflicting dictates of federal law, as well as persuasive sister state precedents and contemporary public policy concerns. In order to effectuate the requirement that *Terry* stops be both substantively and temporally reasonable in scope, I further conclude that a consent search during[14] a routine traffic stop is not valid unless

[14] As the majority notes, some courts have held that the timing of the questioning and request for consent have independent constitutional significance, and therefore require additional justification for inquiries made after a discrete event signals the end of the traffic stop or after the purposes of the traffic stop have been effectuated. See footnote 7 of this dissenting opinion. In the present case, Officer Morgan retained the defendant's license and paperwork while he asked him to step out of the car, frisked him, and asked for consent to search the car. Under the approach of some of our sister states, such a search would be legitimate because Morgan had not yet concluded the traffic stop.

there is a reasonable and articulable suspicion to believe that a detained driver or passenger has engaged in, or is about to engage in, criminal activity.

In determining whether reasonable and articulable suspicion exists, "a court must consider if, relying on the whole picture, the detaining officers had a particularized and objective basis for suspecting the particular person stopped of criminal activity. . . . [A] court must examine the specific information available to the police officer at the time of the initial intrusion and any rational inferences to be derived therefrom." (Internal quotation marks omitted.) *State* v. *Batts*, 281 Conn. 682, 691–92, 916 A.2d 788, cert. denied, 552 U.S. 1048, 128 S. Ct. 667, 169 L. Ed. 2d 524 (2007). Although a trial court's findings of facts in connection with a suppression hearing are entitled to deference, the determination of whether reasonable and articulable suspicion existed is a question of law, subject to plenary review. See *State* v. *Brown*, supra, 279 Conn. 516 ("The defendant challenges not the trial court's factual findings but, rather, its legal conclusions that the actions of the police constitutionally were valid. These conclusions are subject to plenary review.").

In the present case, the Appellate Court thoroughly reviewed the circumstances surrounding the stop and

---

Although I find the reasoning of these courts and their concerns with police overreaching to be persuasive, I believe that they do not go far enough in protecting the rights of drivers under article first, § 7, of the Connecticut constitution, because an unsubstantiated, suspicionless consent search exceeds the permissible scope of a routine traffic stop and violates a driver's privacy whether it is conducted within the first thirty seconds or the last thirty seconds of that encounter. Moreover, this approach vests police with the power to determine, by either prolonging or expediting the requirements of the routine traffic stop, when additional justification is needed. Therefore, I adopt the reasoning articulated by the New Jersey Supreme Court: "A suspicionless consent search shall be deemed unconstitutional whether it preceded or followed completion of the lawful traffic stop." *State* v. *Carty*, supra, 170 N.J. 647.

concluded as a matter of law that the state "did not establish that [Officer] Morgan had reasonable suspicion to expand the scope of the stop into an inquiry of whether the defendant was engaged in illegal activity unrelated to the underlying stop or that Morgan was proceeding on anything more than a mere hunch." *State v. Jenkins*, supra, 104 Conn. App. 434. My own review of the record leads me to the same conclusion. Accordingly, I conclude that the consent search was invalid under article first, § 7, of the Connecticut constitution. Therefore, I respectfully dissent from the majority's decision reversing the judgment of the Appellate Court.

PALMER, J., dissenting. The majority concludes that Detective Michael Morgan of the Newington police department did not violate the rights of the defendant, Christopher Jenkins, under article first, § 7, of the Connecticut constitution when Morgan conducted a consent search of the defendant's vehicle following his lawful stop of the defendant for a traffic violation in Newington at approximately 11:30 p.m. on May 7, 2004. I disagree with the majority's conclusion because I believe that, under the state constitution, Morgan was required to inform the defendant that he had no obligation to consent to the search of his vehicle and that he was free to leave, once he received the traffic ticket, if he chose to withhold consent to search.[1] I reach this conclusion for two interrelated reasons. First, such an advisement is necessary to ensure that a waiver of the constitutionally protected right to refuse consent to a vehicle search following a routine traffic stop has been given freely and intelligently. Second, without that advisement, there exists too great of a risk that the

[1] I disagree with Justice Katz that the defendant inadequately briefed his claim that Morgan's search of his vehicle violated his rights under the state constitution on the ground that Morgan had failed to advise the defendant that he had a right not to consent to the search of his vehicle.

person being detained in connection with the traffic stop, who may not leave the scene until permitted to do so by the police, will feel constrained to agree to the search due to the element of compulsion inherent in the nature of an encounter with the police. The need for such an advisement is all the greater when, as in the present case, the police lack even a reasonable and articulable suspicion that the detained vehicle contains contraband. Because Morgan failed to advise the defendant, I would conclude that the search violated the defendant's rights under article first, § 7. Accordingly, I respectfully dissent.[2]

The undisputed facts and procedural history relevant to this issue are set forth in the majority opinion and require no repetition. I turn, therefore, to the legal principles that guide my analysis. "It is well established that federal constitutional and statutory law establishes a minimum national standard for the exercise of individual rights and does not inhibit state governments from affording higher levels of protection for such rights. . . . Furthermore, although we often rely on the United States Supreme Court's interpretation of the amendments to the constitution of the United States to delineate the boundaries of the protections provided by the constitution of Connecticut, we have also recognized

---

[2] I agree with the majority that the record is inadequate for review of the defendant's claim that Morgan's patdown search of the defendant was unlawful and, further, that Morgan's conduct in obtaining the defendant's consent to search did not violate the fourth amendment to the United States constitution. Finally, I also agree with the majority that, in contrast to the view expressed by Justice Katz in her dissenting opinion, it was not improper under the state constitution for Morgan to seek the defendant's consent to search despite his lack of reasonable and articulable suspicion to do so, at least in the absence of evidence indicating an abuse of the use of consent searches following routine traffic stops by the police. Thus, in my view, the search violated article first, § 7, of the state constitution not because Morgan sought the defendant's consent to search his vehicle but, rather, because Morgan had failed to advise the defendant that he had the right to refuse to consent to such a search.

that, in some instances, our state constitution provides protections beyond those provided by the federal constitution, as that document has been interpreted by the United States Supreme Court. . . . Indeed, this court has determined that, in certain respects, article first, § 7, of the state constitution affords greater protection than the fourth amendment to the United States constitution. E.g., *State* v. *Miller*, 227 Conn. 363, 377, 630 A.2d 1315 (1993) (article first, § 7, requires police to obtain warrant to search impounded automobile); *State* v. *Geisler*, 222 Conn. 672, 691–92, 610 A.2d 1225 (1992) (emergency exception to warrant requirement is narrower under article first, § 7, than under federal constitution); *State* v. *Marsala*, 216 Conn. 150, 171, 579 A.2d 58 (1990) (good faith exception to warrant requirement does not exist under article first, § 7, of state constitution); *State* v. *Dukes*, 209 Conn. 98, 120–21, 547 A.2d 10 (1988) (search incident to arrest exception to warrant requirement is narrower under article first, § 7, than under federal constitution). In determining the scope of the rights secured by our state constitution, the following tools of analysis should be considered to the extent applicable: (1) the [text of the constitutional provision] . . . (2) holdings and dicta of this court . . . (3) federal precedent . . . (4) sister state decisions . . . (5) the [history of the constitutional provision] . . . including the historical constitutional setting and the debates of the framers . . . and (6) economic/sociological considerations."[3] (Citation omitted; internal quotation marks omitted.) *State* v. *Davis*, 283 Conn. 280, 305–306, 929 A.2d 278 (2007).

I agree with the majority that neither the text nor the constitutional history of article first, § 7, of the Connect-

---

[3] This court first articulated the importance of considering these factors for purposes of state constitutional analysis in *State* v. *Geisler*, supra, 222 Conn. 684–85, and, consequently, they often are referred to as the *Geisler* factors.

icut constitution supports the defendant's claim that the state constitution affords greater protection than the federal constitution with respect to a request for consent to search a vehicle made by a police officer in connection with a routine traffic stop. I disagree, however, with the majority's analysis of the remaining *Geisler* factors,[4] which, in my view, leads to the conclusion that, under the state constitution, a consent search of such a vehicle is invalid unless the detained motorist is informed of his or her right to withhold consent to such a search.

## I

## FEDERAL PRECEDENT

As the majority observes, in *Schneckloth* v. *Bustamonte*, 412 U.S. 218, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973), the United States Supreme Court rejected the very same claim under the fourth amendment to the federal constitution that the defendant in the present case raises under the state constitution. Specifically, the court in *Schneckloth* concluded that "the question [of] whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances. While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the sine qua non of an effective consent." Id., 227. For the reasons that follow, I am unpersuaded by the court's analysis in *Schneckloth*, at least in the context of a request for consent during a routine traffic stop.[5]

---

[4] See footnote 3 of this opinion.

[5] Because *Schneckloth* is the seminal case concerning consent searches following routine traffic stops, it is necessary to discuss the case in some detail.

In *Schneckloth*, the court commenced its analysis by observing that "[t]he most extensive judicial exposition of the meaning of 'voluntariness' has been developed in those cases in which the [c]ourt has had to determine the 'voluntariness' of a defendant's confession for purposes of the [f]ourteenth [a]mendment." Id., 223. A review of these cases, the court explained, reveals "no talismanic definition of 'voluntariness,' mechanically applicable to the host of situations [in which] the question has arisen. . . . It cannot be taken literally to mean a 'knowing' choice." (Citation omitted.) Id., 224. "Rather, 'voluntariness' has reflected an accommodation of the complex of values implicated in police questioning of a suspect. At one end of the spectrum is the acknowledged need for police questioning as a tool for the effective enforcement of criminal laws. . . . At the other end of the spectrum is the set of values reflecting society's deeply felt belief that the criminal law cannot be used as an instrument of unfairness, and that the possibility of unfair and even brutal police tactics poses a real and serious threat to civilized notions of justice." (Citations omitted.) Id., 224–25. The court further explained that, in light of these competing concerns, it traditionally has framed the test for voluntariness as whether "the confession [is] the product of an essentially free and unconstrained choice by its maker . . . ." Id., 225. In making this determination, the court made clear that the totality of the circumstances must be considered, and, although the accused's awareness of his constitutional rights is one of several factors relevant to that determination, it is not a dispositive factor. Id., 226–27.

The court in *Schneckloth* reasoned that a similar analysis should apply to the determination of whether a suspect voluntarily has given consent to search. "As with police questioning, two competing concerns must be accommodated in determining the meaning of a 'vol-

untary' consent—the legitimate need for such searches and the equally important requirement of assuring the absence of coercion." Id., 227. In reaching this conclusion, the court observed that, in cases in which the police may "have some evidence of illicit activity, but lack probable cause to arrest or search," consent searches serve a vital purpose because they "may be the only means of obtaining important and reliable evidence." Id. These searches, the court stated, may "[provide] some assurance that [third parties], wholly innocent of the crime, [will] not [be] mistakenly brought to trial." Id., 228.

The court then stated that requiring the state to prove "affirmatively . . . that the subject of the search knew that he had a right to refuse consent would, in practice, create serious doubt [about] whether consent searches could continue to be conducted." Id., 229. In support of this assertion, the court explained: "There might be rare cases [in which] it could be proved from the record that a person in fact affirmatively knew of his right to refuse . . . . But more commonly where there was no evidence of any coercion, explicit or implicit, the prosecution would nevertheless be unable to demonstrate that the subject of the search in fact had known of his right to refuse consent." Id., 229–30. "The very object of the inquiry—the nature of a person's subjective understanding—underlines the difficulty of the prosecution's burden under [a] rule [that would require proof of such knowledge]. Any defendant who [is] the subject of a search authorized solely by his consent could effectively frustrate the introduction into evidence of the fruits of that search by simply failing to testify that he in fact knew [that] he could refuse to consent. And the near impossibility of meeting this prosecutorial burden suggests why [the] [c]ourt has never accepted any such litmus-paper test of voluntariness." Id., 230.

The court in *Schneckloth* acknowledged that the police officer seeking consent to search the vehicle in that case simply could have informed the subject of the traffic stop that he had the right to withhold such consent. The court, however, rejected that approach, reasoning as follows: "One alternative that would go far toward proving that the subject of a search did know [that] he had a right to refuse consent would be to advise him of that right before eliciting his consent. . . . [I]t would be thoroughly impractical [however] to impose on the normal consent search the detailed requirements of an effective warning. Consent searches are part of the standard investigatory techniques of law enforcement agencies. They normally occur on the highway, or in a person's home or office, and under informal and unstructured conditions. The circumstances that prompt the initial request to search may develop quickly or be a logical extension of investigative police questioning. The police may seek to investigate further suspicious circumstances or to follow up leads developed in questioning persons at the scene of a crime. These situations are a far cry from the structured atmosphere of a trial where, assisted by counsel if he chooses, a defendant is informed of his trial rights. . . . And, while surely a closer question, these situations are still immeasurably far removed from 'custodial interrogation' where, in *Miranda* v. *Arizona*, [384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966)], we found that the [c]onstitution required certain now familiar warnings as a prerequisite to police interrogation." (Citation omitted.) *Schneckloth* v. *Bustamonte*, supra, 412 U.S. 231–32.

The court in *Schneckloth* also rejected the respondent's contention that, because " 'consent' is a waiver of a person's rights under the [f]ourth and [f]ourteenth [a]mendments," to establish waiver, the state must be required to "demonstrate 'an intentional relinquishment

or abandonment of a known right or privilege.' " Id., 235. In so concluding, the court observed that a knowing and intelligent waiver is not required whenever a subject declines to invoke a constitutional protection; instead, waiver analysis applies only to those rights needed to protect the fairness of a trial or trial-type proceeding. Id., 237–38. By way of example, the court observed that, in *Miranda*, it had "found that *custodial* interrogation by the police was inherently coercive, and consequently held that detailed warnings were required to protect the privilege against compulsory self-incrimination. The [c]ourt [in *Miranda*] made it clear that the basis for [its] decision was the need to protect the fairness of the trial itself:

" 'That counsel is present when statements are taken from an individual during interrogation obviously enhances the integrity of the fact-finding processes in court. . . . Without the protections flowing from adequate warnings and the rights of counsel, "all the careful safeguards erected around the giving of testimony, whether by an accused or any other witness, would become empty formalities in a procedure where the most compelling possible evidence of guilt, a confession, would have already been obtained at the unsupervised pleasure of the police." ' [*Miranda* v. *Arizona*, supra, 384 U.S. 466]." (Emphasis in original.) *Schneckloth* v. *Bustamonte*, supra, 412 U.S. 240.

The court continued: "[T]here is a vast difference between those rights that protect a fair criminal trial and the rights guaranteed under the [f]ourth [a]mendment." Id., 241. Thus, the court concluded that there was no reason to extend the requirement of a knowing and intelligent waiver to consent searches. See id. The fourth amendment, the court explained, was not designed to protect the accuracy of the truth determining process at trial; instead, it protects an individual's privacy against arbitrary intrusion by the police. Id.,

242. In support of this assertion, the court relied on its prior determination that "there is no likelihood of unreliability or coercion present in a search-and-seizure case . . . ." (Citation omitted; internal quotation marks omitted.) Id. Consequently, the court maintained, "it cannot be said [that] every reasonable presumption ought to be indulged against voluntary relinquishment. . . . [I]t is no part of the policy underlying the [f]ourth and [f]ourteenth [a]mendments to discourage citizens from aiding to the utmost of their ability in the apprehension of criminals. . . . Rather, the community has a real interest in encouraging consent, for the resulting search may yield necessary evidence for the solution and prosecution of crime, evidence that may [e]nsure that a wholly innocent person is not wrongly charged with a [crime]." (Citation omitted; internal quotation marks omitted.) Id., 243.

The court further explained that "it would be next to impossible to apply to a consent search the standard of 'an intentional relinquishment or abandonment of a known right or privilege.' " Id. According to the court, in determining whether one knowingly and voluntarily has waived a right, a trial judge in "the structured atmosphere of a courtroom" must conduct an examination into whether there is an intelligent and competent waiver by the accused. Id., 243–44. This detailed examination would be unrealistic in the "informal, unstructured context of a consent search . . . . And if, for this reason a diluted form of 'waiver' were found [to be] acceptable, that would itself be ample recognition of the fact that there is no universal standard that must be applied in every situation [in which] a person forgoes a constitutional right." Id., 245.

Finally, the court explained that *Miranda* does not compel a knowledge requirement in the context of a consent search. Id., 246. The court asserted that, unlike the inherent coerciveness of custodial interrogation

that requires safeguards to ensure voluntariness, consent searches "normally occur on a person's own familiar territory . . . [and thus] the specter of incommunicado police interrogation in some remote station house is simply inapposite. There is no reason to believe . . . that the response to a policeman's question is presumptively coerced; and there is, therefore, no reason to reject the traditional test for determining the voluntariness of a person's response. *Miranda*, of course, did not reach investigative questioning of a person not in custody, which is most directly analogous to the situation of a consent search, and it assuredly did not indicate that such questioning ought to be deemed inherently coercive." Id., 247. The court thus concluded that a consent search following a routine traffic stop may pass muster under the fourth amendment even though the police have not informed the subject of the stop that he or she may decline to give consent to the search. See id., 248–49.

In separate opinions, Justices William O. Douglas, William J. Brennan, Jr., and Thurgood Marshall dissented from the opinion of the majority in *Schneckloth*. Justice Douglas concluded that a suspect should be informed of his right to withhold consent because, " '[u]nder many circumstances a reasonable person might read an officer's "[m]ay I" as the courteous expression of a demand backed by force of law.' " Id., 275–76 (Douglas, J., dissenting). In the same vein, Justice Brennan stated that "[t]he [c]ourt holds . . . that an individual can effectively waive this right even though he is totally ignorant of the fact that, in the absence of his consent, such invasions of his privacy would be constitutionally prohibited. It wholly escapes me how our citizens can meaningfully be said to have waived something as precious as a constitutional guarantee without ever being aware of its existence." Id., 277 (Brennan, J., dissenting).

Justice Marshall's dissent has been celebrated by commentators and scholars. See, e.g., A. Loewy, "Knowing 'Consent' Means 'Knowing Consent': The Underappreciated Wisdom of Justice Marshall's *Schneckloth* v. *Bustamonte* Dissent," 79 Miss. L.J. 97, 104–108 (2009). Justice Marshall begins his dissent with the observation that, "[s]everal years ago, [Justice Potter Stewart, the author of the majority opinion in *Schneckloth*] reminded us that '[t]he [c]onstitution guarantees . . . a society of free choice. Such a society presupposes the capacity of its members to choose.' *Ginsburg* v. *New York*, 390 U.S. 629, 649 [88 S. Ct. 1274, 20 L. Ed. 2d 195] (1968) ([Stewart, J.] concurring in result). I would have thought that the capacity to choose necessarily depends [on] knowledge that there is a choice to be made. But . . . the [majority in *Schneckloth*] reaches the curious result that one can choose to relinquish a constitutional right—the right to be free [from] unreasonable searches—without knowing that he has the alternative of refusing to accede to a police request to search." *Schneckloth* v. *Bustamonte*, supra, 412 U.S. 277 (Marshall, J., dissenting). In Justice Marshall's view, because the United States Supreme Court always had "scrutinized with great care claims that a person has forgone the opportunity to assert constitutional rights," there is no reason why that analysis should not apply with equal force to the issue of "whether a simple statement of assent to search, without more, should be sufficient to permit the police to search and thus act as a relinquishment of [that person's] constitutional right to exclude the police." Id., 278 (Marshall, J., dissenting).

After concluding that cases involving coerced confessions are inapposite in the context of a consent search,[6]

---

[6] In reaching this conclusion, Justice Marshall explained that "the phrase 'voluntary consent' seems redundant in a way that the phrase 'voluntary confession' does not." *Schneckloth* v. *Bustamonte*, supra, 412 U.S. 280 n.6 (Marshall, J., dissenting). Relying on *Miranda*, Justice Marshall asserted that, "[b]ecause of the nature of the right to be free of compulsion, it would be pointless to ask whether a defendant knew of it before he made a

Justice Marshall rejected the assertion of the majority in *Schneckloth* that consent " 'cannot be taken literally to mean a "knowing" choice.' " Id., 284 (Marshall, J., dissenting). Indeed, Justice Marshall explained that he had "difficulty in comprehending how a decision made without knowledge of available alternatives can be treated as a choice at all." Id. Furthermore, "[i]f consent to search means that a person has chosen to forgo his right to exclude the police from the place they seek to

statement; no sane person would knowingly relinquish a right to be free of compulsion. Thus, the questions of compulsion and of violation of the right itself are inextricably intertwined. The cases involving coerced confessions, therefore, pass over the question of knowledge of that right as irrelevant, and turn directly to the question of compulsion." Id., 281 (Marshall, J., dissenting). Justice Marshall further asserted that, although "we would not ordinarily think that a suspect could waive his right to be free of coercion, for example, we do permit suspects to waive the rights they are informed of by police warnings, on the belief that such information in itself sufficiently decreases the chance that a statement would be elicited by compulsion. . . . Thus, nothing the defendant did in [any case] involving coerced confessions was taken to operate as a relinquishment of his rights; certainly the fact that the defendant made a statement was never taken to be a relinquishment of the right to be free of coercion." (Citation omitted.) Id., 281–82 (Marshall, J., dissenting).

By contrast, Justice Marshall explained, the *Schneckloth* case did not involve the right to be free from police misconduct of the kind implicated by a coerced confession but, rather, the issue of consent. Id., 282 (Marshall, J., dissenting). Justice Marshall further observed that the two concepts are different because freedom from coercion is a substantive, constitutional right, whereas consent "is a mechanism by which substantive requirements, otherwise applicable, are avoided." Id. Thus, the substantive requirement of the fourth amendment is that searches may be conducted only on the basis of a properly issued warrant supported by probable cause. See id. Justice Marshall further asserted that, although there are exceptions to this requirement, they are justified by the overriding needs of law enforcement, which are applicable when consent is the sole justification for a search. Id., 282–83 (Marshall, J., dissenting). Indeed, Justice Marshall explained that "the needs of law enforcement are significantly more attenuated, for probable cause to search may be lacking but a search permitted if the subject's consent has been obtained. Thus, consent searches are permitted, not because such an exception to the requirements of probable cause and warrant is essential to proper law enforcement, but because we permit our citizens to choose whether . . . they wish to exercise their constitutional rights." Id., 283 (Marshall, J., dissenting).

search, it follows that his consent cannot be considered a meaningful choice unless he knew that he could in fact exclude the police. . . . I can think of no other situation in which we would say that a person agreed to some course of action if he convinced us that he did not know that there was some other course he might have pursued. I would therefore hold, at a minimum, that the prosecution may not rely on a purported consent to search if the subject of the search did not know that he could refuse to give consent. . . . Where the police claim authority to search yet in fact lack such authority, the subject does not know that he may permissibly refuse them entry, and it is this lack of knowledge that invalidates the consent."[7] (Citations omitted.) Id., 284–85 (Marshall, J., dissenting).

Justice Marshall also rejected the majority's assertion that, "if an officer paused to inform the subject of his rights, the informality of the exchange would be destroyed. I doubt that a simple statement by an officer of an individual's right to refuse consent would do much to alter the informality of the exchange, except to alert the subject to a fact that he surely is entitled to know. It is not without significance that for many years the agents of the Federal Bureau of Investigation have routinely informed subjects of their right to refuse consent, when they request consent to search. . . . The reported cases in which the police have informed subjects of their right to refuse consent show, also, that

---

[7] "When a prosecutor seeks to rely [on] consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given. This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority. A search conducted in reliance [on] a warrant cannot later be justified on the basis of consent if it turns out that the warrant was invalid. The result can be no different when it turns out that the [s]tate does not even attempt to rely [on] the validity of the warrant, or fails to show that there was, in fact, any warrant at all." *Bumper* v. *North Carolina*, 391 U.S. 543, 548–50, 88 S. Ct. 1788, 20 L. Ed. 2d 797 (1968).

the information can be given without disrupting the casual flow of events. . . . What evidence there is, then, rather strongly suggests that nothing disastrous would happen if the police, before requesting consent, informed the subject that he ha[s] a right to refuse consent and that his refusal would be respected." (Citations omitted.) Id., 287–88 (Marshall, J., dissenting).

Justice Marshall concluded "that when the [majority in *Schneckloth*] speaks of practicality, what it really is talking of is the continued ability of the police to capitalize on the ignorance of citizens so as to accomplish by subterfuge what they could not achieve by relying only on the knowing relinquishment of constitutional rights. . . .

"I find nothing in the [majority] opinion [in *Schneckloth*] to dispel my belief that . . . '[u]nder many circumstances a reasonable person might read an officer's "[m]ay I" as the courteous expression of a demand backed by force of law.' . . . Most cases, in my view . . . [reflect that] consent ordinarily is given as acquiescence in an implicit claim of authority to search. Permitting searches in such circumstances, without any assurance at all that the subject of the search knew that, by his consent, he was relinquishing his constitutional rights, is something that I cannot believe is sanctioned by the [c]onstitution." (Citations omitted.) Id., 288–89 (Marshall, J., dissenting).

The United States Supreme Court reaffirmed its holding in *Schneckloth* in *Ohio* v. *Robinette*, 519 U.S. 33, 39–40, 117 S. Ct. 417, 136 L. Ed. 2d 347 (1996). In *Robinette*, the state of Ohio appealed from the judgment of the Supreme Court of Ohio, which had adopted the following rule under the United States and Ohio constitutions: " '[C]itizens stopped for traffic offenses [must] be clearly informed by the detaining officer when they are free to go after a valid detention, before an officer

attempts to engage in a consensual interrogation. Any attempt at consensual interrogation must be preceded by the phrase "[a]t this time you legally are free to go" or by words of similar import.' " Id., 36. The United States Supreme Court rejected the rule announced by the Supreme Court of Ohio as a matter of federal constitutional law.[8] Remarking that "the touchstone of the [f]ourth [a]mendment is reasonableness . . . [which is] measured in objective terms by examining the totality of the circumstances"; (citation omitted; internal quotation marks omitted) id., 39; the court observed that it "consistently [has] eschewed bright-line rules . . . ." Id. Indeed, relying on the conclusion of the court in *Schneckloth* that "it would be thoroughly impractical to impose on the normal consent search the detailed requirements of an effective warning"; (internal quotation marks omitted) id., quoting *Schneckloth* v. *Busta-monte*, supra, 412 U.S. 231; the court concluded that it similarly would "be unrealistic to require police officers to always inform detainees that they are free to go before a consent to search may be deemed voluntary."[9] *Ohio* v. *Robinette*, supra, 39–40.

---

[8] Although the Ohio Supreme Court had decided the case on the basis of both the federal and Ohio constitutions, the United States Supreme Court concluded that it was appropriate to consider the federal constitutional issue because the Ohio Supreme Court had relied almost entirely on fourth amendment jurisprudence in reaching its decision. *Ohio* v. *Robinette*, supra, 519 U.S. 36–37.

[9] Justice John Paul Stevens dissented, concluding that, on the basis of the facts presented, the Supreme Court of Ohio "correctly held that [the] consent [of the defendant, Robert Robinette] to the search of his vehicle was the product of an unlawful detention." *Ohio* v. *Robinette*, supra, 519 U.S. 45 (Stevens, J., dissenting). In reaching this conclusion, Justice Stevens explained that "[t]he [Supreme Court of Ohio] was surely correct in stating: 'Most people believe that they are validly in a police officer's custody as long as the officer continues to interrogate them. The police officer retains the upper hand and the accouterments of authority. That the officer lacks legal license to continue to detain them is unknown to most citizens, and a reasonable person would not feel free to walk away as the officer continues to address him.' " Id., 47 (Stevens, J., dissenting).

Before addressing the merits of the court's reasoning in *Schneckloth*, it bears emphasis that, in considering the value of applicable federal precedent in the context of a *Geisler* analysis, it is necessary to consider that precedent's persuasive value. See *Kerrigan* v. *Commissioner of Public Health*, 289 Conn. 135, 230–31, 957 A.2d 407 (2008) ("[we examine federal] precedent for guidance and analogy [in construing our own constitution but only] when [those] authorities are logically persuasive and well-reasoned" [internal quotation marks omitted]); cf. *State* v. *Brunetti*, 276 Conn. 40, 115, 883 A.2d 1167 (2005) (*Palmer, J.*, dissenting) ("a judicial opinion must be judged not on the number of votes that it has garnered but on its reasoning"), superseded by *State* v. *Brunetti*, 279 Conn. 39, 901 A.2d 1 (2006), cert. denied, 549 U.S. 1212, 127 S. Ct. 1328, 167 L. Ed. 2d 85 (2007). Thus, when this court undertakes an independent analysis of the meaning of article first, § 7, of the state constitution, it may reject as lacking in persuasive force, for state constitutional purposes, precedent of the United States Supreme Court construing the analogous provisions of the fourth amendment to the federal constitution. Indeed, not infrequently, this court, in interpreting article first, § 7, has rejected the reasoning and holding of a majority opinion of the United States Supreme Court and, instead, expressly or implicitly adopted the reasoning employed by one or more dissenting justices of that court. See, e.g., *State* v. *Miller*, supra, 227 Conn. 377 (declining to adopt rule in *Chambers* v. *Maroney*, 399 U.S. 42, 51–52, 90 S. Ct. 1975, 26 L. Ed. 2d 419 [1970], as matter of state constitutional law, and holding, in accordance with rationale of concurrence and dissent of Justice John M. Harlan in *Chambers,* that warrantless search of automobile impounded by police that is not performed for inventory purposes is violation of article first, § 7); *State* v. *Oquendo*, 223 Conn. 635, 649–52, 613 A.2d 1300 (1992)

(declining to adopt restrictive definition of seizure adopted in *California* v. *Hodari D.*, 499 U.S. 621, 626, 111 S. Ct. 1547, 113 L. Ed. 2d 690 [1991], for purposes of article first, §§ 7 and 9, relying in part on reasoning of dissent of Justice Stevens in *Hodari D.*); *State* v. *Geisler*, supra, 222 Conn. 682–83, 687–90 (declining to follow *New York* v. *Harris*, 495 U.S. 14, 18, 21, 110 S. Ct. 1640, 109 L. Ed. 2d 13 [1990], for purposes of state constitution and holding, in accordance with reasoning of dissent of Justice Marshall in *Harris*, that, under article first, § 7, evidence derived from arrest of suspect following unlawful warrantless entry into home must be suppressed, despite probable cause for arrest, unless taint of illegal entry is attenuated by passage of time or intervening circumstances); *State* v. *Marsala*, supra, 216 Conn. 168–71 (rejecting "good faith" exception to exclusionary rule adopted in *United States* v. *Leon*, 468 U.S. 897, 913, 104 S. Ct. 3405, 82 L. Ed. 2d 677 [1984], for purposes of article first, § 7, relying in part on reasoning of dissent of Justice Brennan in *Leon*); *State* v. *Stoddard*, 206 Conn. 157, 166–67, 169, 537 A.2d 446 (1988) (rejecting holding of *Moran* v. *Burbine*, 475 U.S. 412, 422, 106 S. Ct. 1135, 89 L. Ed. 2d 410 [1986], and concluding, in accordance with reasoning of dissent of Justice Stevens in *Moran*, that due process clause of article first, § 8, of state constitution requires police promptly to inform suspect of his attorney's attempt to provide legal assistance during interrogation). In the foregoing cases, as in other cases, we have rejected United States Supreme Court precedent in interpreting our state constitution because, as this court previously has observed, "decisions of the United States Supreme Court defining fundamental rights are persuasive authority to be afforded respectful consideration, but they are to be followed by Connecticut courts only when they provide no less individual protection than is guaranteed by Connecticut law." (Internal quotation

marks omitted.) *State* v. *Marsala*, supra, 216 Conn. 160, quoting *Horton* v. *Meskill*, 172 Conn. 615, 642, 376 A.2d 359 (1977). For the reasons that follow, *Schneckloth* also is such a case.

The analysis employed by the court in *Schneckloth* has been widely criticized by legal scholars. See, e.g., *United States* v. *Gagnon*, 230 F. Sup. 2d 260, 269 n.8 (N.D.N.Y. 2002) ("[t]he judicially created framework of the consent doctrine has been severely criticized, with no small measure of merit, as ignoring the practical realities of encounters between police and citizens"), rev'd on other grounds, 373 F.3d 230 (2d Cir. 2004); *Brown* v. *State*, 182 P.3d 624, 632 (Alaska App. 2008) (noting that "legal commentators have been widely critical of the United States Supreme Court's consent-search jurisprudence"); 4 W. LaFave, Search and Seizure (4th Ed. 2004) § 8.2 (i), p. 111 ("Perhaps the most telling criticism of . . . *Schneckloth* . . . is that the [c]ourt misapprehended the potential for psychological coercion in the context of consent searches. . . . [T]here is much to be said for the conclusion that . . . [the] right to withhold consent [should be communicated to a suspect]." [Internal quotation marks omitted.]); R. Simmons, "Not 'Voluntary' but Still Reasonable: A New Paradigm for Understanding the Consent Search Doctrine," 80 Ind. L.J. 773, 775 (2005) ("[i]t is no exaggeration to say that the nearly unanimous condemnation of the [c]ourt's rulings on consensual searches is creating a problem of legitimacy [that] threatens to undermine the integrity of judicial review of police behavior"); R. Ward, "Consensual Searches, The Fairytale That Became a Nightmare: *Fargo* Lessons Concerning Police Initiated Encounters," 15 Touro L. Rev. 451, 457 (1999) ("many of the suppositions underlying [*Schneckloth*] are false"); A. Barrio, note, "Rethinking *Schneckloth v. Bustamonte*: Incorporating Obedience Theory into the Supreme Court's Conception of Voluntary Consent,"

1997 U. Ill. L. Rev. 215, 218 ("*Schneckloth* misapprehended the potential for psychological coercion in the context of consent searches"). This criticism is based on certain flaws in several of the assumptions that underlie the reasoning of the majority opinion in *Schneckloth*.

First, *Schneckloth* has been criticized for overlooking the coercive effect that an officer's request for consent is likely to have on a motorist who has been detained in connection with a traffic stop. As one commentator has stated, "[w]hat is remarkable . . . is the ever-widening gap between [f]ourth [a]mendment consent jurisprudence, on the one hand, and scientific findings about the psychology of compliance and consent on the other. Ever since the [c]ourt first applied the 'totality of the circumstances' standard to consent search issues in *Schneckloth* . . . in 1973, it has held in case after case, with only a few exceptions, that a reasonable person in the situation in question either would feel free to terminate the encounter with [the] police, or would feel free to refuse the police request to search. By contrast, empirical studies over the last several decades on the social psychology of compliance, conformity, social influence, and politeness have all converged on a single conclusion: the extent to which people feel free to refuse to comply is extremely limited under situationally induced pressures." J. Nadler, "No Need to Shout: Bus Sweeps and the Psychology of Coercion," 2002 Sup. Ct. Rev. 153, 155. It therefore has been argued that the United States Supreme Court should incorporate the "empirical findings on compliance and social influence into . . . consent [search] jurisprudence . . . to dispel the 'air of unreality' that characterizes current doctrine." Id., 156–57; see also W. LaFave, "The 'Routine Traffic Stop' From Start to Finish: Too Much 'Routine,' Not Enough Fourth Amendment," 102 Mich. L. Rev. 1843, 1902 (2004) ("[i]t is . . . nonsensical for courts

to continue their embrace of the . . . position that a reasonable motorist, having been seized, would conclude he was free to leave [even though not told so] in the face of ongoing police interrogation"); T. Maclin, "The Good and Bad News About Consent Searches in the Supreme Court," 39 McGeorge L. Rev. 27, 28 (2008) ("everyone . . . knows . . . [that] a police 'request' to search a bag or automobile is understood by most persons as a 'command' "); M. Strauss, "Reconstructing Consent," 92 J. Crim. L. & Criminology 211, 219 n.29 (2001) ("Except [when] consent is required in a person's home, it is often sought in areas unfamiliar and intimidating. How many of us feel like we are on 'familiar territory' when pulled over to the side of the road by a police car or two?"); M. Strauss, supra, 235 (*Schneckloth* "ignor[es] the most significant factor of all: the inevitability that individuals will feel coerced simply by virtue of dealing with an authority figure like the police"); R. Weaver, "The Myth of 'Consent'," 39 Tex. Tech L. Rev. 1195, 1199 (2007) ("The *Schneckloth* decision is . . . troubling because it ignores the realities of police-citizen encounters and the inherent pressures on individuals to comply with police requests. . . . [W]hen a police officer requests permission to search, the police officer inevitably retains a distinct psychological advantage over the suspect."); A. Barrio, supra, 1997 U. Ill. L. Rev. 233 ("[t]he most baffling aspect of the [United States] Supreme Court's conception of voluntary consent is that it virtually ignores the well-documented observation that most people mechanically obey legitimate authority"); cf. G. Dery, " 'When Will This Traffic Stop End?': The United States Supreme Court's Dodge of Every Detained Motorist's Central Concern—*Ohio v. Robinette*," 25 Fla. St. U. L. Rev. 519, 559–60 (1998) (observing that United States Supreme Court's statements regarding relative positions of power between police officer and citizen are simply incorrect in context of routine traffic stop).

Indeed, drawing on relevant empirical studies, several commentators have concluded that the dissenting justices in *Schneckloth* were correct in that individuals tend to see an officer's request for consent as a demand. See M. Strauss, supra, 92 J. Crim. L. & Criminology 236–42. For example, it seems evident, on the basis of empirical research regarding obedience to authority and uniform, that individuals "attribute legitimacy to the police officer's uniform [and] that they obey police authority reflexively." A. Barrio, supra, 1997 U. Ill. L. Rev. 243; see also J. Burkoff, "Search Me?," 39 Tex. Tech L. Rev. 1109, 1138 (2007) ("most people do not expect that they have the right not to accede a police officer's request that a search be authorized" [internal quotation marks omitted]). Consequently, "the weight of scientific authority suggests that a suspect's ignorance of fundamental [f]ourth [a]mendment rights must be viewed as a state of mind that renders a suspect's consent involuntary." A. Barrio, supra, 247; see also id., 240 ("[the] obedience theory casts serious doubt on the continued vitality of what *Schneckloth* characterized as *Miranda*'s central holding: that custody is a necessary prerequisite for a finding of psychological coercion"). Thus, "[t]o curb the coercive power of police authority, the police officer should be required to advise the suspect of his right to withhold consent prior to requesting his permission to search. Such a warning would combat the obedience phenomenon by assuring the suspect both that he is under no obligation to give consent and that the investigating officer is 'prepared to recognize his privilege.' " Id., 247; see also 4 W. LaFave, Search and Seizure (4th Ed. 2004) § 8.2 (i), pp. 111–12 (expressing support for such approach).

The factual scenario in the present case provides a good example of why the court in *Schneckloth* was wrong in concluding that a motorist stopped for a traffic violation is not likely to feel compelled to agree to a

police officer's request for permission to search his or her vehicle. According to the court in *Schneckloth*, there is no reason to believe that the subject of such a stop will view the encounter as coercive because the search "occur[s] on [the driver's] own familiar territory [where] the specter of incommunicado police interrogation in some remote station house is . . . inapposite." *Schneckloth* v. *Bustamonte*, supra, 412 U.S. 247. Of course, there can be no doubt that police interrogation of a person held incommunicado and far from home gives rise to a legitimate concern about the voluntariness of any statement obtained as a result of such interrogation, and so, too, is the voluntariness of the defendant's consent to search open to serious doubt. The defendant, an African-American from out of state and traveling alone, was stopped by Detective Morgan shortly before midnight and pulled over in a dark area of the Berlin Turnpike. Morgan operated an unmarked car but was dressed in full police uniform and possessed a firearm, a utility belt with handcuffs, pepper spray and a flashlight, all in plain view. While preparing the traffic citation in his cruiser, Morgan called for a backup police officer because, unbeknownst to the defendant, Morgan intended to request that the defendant consent to a search of his vehicle. That backup officer, Sergeant Derrick Sutton, who also was in full police uniform, arrived before Morgan had returned to the defendant's vehicle. At that point, ten to fifteen minutes had passed since the defendant had been stopped. Morgan then approached the defendant and told him to exit his car. Morgan explained the citation to the defendant but did not give it to him at that time. Rather, Morgan asked the defendant whether he had anything illegal on his person, and, when the defendant said that he did not, Morgan patted him down. Morgan then asked the defendant if he had anything illegal in the vehicle, and the defendant responded that all he had in the car was

some beer on the floor in front of the passenger seat. When the defendant told Morgan that he could "go ahead and check," Morgan conducted a search of the defendant's vehicle.

It is fanciful to think that the circumstances that led to the search of the defendant's vehicle did not give rise to a substantial element of compulsion. The defendant, an African-American who does not reside in this state, was pulled over in a dark area of the highway, late at night, by an armed police officer, and detained there, in his car, for up to fifteen minutes, at which point a second armed police officer arrived at the scene in a separate cruiser. Morgan then directed the defendant to exit his vehicle, questioned him about contraband on his person, conducted a patdown search, and asked him whether he had any contraband in the vehicle. It is difficult to see how anyone held under such circumstances would not feel vulnerable as a result of the encounter with the police, and there is little doubt that, in light of that vulnerability, the average person in that situation also would feel the need to accommodate, if not placate, the police officers involved in the encounter.

A second criticism of *Schneckloth*, which also is based on empirical evidence, concerns the assertion that a knowledge requirement could jeopardize the continued viability of consent searches. In fact, studies suggest just the opposite, that is, that it appears that persons subjected to traffic stops give consent to vehicle searches at the same rate regardless of whether they are aware that such consent may be withheld. See, e.g., I. Lichtenberg, "*Miranda* in Ohio: The Effects of *Robinette* on the 'Voluntary' Waiver of Fourth Amendment Rights," 44 How. L.J. 349, 370, 373 (2001) (study demonstrated that between approximately 75 and 95 percent of motorists agree to police search of vehicle and that rates were very similar regardless of whether

motorists were apprised of their right to refuse such consent, and, consequently, assertion of court in *Schneckloth* that such advisement would jeopardize continued viability of consent searches was "[c]learly . . . unfounded"); M. Phillips, note, "Effective Warnings Before Consent Searches: Practical, Necessary, and Desirable," 45 Am. Crim. L. Rev. 1185, 1201 (2008) (citing study demonstrating that approximately 88 percent of motorists agree to consent search after being advised verbally and in writing of right to refuse consent). These findings should not be surprising in light of the fact that approximately 84 percent of suspects who have been advised of their rights in accordance with *Miranda* nevertheless waive their right to remain silent and comply with a request by the police for a statement. See S. Chanenson, "Get the Facts, Jack! Empirical Research and the Changing Constitutional Landscape of Consent Searches," 71 Tenn. L. Rev. 399, 442 (2004).

Although these data indicating that the provision of warnings has little effect on the rate at which consent is granted may suggest that such warnings are ineffective, it fairly may be argued that warnings nevertheless serve a salutary purpose insofar as they are likely to reduce the compulsion that people feel on the basis of "an inaccurate belief that the police have the legal right to compel them to [agree to the requested] search." R. Simmons, supra, 80 Ind. L.J. 819. To be sure, motorists undoubtedly have a multitude of reasons for granting consent to search, not all of which are the product of the inherently coercive nature of the police stop and following encounter; see *People* v. *James*, 19 Cal. 3d 99, 114, 561 P.2d 1135, 137 Cal. Rptr. 447 (1977) ("[T]here may be a number of 'rational reasons' for a suspect to consent to a search even though he knows the premises contain evidence that can be used against him: for example, he may wish to appear cooperative

in order to throw the police off the scent or at least to lull them into conducting a superficial search; he may believe the evidence is of such a nature or in such a location that it is likely to be overlooked; he may be persuaded that if the evidence is nevertheless discovered he will be successful in explaining its presence or denying any knowledge of it; he may intend to lay the groundwork for ingratiating himself with the prosecuting authorities or the courts; or he may simply be convinced that the game is up and further dissembling is futile."); and, consequently, warnings may have an impact on what may be considered negative forms of compulsion, such as acquiescence to a show of authority. See R. Simmons, supra, 820; see also R. Ward, supra, 15 Touro L. Rev. 477 ("[t]he combined forces of obedience to authority, the power of the uniform and lower expectations of privacy make it imperative that citizens be told from the outset that they do have a choice"). Indeed, the importance of *Miranda* warnings is widely accepted even though the large majority of suspects who are advised of their rights under *Miranda* nevertheless give a statement to the police.

There also seems to be little or no basis for the assertions of the court in *Schneckloth* that it would be unreasonable to burden the state with having to prove that a motorist who gives consent to search during the course of a routine traffic stop was aware of his or her right to refuse consent; *Schneckloth v. Bustamonte*, supra, 412 U.S. 229–30; and that requiring the police to advise motorists of their right to withhold consent to search would adversely affect the informality of the encounter, thereby impairing the ability of the police to use the consent search as a standard investigatory technique. See id., 231–32. With respect to the court's first assertion, I see no reason why the state could not meet its burden of proving knowledge simply by demonstrating that the officer at the scene had advised

the motorist of the right to withhold consent and that he or she was free to leave upon choosing that option. Indeed, in the ordinary case, the state's burden would be readily satisfied by testimony from the police officer that the subject of the stop was so advised. The court's second assertion, namely, that it would be "thoroughly impractical" to require the police to give such an advisement; id., 231; also is dubious. The advisement would take but a few seconds and easily could be given at the same time that the officer seeks the motorist's consent to search. See, e.g., M. Phillips, supra, 45 Am. Crim. L. Rev. 1185–86 (observing that high courts of several states have required police to provide warnings before seeking consent to search and asserting that "[a] review of the experience[s] of these states indicates that a warning requirement is practical"); E. Smary, note, "The Doctrine of Waiver and Consent Searches," 49 Notre Dame L. Rev. 891, 903 (1974) (criticizing as "straw-man logic" court's assertion in *Schneckloth* that it would be thoroughly impractical for police officer to engage in detailed examination needed to ensure valid waiver); cf. J. Adams, "Search and Seizure as Seen By Supreme Court Justices: Are They Serious or Is This Just Judicial Humor?," 12 St. Louis U. Pub. L. Rev. 413, 446–47 (1993) (criticizing court's consideration in *Schneckloth* of practical considerations of police in assessing whether advisement of right to withhold consent should be required).

Finally, the court in *Schneckloth* has been criticized for essentially ignoring the issue of how a consent to search fairly may be deemed to be truly voluntary when the person giving consent does not know that he or she has an absolute right, protected by the constitution, to refuse to do so. Thus, as one commentator has stated, "[a]ny competent person can give up rights at the request of the government. But it is hard to comprehend a theory of individual rights that permits that decision

to be made by someone unaware that he is relinquishing a fundamental civil liberty." M. Cloud, "Ignorance and Democracy," 39 Tex. Tech L. Rev. 1143, 1169 (2007).

In sum, because the reasons underlying the court's holding in *Schneckloth* ultimately are not persuasive, the holding of the court is itself not persuasive.[10] Indeed, the dissenting opinions in *Schneckloth* are significantly more convincing than the opinion of the majority in *Schneckloth*. This court therefore is not bound to adopt the holding of the majority opinion in *Schneckloth* for purposes of the state constitution.

## II

## HOLDINGS AND DICTA OF THIS COURT

As I discussed in part I of this opinion, this court has interpreted article first, § 7, of the Connecticut constitution as providing protections beyond those guaranteed under the fourth amendment to the federal constitution in a variety of different contexts. In no case, however, has this court or the Appellate Court previously had occasion to consider the scope of article first, § 7, in the context of consent searches generally or, more specifically, in the context of a consent search of a vehicle following a routine traffic stop. Accordingly, Connecticut precedent is neutral on the issue of whether the state constitution provides the same or greater protection than the federal constitution with respect to searches of the kind conducted in the present case.

---

[10] I note that commentators also have criticized the court's reliance in *Schneckloth* on coerced confession cases because the court never explained why those cases are relevant in the fourth amendment context; e.g., D. Smith, comment, "*Ohio v. Robinette*: Per Se Unreasonable," 29 McGeorge L. Rev. 897, 928 (1998); whereas other commentators have characterized "the [c]ourt's distinction between 'trial rights' and [f]ourth [a]mendment rights [as] *questionable* . . . ." (Emphasis added.) D. Kaplan & L. Dixon, "Coerced Waiver and Coerced Consent," 74 Denv. U. L. Rev. 941, 951 (1997).

III

## SISTER STATE DECISIONS

A significant majority of the states that have considered the issue apply the *Schneckloth* totality of the circumstances test in assessing whether consent was voluntary for purposes of their state constitutions, and do not require an express advisement of the right to withhold consent. E.g., *Henry* v. *State*, 621 P.2d 1, 4 and n.9 (Alaska 1980); *State* v. *Knaubert*, 27 Ariz. App. 53, 56–57, 550 P.3d 1095 (1976), overruled on other grounds by *State* v. *Grilz*, 136 Ariz. 450, 666 P.2d 1059 (1983); *People* v. *Hayhurst*, 194 Colo. 292, 295–96, 571 P.2d 721 (1977); *State* v. *Thompson*, 284 Kan. 763, 779–81, 166 P.3d 1015 (2007); *Scott* v. *State*, 366 Md. 121, 145, 782 A.2d 862 (2001), cert. denied, 535 U.S. 940, 122 S. Ct. 1324, 152 L. Ed. 2d 231 (2002); *Reese* v. *State*, 95 Nev. 419, 421, 596 P.2d 212 (1979); *State* v. *Osborne*, 119 N.H. 427, 433, 402 A.2d 493 (1979); *State* v. *Robinette*, 80 Ohio St. 3d 234, 245, 685 N.E.2d 762 (1997); *State* v. *Flores*, 280 Or. 273, 279–82, 570 P.2d 965 (1977); *Commonwealth* v. *Cleckley*, 558 Pa. 517, 527, 738 A.2d 427 (1999); *State* v. *Cox*, 171 S.W.3d 174, 181–84 (Tenn. 2005); *State* v. *Contrel*, 886 P.2d 107, 111–12 (Utah App. 1994), cert. denied, 899 P.2d 1231 (Utah 1995); *State* v. *Zaccaro*, 154 Vt. 83, 88–91, 574 A.2d 1256 (1990); *State* v. *McCrorey*, 70 Wash. App. 103, 110–11, 851 P.2d 1234, review denied, 122 Wash. 2d 1013 (1993); *State* v. *Rodgers*, 119 Wis. 2d 102, 114–15, 349 N.W.2d 453 (1984). For many of the reasons set forth in part I of this opinion, however, I believe that the cases that have rejected *Schneckloth* are better reasoned and, therefore, more persuasive with respect to the determination of whether consent voluntarily was granted in the inherently coercive context of a routine traffic stop.

For example, in *State* v. *Johnson*, 68 N.J. 349, 353–54, 346 A.2d 66 (1975), the New Jersey Supreme Court

rejected *Schneckloth* in construing the New Jersey constitution[11] and imposed a knowledge requirement for consent searches.[12] The court in *Johnson* observed that "[m]any persons, perhaps most, would view the request of a police officer to make a search as having the force of law. Unless it is shown by the [s]tate that the person involved knew that he had the right to refuse to accede to such a request, his assenting to the search is not meaningful. One cannot be held to have waived a right if he was unaware of its existence." Id., 354. The court therefore concluded that when "the [s]tate seeks to justify a search on the basis of consent it has the burden of showing that the consent was voluntary, an essential element of which is knowledge of the right to refuse consent." Id., 353–54. Although the court declined to impose a strict warning requirement in noncustodial settings, under the New Jersey constitution, the state must demonstrate that the defendant knew that he or she had the right to refuse to give consent.[13] Id.

Justice Morris Pashman dissented. Although he agreed with the majority in rejecting *Schneckloth* for purposes of the New Jersey constitution, he concluded that the standard that the majority adopted fell "short of what [was] necessary to protect the privacy rights of the consenting individual." Id., 359 (Pashman, J.,

---

[11] The court in *Johnson* reached this conclusion even though article I, paragraph seven, of the New Jersey constitution is virtually identical to the fourth amendment and previously had not been interpreted to provide greater protections than the fourth amendment. *State* v. *Johnson*, supra, 68 N.J. 353 n.2.

[12] *Johnson* involved the consent search of a residence, but its holding applies to consent searches of vehicles following a routine traffic stop, as well. See, e.g., *State* v. *Carty*, 170 N.J. 632, 639, 790 A.2d 903, modified on other grounds, 174 N.J. 351, 806 A.2d 798 (2002).

[13] A 1999 consent decree required the provision of warnings in New Jersey in all cases involving requests for consent to search following a routine traffic stop. Consent Decree in *United States* v. *New Jersey*, Civil No. 99-5970 (MLC) (D.N.J. December 30, 1999), available at http://www.state.nj.us/oag/jointapp.htm (last visited August 26, 2010).

dissenting). Recognizing that a person confronted with a request by the police for consent to search is likely to feel an element of compulsion due to the nature of the encounter, Justice Pashman concluded that the state should be obligated to establish that that person was aware of his right to withhold consent and that the police would respect his decision to withhold consent if he chose to do so. Id., 366 (Pashman, J., dissenting). Justice Pashman explained: "I find it inconceivable and incomprehensible to suppose that an individual can be said to have relinquished privileges as fundamental as those embodied in our constitutional guarantees against unreasonable searches and seizures unless it clearly and unmistakably appears that the subject of the search knew that he did not have to submit to the official request. *Schneckloth* . . . cannot withstand close scrutiny when it treats that knowledge as merely one factor to be considered in determining the validity of a consent search." Id., 367–68 (Pashman, J., dissenting).

Similarly, in *Penick* v. *State*, 440 So. 2d 547, 551 (Miss. 1983), the Mississippi Supreme Court concluded, contrary to the holding of *Schneckloth*, that a knowing waiver is necessary before consent may be deemed valid under the Mississippi constitution. Subsequently, the Mississippi Supreme Court clarified that the state is not required to prove that the defendant had knowledge of his or her right to refuse consent; instead, the defendant must show "impaired consent or some diminished capacity." (Internal quotation marks omitted.) *Graves* v. *State*, 708 So. 2d 858, 863 (Miss. 1997). Thus, "[i]f the defendant claims that his waiver was not knowledgeable, the burden is on him to raise the issue of lack of knowledgeable waiver. Knowledgeable waiver is defined as consent [when] the defendant knows that he or she has a right to refuse, being cognizant of his or her rights in the premises." Id., 864. Although this standard is not crystal clear, most courts have interpre-

ted it as requiring a knowledgeable waiver for all consent searches. See, e.g., *Commonwealth* v. *Cleckley*, supra, 558 Pa. 526.

In a context analogous to the temporary detention of the subject of a routine traffic stop, that is, a consensual investigative encounter,[14] the Hawaii Supreme Court has concluded that, under the Hawaii constitution, an investigating officer must inform the subject of a suspicionless encounter of his or her right to terminate the encounter.[15] See *State* v. *Kearns*, 75 Haw. 558, 570–72, 867 P.2d 903 (1994). In particular, the court concluded that "an investigative encounter can . . . be deemed 'consensual' [only] if (1) prior to the start of questioning, the person encountered was informed that he or she had the right to decline to participate in the encounter and could leave at any time, and (2) the person thereafter voluntarily participated in the encounter."[16] Id., 571.

[14] "The Supreme Court has said [that] there are three types of police-citizen encounters:

"(1) consensual encounters [that] do not implicate the [f]ourth [a]mendment; (2) investigative detentions [that] are [f]ourth [a]mendment seizures of limited scope and duration and must be supported by a reasonable suspicion of criminal activity; and (3) arrests, the most intrusive of [f]ourth [a]mendment seizures and reasonable only if supported by probable cause." (Internal quotation marks omitted.) *United States* v. *Brown*, 496 F.3d 1070, 1074 (10th Cir. 2007).

[15] The Hawaii Supreme Court characterized this police practice as a "walk and talk" investigation. (Internal quotation marks omitted.) *State* v. *Kearns*, 75 Haw. 558, 564, 867 P.2d 903 (1994). The court explained the practice as follows: "[T]he Honolulu [p]olice [department] . . . utilizes a walk and talk drug interdiction program in order to arrest drug smugglers and to seize any narcotics [that] they might be carrying on their persons or in their luggage. This walk and talk program does not employ any type of drug courier profile or require the officers to have a reasonable suspicion that a person may be in possession of illegal drugs . . . or . . . engaged in criminal activity. Instead, [officers] are trained to engage in consensual encounters whereby airline passengers are approached and in a conversational manner, [are] requested to consent to a search of their luggage or person." (Internal quotation marks omitted.) Id.

[16] It must be noted that, in *Kearns*, the court stated that, for purposes of a consent search, the police are *not* required to inform the person whose

In reaching its conclusion, the court observed that "[i]t is appropriate to require police officers who wish to question individuals without even a reasonable suspicion of criminal activity to ensure that the individuals are aware of their rights, because 'no system of criminal justice can, or should, survive if it comes to depend for its continued effectiveness on the citizens' abdication through unawareness of their constitutional rights.' *Escobedo* v. *Illinois*, 378 U.S. 478, 490 [84 S. Ct. 1758, 12 L. Ed. 2d 977] (1964) . . . . Moreover, 'if the exercise of constitutional rights will thwart the effectiveness of a system of law enforcement, then there is something very wrong with that system.' Id." *State* v. *Kearns*, supra, 75 Haw. 571. Indeed, in a subsequent case, *State* v. *Trainor*, 83 Haw. 250, 925 P.2d 818 (1996), the Hawaii Supreme Court explained that, "[i]n the context of walk and talk investigations[17] . . . [c]onsent . . . can hardly be viewed as either voluntary or intelligent if it

consent to search is sought that he or she has the right to refuse consent. *State* v. *Kearns*, supra, 75 Haw. 570. The court explained that, "[a]lthough this rule is appropriate in the context of searches [when] the scope of the search is generally well-defined and limited to a particular item or area at the time consent is given, it is not equally applicable to seizures"; id.; including the "walk and talk" encounter. The court, however, failed to offer any meaningful explanation as to why it is constitutionally necessary for the police to advise the subject of a "walk and talk" encounter of his or her right to refuse to speak to the police, on the one hand, and why it is not constitutionally necessary for the police to advise a person of his or her right to withhold consent to a search, on the other. Indeed, it is particularly difficult to ascertain the reason for any such distinction when, as in the present case, the police do not even have reasonable suspicion that the person from whom consent to search is sought is in possession of contraband. Thus, I disagree with the court in *Kearns* that its rationale for requiring the police to advise the subject of a "walk and talk" encounter is not equally applicable to a case involving a consent to search. Cf. *State* v. *Robinette*, supra, 80 Ohio St. 3d 244 ("The transition between detention and a consensual exchange can be so seamless that the untrained eye may not notice that it has occurred. The undetectability of that transition may be used by police officers to coerce citizens into answering questions that they need not answer, or to allow a search of a vehicle that they are not legally obligated to allow." [Internal quotation marks omitted.]).

[17] See footnote 15 of this opinion.

is obtained through such material nondisclosures as an officer's failure to advise the consenting individual . . . that the individual is free to go at any time." (Internal quotation marks omitted.) Id., 260.

Moreover, at least two state courts expressly have declined to apply *Schneckloth* in the context of a "knock and talk" search, which has been described as a "fashionable . . . alternative to obtaining a search warrant when police officers do not have sufficient probable cause to obtain a search warrant. What generally occurs is that several law enforcement officers accost a home dweller on the doorstep of his or her home and request consent to search that home. If an oral consent is given, the search proceeds. What is found by police officers may then form the basis for probable cause to obtain a search warrant and result in the subsequent seizure of contraband." (Internal quotation marks omitted.) *State* v. *Brown*, 356 Ark. 460, 466, 156 S.W.3d 722 (2004). Thus, in *State* v. *Ferrier*, 136 Wash. 2d 103, 115, 118–19, 960 P.2d 927 (1998), and *State* v. *Brown*, supra, 472–74, the Supreme Court of Washington and the Supreme Court of Arkansas, respectively, held that the use of the "knock and talk" investigative technique is unconstitutional when the police fail to inform the subject of his or her right to refuse consent.

In *Ferrier*, the Supreme Court of Washington concluded that, under article I, § 7, of the Washington constitution,[18] as a prerequisite for a valid knock and talk

---

[18] Article I, § 7, of the Washington constitution, Washington's analogue to the fourth amendment, provides: "No person shall be disturbed in his private affairs, or his home invaded, without authority of law." As the court in *Ferrier* observed, "[t]his provision differs from the [f]ourth [a]mendment in that [u]nlike the [f]ourth [a]mendment, [the Washington constitution] clearly recognizes an individual's right to privacy with no express limitations." (Internal quotation marks omitted.) *State* v. *Ferrier*, supra, 136 Wash. 2d 110.

search, the resident must be "advised, prior to giving her consent to the search of her home, that she could refuse to consent." *State* v. *Ferrier*, supra, 136 Wash. 2d 115. The court observed: "[A]ny knock and talk is inherently coercive to some degree. . . . [T]he great majority of home dwellers confronted by police officers on their doorstep or in their home would not question the absence of a search warrant because they either (1) would not know that a warrant is required; (2) would feel inhibited from requesting its production, even if they knew of the warrant requirement; or (3) would simply be too stunned by the circumstances to make a reasoned decision about whether or not to consent to a warrantless search." Id. To mitigate the coercive effects of the knock and talk, the court concluded that "officers who conduct the procedure [must] warn home dwellers of their right to refuse consent to a warrantless search. This would provide greater protection for privacy rights that are protected by the state constitution and would also accord with the state's [f]ourth [a]mendment burden of demonstrating, by clear and convincing evidence, that consent to a search was voluntarily given." Id., 116. The court further observed that "the only sure way to give [the right to refuse consent] substance is to require a warning of its existence. If we were to reach any other conclusion, we would not be satisfied that a home dweller who consents to a warrantless search possessed the knowledge necessary to make an informed decision. That being the case, the [s]tate would be unable to meet its burden of proving that a knowing and voluntary waiver occurred." Id., 116–17; see *State* v. *Brown,* supra, 356 Ark. 470–72 (adopting *Ferrier*, among other cases, for purposes of

article two, § 15,[19] of Arkansas constitution);[20] see also *State* v. *Brown, supra,* 466 ("[i]t is the intimidation effect of multiple police officers appearing on a home dweller's doorstep, sometimes in uniform and armed, and requesting consent to search without advising the home dweller of his or her right to refuse consent that presents the constitutional problem").

Although it is axiomatic that the "physical entry of the home is the chief evil against which the wording of the [f]ourth [a]mendment is directed"; *United States* v. *United States District Court,* 407 U.S. 297, 313, 92 S. Ct. 2125, 32 L. Ed. 2d 752 (1972); the analysis of the coercive effect of the knock and talk investigative procedure involved in the foregoing cases also is applicable to a request by the police for consent to search following a routine traffic stop because of the inherently coercive nature of the latter type of encounter. Indeed, the Wyoming Supreme Court has observed that the atmosphere surrounding a traffic stop is more coercive than that attendant to the knock and talk encounter, stating that "the standards [that have been] . . . applied in [cases involving] premises searches—where the individual is on his or her own premises and likely

---

[19] Article two, § 15, of the Arkansas constitution provides: "The right of the people of this State to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated; and no warrant shall issue, except upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or thing to be seized." As the court in *Brown* observed, this provision is almost identical to the fourth amendment to the United States constitution. *State* v. *Brown, supra,* 356 Ark. 467.

[20] In reaching its conclusion, however, the court in *Brown* distinguished its automobile search jurisprudence. See *State* v. *Brown, supra,* 356 Ark. 468. Specifically, the Arkansas Supreme Court previously had determined that, with respect to automobile searches, the protections of the Arkansas constitution are coterminous with those of the fourth amendment to the United States constitution. Id. With respect to the search of a home, however, the Arkansas Supreme Court previously had determined that the Arkansas constitution provides greater protection than the federal constitution. See id., 468–70.

feels freer to turn law enforcement away—[are] even more applicable in the context of roadside vehicle searches—where the traveler has been stopped for a traffic offense and is not free to leave." *O'Boyle* v. *State*, 117 P.3d 401, 412 (Wyo. 2005).

As in *O'Boyle*, several courts have taken notice of the coercion inherent in the routine traffic stop in crafting rules applicable to that factual scenario. For example, in *State* v. *Carty*, 170 N.J. 632, 790 A.2d 903, modified, 174 N.J. 351, 806 A.2d 798 (2002), the court observed that, "[i]n the context of motor vehicle stops, [in which] the individual is at the side of the road and confronted by a uniformed officer seeking to search his or her vehicle, it is not a stretch of the imagination to assume that the individual feels compelled to consent." Id., 644. Indeed, after analyzing scholarly articles and empirical data, the court observed that (1) detained motorists give consent approximately 95 percent of the time it is sought even though, in New Jersey, following the decision of the New Jersey Supreme Court in *State* v. *Johnson*, supra, 68 N.J. 349, police in New Jersey are required to inform motorists of their right to withhold consent, and (2) the vast majority of motorists subjected to consent searches following routine traffic stops are not charged with any wrongdoing. *State* v. *Carty*, supra, 645. As a result, the court in *Carty* concluded that, despite its holding in *Johnson*, "consent searches following valid motor vehicle stops are either not voluntary because people feel compelled to consent for various reasons, or are not reasonable because of the detention associated with obtaining and executing the consent search."[21] Id., 646.

---

[21] Accordingly, the New Jersey Supreme Court engrafted onto *Johnson* an additional requirement, namely, "that consent searches following a lawful stop of a motor vehicle should not be deemed valid under *Johnson* unless there is reasonable and articulable suspicion to believe that an errant motorist or passenger has engaged in, or is about to engage in, criminal activity." *State* v. *Carty*, supra, 170 N.J. 647. The court reasoned that this requirement "serves to validate the continued detention associated with the search. It

Although other courts have not expressly adopted the rule articulated in *Carty*, they nevertheless have identified the coercive effects of a request for consent to search following a routine traffic stop. For example, in *Brown* v. *State*, supra, 182 P.3d 624, the Alaska Court of Appeals observed that "motorists who have been stopped for traffic infractions do not act from a position of psychological independence when they decide how to respond to a police officer's request for a search. Because of the psychological pressures inherent in the stop, and often because of the motorist's ignorance of [his or her] rights, large numbers of motorists—guilty and innocent alike—accede to these requests." Id., 626. The court in *Brown* further observed that, "[i]n all but exceptional cases . . . consent searches [following routine traffic stops] are held to be valid under the [f]ourth [a]mendment. The federal law in this area is premised on the assumption that, all things being equal, a motorist who does not wish to be subjected to a search will refuse consent when the officer seeks permission to conduct a search. But experience has shown that this assumption is wrong." Id., 630. The court concluded: "Motorists are giving consent in such large numbers that it is no longer reasonable to believe that they are making the kind of independent decision that lawyers and judges typically have in mind when they use the phrase 'consent search'." Id., 631; see also *Commonwealth* v. *Strickler*, 563 Pa. 47, 73, 757 A.2d 884 (2000) ("[the] element of coercion [inherent in all interactions between a uniformed police officer and a citizen] is obviously enhanced when police actually detain a citizen, albeit lawfully, for some period of time, by means of

also serves the prophylactic purpose of preventing the police from turning a routine traffic stop into a fishing expedition for criminal activity unrelated to the stop." Id.; see also *State* v. *Fort*, 660 N.W.2d 415, 418–19 (Minn. 2003) (as matter of state constitutional law, police may not question subject of routine traffic stop regarding matters unrelated to that stop without reasonable and articulable suspicion).

a traffic or similar stop"); *Commonwealth* v. *Strickler*, supra, 74 (in determining whether encounter following conclusion of routine traffic stop is consensual, courts cannot "discount the fact that there remains at work some pertinent psychological dynamic based [on] the relative positions of authority as between the officer and a citizen-subject, and an immediately-preceding exercise of the officer's authority").

Finally, although many state courts have adopted the *Schneckloth* standard under their respective state constitutions, I am more persuaded by the thoughtful dissenting opinions that have been issued in many of those cases. For example, in *Commonwealth* v. *Cleckley*, supra, 558 Pa. 517, the Supreme Court of Pennsylvania concluded that article I, § 8, of the Pennsylvania constitution does not require the subject of a consent search to be informed of his or her right to refuse to consent. See id., 527. The court, relying on (1) the fact that most states apply *Schneckloth* for purposes of their own constitutions, and (2) the lack of local policy issues indicating that a departure from the federal standard is needed; id., 526–27; concluded that "the federal voluntariness standard as enunciated in *Schneckloth* adequately protects the privacy rights obtained under [a]rticle I, [§] 8 of [the Pennsylvania] constitution." Id., 527.

In his dissent, Justice Russell M. Nigro concluded "that when police seek consent to perform an otherwise unconstitutional search, they should be required under . . . the Pennsylvania constitution to expressly advise the subject of the search that he or she has the right to refuse to give consent and that any refusal will be respected." Id., 528 (Nigro, J., dissenting). In reaching this conclusion, Justice Nigro stated that "the majority . . . ignore[d] the practical impact that a police officer's request for consent to search has on the average citizen." Id., 530 (Nigro, J., dissenting). Relying on both

*State* v. *Johnson,* supra, 68 N.J. 349, and Justice Marshall's dissent in *Schneckloth,* Justice Nigro concluded that, "[i]f a person believes [that] he has no choice but to consent upon an officer's request, then that person's consent cannot be said to have been given voluntarily, much less knowingly and intelligently. The safeguard advocated by [the] [a]ppellant—a simple statement by the police that the subject of the search has the lawful right to withhold consent to search—would serve to protect not only those who are unaware of their rights, but also those who, although perhaps aware of their rights, become too intimidated to refuse what can readily be perceived as an official demand." *Commonwealth* v. *Cleckley,* supra, 558 Pa. 530–31 (Nigro, J., dissenting). Lastly, Justice Nigro rejected the majority's assertion that the commonwealth of Pennsylvania would be prejudiced if it was required to inform suspects of their rights before seeking consent to search: "There is . . . little reason to believe, as the *Schneckloth* [c]ourt apparently did, that the requirement of informed consent would reduce the number of consent searches obtained by the police. It has not occurred with the [f]ifth [a]mendment waiver even in the wake of *Miranda,* and there is no reason to expect [that] it will occur in the face of the requirement to inform of the right to refuse a consent to search. Many cases hinge on confessions, despite the *Miranda* warning requirement. Although somewhat different considerations are often present in a confession situation, such as the prior arrest of the defendant, and thus more than mere suspicion exists at that point, there is little cause to believe that warnings of the right to refuse to consent to search will, in any great degree, cause a vast reduction in the number of consent searches." (Internal quotation marks omitted.) Id., 531 (Nigro, J., dissenting).

Likewise, in *State* v. *Flores,* supra, 280 Or. 273, the Supreme Court of Oregon concluded that the Oregon

constitution provides no greater protection than the federal constitution for purposes of consent searches.[22] See id., 282. That case, in which the court implicitly overruled a prior Oregon Supreme Court decision that predated *Schneckloth* and required the police to inform the subject of the encounter of his or her right to withhold consent; see id., 276–77, 281; was predicated on (1) the reasoning of *United States* v. *Watson*, 423 U.S. 411, 96 S. Ct. 820, 46 L. Ed. 2d 598 (1976);[23] see *State* v. *Flores*, supra, 281; (2) the absence "of any unique local conditions, such as widespread police misconduct infringing suspects' rights against unreasonable searches and seizures, that would require a different rule under the state constitution"; id.; and (3) the perceived need for a "uniform" standard, "particularly when state and law enforcement agencies collaborate . . . ."[24] Id.

In his dissent, Justice Hans A. Linde noted the then existing criticism of *Schneckloth* and explained that the

[22] Specifically, the defendant, Armando Zamora Flores, contended that his consent to search two lockers at a bus station was invalid because the police had failed to inform him of his right to refuse to consent to the search. *State* v. *Flores*, supra, 280 Or. 275–76. Flores was in custody when he gave consent to search. See id., 275. Although the court in *Schneckloth* did not address whether its rationale extended to cases in which a suspect is in custody, in *United States* v. *Watson*, 423 U.S. 411, 424–25, 96 S. Ct. 820, 46 L. Ed. 2d 598 (1976), the United States Supreme Court concluded that it did under the circumstances of that case.

[23] See footnote 22 of this dissenting opinion.

[24] The Supreme Court of Oregon addressed the merits of the state constitutional claim of the defendant, Armando Zamora Flores, only briefly, concluding that "requiring proof that a criminal suspect was aware of his right to refuse consent would be tantamount to requiring a police warning similar to the *Miranda* warning. . . .

"The application of [*Miranda*] to searches and seizures can . . . be justified [only] on the basis that there is the same necessity for prophylaxis because of similar abuses by the police in obtaining consents to searches and seizures." (Internal quotation marks omitted.) *State* v. *Flores*, supra, 280 Or. 281–82. The court, however, did not analyze the reasoning of either *Schneckloth* or *Watson*.

reasoning of *Schneckloth* was "rejected . . . by the experts who prepared the [M]odel Code of Pre-Arraignment Procedure for the American Law Institute, and by the [American Law Institute] in approving that code. The [American Law] [I]nstitute adopted the position that before undertaking a search on the basis of consent, an officer must inform the individual whose consent is sought that he need not consent and that anything found may be used as evidence . . . . [I]n short, the [American Law] [I]nstitute would treat [the] waiver of the protection of a search warrant the same as [the] waiver of the right to remain silent."[25] Id., 285–86 (Linde, J., dissenting). Justice Linde also observed that, as the drafters of the Model Code of Pre-Arraignment Procedure explained in its accompanying commentary, there is a greater need for warnings in the context of a consent search than in the context of a custodial interrogation because, "by the consent search the officer is seeking to short-circuit another means available to him—the use of a warrant—to obtain evidence. No such alternative exists with respect to information sought by interrogation. It seems far less justifiable to omit the protection of the warning when, by the very act of seeking consent, the officer is depriving the person from whom it is sought of the protective screening

---

[25] "[T]he reporter for the search and seizure sections of the Model Code of Pre-Arraignment Procedure . . . commented [further] on *Schneckloth* as follows: 'It seems unlikely that there is any greater knowledge of one's right to refuse a search than the right to silence.' He goes on to explain that a choice based on a wholly erroneous factual belief may not be the result of a will that has been overborne, but neither is it an understanding choice.

" 'In consent searches, the police have full knowledge that the person from whom they are seeking consent is under no obligation to give it. The right to refuse is a fact crucially pertinent to an understanding consent and, if there is the slightest doubt that the person in question is not aware of his right, and no such information is given [to] him, the police are eliciting consent on the basis of withheld information. It is hard to describe such conduct as other than deceptive, or the [c]ourt's decision [in *Schneckloth*] as other than retrograde.' " *State* v. *Rodgers*, supra, 119 Wis. 2d 119–20 n.3 (Abrahamson, J., dissenting).

of judicial involvement in the issuance of the warrant."
(Internal quotation marks omitted.) Id., 286 (Linde, J.,
dissenting). Declining to adopt fully the American Law
Institute's position, Justice Linde was persuaded by the
approach that the New Jersey Supreme Court had taken
in *Johnson* and concluded that warnings are not consti-
tutionally required as long as the state could show that
consent was given with the knowledge that it could be
withheld. Id., 287–88 (Linde, J., dissenting). Dissenting
justices of other state courts also have recognized the
inherently coercive nature of the encounter between a
police officer and motorist subject to a traffic stop. See,
e.g., *Salmeron* v. *State*, 280 Ga. 735, 739, 632 S.E.2d
645 (2006) (Sears, C. J., dissenting) (disagreeing with
decision of majority not to impose reasonable suspicion
requirement for consent searches and noting that
"[t]raffic stops are inherently time-consuming and coer-
cive events providing ample opportunity for interroga-
tions" and that "[m]ost citizens naturally feel compelled
to submit to any request from a police officer who has
already seized them for some other legal violation");
*State* v. *Akuba*, 686 N.W.2d 406, 426 (S.D. 2004) (Sabers,
J., dissenting) ("An honest appraisal of the typical traffic
stop must [lead] to the conclusion that it is an inherently
coercive situation in which very few citizens understand
their constitutional protections. . . . A citizen pulled
over to the side of the road and brought to a trooper's
car would not feel free to terminate the encounter and
carry on with their business. . . . Therefore, the
encounter is inherently coercive and an officer should
be required to meet a threshold evidentiary standard
before requesting such consent." [Citations omitted;
internal quotation marks omitted.]).

Ultimately, I am not convinced by the reasoning of
those courts that have adopted *Schneckloth* as the gov-
erning standard for purposes of their state constitu-
tions. Indeed, those courts generally have not engaged

in any substantive analysis of the rationale underlying the court's holding in *Schneckloth*. Moreover, they simply do not address the pervasive criticism that has been directed at *Schneckloth*.[26] As Justice Linde observed in his dissenting opinion in *Flores*, the extent of the protections of our constitution "is not answered by the [decision] in *Schneckloth* . . . . It cannot be answered by the Supreme Court of the United States but only by [the Supreme Court of Oregon]. Obviously, if [this] case had arisen before *Schneckloth* . . . this court would have had to form its own judgment. It does not escape that responsibility after *Schneckloth*." (Citations omitted.) *State* v. *Flores*, supra, 280 Ore. 285 (Linde, J., dissenting). For this reason, I am persuaded by the dissenting opinions in those cases because I believe that they properly account for the coercion inherent in routine traffic stops that was overlooked by the majority in *Schneckloth*.

## IV

## ECONOMIC AND SOCIOLOGICAL CONSIDERATIONS

In my view, these considerations support the conclusion that the police should be required to advise a motorist that he or she has a right to withhold consent

---

[26] For example, in *State* v. *Cox*, supra, 171 S.W.3d 174, the court adopted *Schneckloth* as the governing test under the Tennessee constitution, predicated on the following analysis: "In the case of consent searches . . . the totality of the circumstances test adequately balances the government's interest in pursuing criminal investigations against the citizen's right to be free from unreasonable searches and seizures. The very nature of a consent search differs from the other exceptions to the warrant requirement; a subject approached regarding a consent search is presumed free to decline the request. . . .

"*Schneckloth* remains the majority rule despite the occasional efforts to scuttle it. Accordingly, [the court] decline[s] to impose a requirement that the subject be informed of the right to refuse consent." Id., 183–84; see also *Henry* v. *State*, supra, 621 P.2d 4 n.9 (adopting *Schneckloth* because "the formal waiver requirements appropriate in a trial setting or during custodial interrogation would unjustifiably hamper proper police investigation").

to search following a routine traffic stop. Public trust in the police is likely to be enhanced if they are required to provide motorists with such an advisement, and the empirical evidence indicates that the vast majority of motorists who are warned of their right to withhold consent will continue to grant consent despite the warning. Indeed, it is especially important that a motorist be advised of his or her right to refuse consent when, as in the present case, the police officer lacks even a reasonable and articulable suspicion that the vehicle contains contraband; in such circumstances, a request for consent is no more than a fishing expedition pursuant to which the police are able to take advantage of the coercive nature of the encounter and, in many cases, the subject's lack of knowledge that he or she has the legal right to withhold consent without any resultant adverse consequences.

## V

## CONCLUSION

Upon review of the *Geisler* factors, I conclude that article first, § 7, of the Connecticut constitution provides greater protection than the federal constitution with respect to consent searches undertaken in connection with routine traffic stops. For the foregoing reasons, I am not persuaded by the analysis of *Schneckloth* and its progeny; the view that the police must inform motorists of their right to withhold consent, although the minority position, is considerably more persuasive. Indeed, by and large, those courts that have adopted the standard articulated in *Schneckloth* have failed to engage in any real analysis of the rationale underlying the court's holding in that case. Cf. *State* v. *Thompson,* supra, 284 Kan. 779–80 (observing that scholarly criticism of *Schneckloth* "is valid in many respects" and that, if the court were free to adopt different rule, it "would consider a different paradigm," but also noting

that it was not free to depart from *Schneckloth* in light of prior Kansas decisions concluding that Kansas constitution's analogue to fourth amendment was coextensive with federal constitution). I therefore am convinced that, for purposes of article first, § 7, of the state constitution, a motorist's consent to search following a routine traffic stop should not be deemed voluntary unless the motorist has been informed of his or her right to withhold consent.[27] In essence, I see no reason for this court to abandon its prior precedent concerning the standard for an effective waiver of a constitutional right. "[W]e have adopted the definition of a valid waiver of a constitutional right as the intentional relinquishment or abandonment of a known right." (Internal quotation marks omitted.) *State* v. *Gore*, 288 Conn. 770, 776, 955 A.2d 1 (2008); accord *State* v. *Ouellette*, 271 Conn. 740, 752, 859 A.2d 907 (2004). Having repeatedly characterized this standard as a "strict" one; *State* v. *Gore*, supra, 776; accord *State* v. *Ouellette*, supra, 752; we also have explained that "[a]n effective waiver presupposes full knowledge of the right or privilege allegedly waived and some act done designedly or knowingly to relinquish it. . . . Moreover, the waiver must be accomplished with sufficient awareness of the relevant circumstances and likely consequences." (Citations omitted; internal quotation marks omitted.) *State* v. *Ramos*, 201 Conn. 598, 603, 519 A.2d 9 (1986); cf. *State* v. *Madera*, 210 Conn. 22, 48, 554 A.2d 263 (1989) ("[c]ourts

[27] It may be argued, as some courts have concluded, that the state should not be required to establish that the police advised the subject of the consent search of his or her right to refuse consent, as long as the state can prove that the subject actually knew that consent could be withheld. I do not agree with this approach because it is important that the subject be made aware that the police are prepared to honor the subject's decision to refuse consent and that no adverse consequences will befall the subject upon such a refusal. Unless the police warn the subject of his or her right to refuse consent, there remains the risk that the subject will feel compelled to agree to the search out of concern for how the police will react to a decision to withhold consent.

indulge every reasonable presumption against waiver of fundamental constitutional rights . . . [and] do not presume acquiescence in the loss of fundamental rights" [internal quotation marks omitted]).

Applying these principles to the present case, I conclude that the defendant was not properly informed of his right to withhold consent. Although the state asserts that the defendant volunteered permission to search before consent was sought, and, consequently, there was no need for Morgan to inform the defendant of his right to withhold consent, I agree with the defendant that he reasonably construed Morgan's inquiry about whether the vehicle contained anything illegal as demonstrating Morgan's interest in searching the vehicle. Indeed, prior to asking the defendant about the contents of his vehicle, Morgan asked him whether he had anything illegal on his person; when the defendant responded in the negative, Morgan patted him down. In such circumstances, the defendant reasonably would have believed that Morgan intended to search the vehicle—an intent that Morgan readily and candidly acknowledged.[28] Thus, because the defendant was not informed of his right to refuse to consent to a search of his vehicle, I respectfully dissent.

---

[28] As I previously indicated, I agree with the majority's conclusion that the record is inadequate to review the defendant's separate claim that the patdown search was illegal. The fact that Morgan conducted a patdown search of the defendant, however, is relevant to the issue of whether the defendant reasonably would have considered Morgan's subsequent inquiry regarding the presence of contraband in the vehicle as indicative of Morgan's intent to search the vehicle.